**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DRAGON INTELLECTUAL PROPERTY, LLC,<br><br>    Plaintiff,<br><br>  v.<br><br>AT&T SERVICES, INC.,<br><br>    Defendant. | C. A. No. 13-2061-RGA |
| DRAGON INTELLECTUAL PROPERTY, LLC<br><br>    Plaintiff,<br><br>  v.<br><br>DIRECTV, LLC<br><br>    Defendant. | C.A. No. 13-2065 RGA |
| DRAGON INTELLECTUAL PROPERTY, LLC,<br><br>    Plaintiff,<br><br>  v.<br><br>DISH NETWORK L.L.C.,<br><br>    Defendant. | C.A. No. 13-2066 RGA |
| DRAGON INTELLECTUAL PROPERTY, LLC,<br><br>    Plaintiff,<br><br>  v.<br><br>SIRIUS XM RADIO INC.,<br><br>    Defendant. | C.A. No. 13-2067 RGA |

**DRAGON INTELLECTUAL PROPERTY, LLC'S**
***CORRECTED* OPPOSITION TO**
**MOTION TO DECLARE THE CASE EXCEPTIONAL**
**PURSUANT TO 35 U.S.C. § 285**

## TABLE OF CONTENTS

Page

I. THE CLAIM THAT DRAGON FAILED TO CONDUCT AN ADEQUATE PRE-FILING INVESTIGATION IS UNFOUNDED AND UNSUBSTANTIAT-ED ................................................................................................................. 1

II. DISH AND SIRIUS ARE ESTOPPED TO ARGUE A DISCLAIMER OF "CONTINUOUS RECORDING DEVICES." .................................................... 2

    A. DISH's and Sirius's IPR Position Is Inconsistent With Their Present Motions ....................................................................................................... 2

        1. Goldwasser Is A "Continuous Recording Device." ................................ 3

        2. Yifrach Is A "Continuous Recording Device." ....................................... 4

        3. DISH, Sirius, And The Board Relied On "Continuous Recording Devices." ......................................................................................... 5

    B. DISH And Sirius Have Acted In Bad Faith ................................................ 6

    C. Denial Of The Motions Is Tailored To The Threat ..................................... 7

III. EACH OF DRAGON'S CLAIM CONSTRUCTION POSITIONS WAS WELL-FOUNDED ...................................................................................................... 7

    A. "Broadcast Program Information" And "The Broadcast Program Information" ................................................................................................... 7

    B. The Failed "Inconsistency" Argument ........................................................ 8

        1. Infringement Contentions ....................................................................... 8

        2. Acknowledging The Use Of The Definite Article ................................... 9

        3. The Mistaken "Antecedent" Argument ................................................. 10

    C. The Defendants' Reliance On AT&T's Non-Infringement Argument In Sheep's Clothing ........................................................................................ 16

    D. The "Record Key" And Beginning "A Recording." ................................... 19

        1. Claim Language: "A Recording," Not "Recording." ............................. 19

        2. The Importation Dispute: "Basic Operation." ...................................... 21

        3. Clarifying Amendment: The Three "Hows." ......................................... 25

    E. "To Begin A Recording By Initiating Storage Of The Broadcast Program Information In Said Memory Unit" ........................................................... 26

IV. THE DEFENDANTS FAILED TO PRESENT EVIDENCE SUFFICIENT TO SUPPORT A DISCLAIMER FINDING ........................................................... 28

V. THERE IS NO PROVEN OR PROVABLE DISCLAIMER OF "CONTINUOUS RECORDING DEVICES." ........................................................................... 30

# TABLE OF CONTENTS
(continued)

**Page**

A.  The Sata Reference ................................................................ 30

B.  The Defendants' Disclaimer Argument Oversimplifies The Comments Made During Prosecution ............................................ 31

C.  Foundations: The September 9, 1993 Response ................................. 32

D.  The February 2, 1994 Response And The Idea Of "Graceful Recovery." .......... 33

E.  The April 28, 1994 Preliminary Amendment ..................................... 35

F.  The May 19, 1995 Response ..................................................... 41

G.  The November 15, 1995 Response ............................................... 43

H.  Subsequent Prosecution History and Allowance ................................. 46

VI.   THE DEFENDANTS' MISREPRESENTATION OF THE IPR PROCEEDINGS........ 49

VII.  DISH IS NOT ENTITLED TO IPR ATTORNEY FEES ........................... 52

VIII. THE DEFENDANTS IDENTIFY NO OTHER INDICIA OF EXCEPTIONALITY ............................................................................... 54

IX.   CONCLUSION ............................................................... 56

AT&T, DirecTV, DISH, and Sirius claim that this case is "exceptional" because the Court found that "continuous recording devices" were disclaimed during prosecution of the '444 Patent. The defendants also attempt to portray claim construction positions argued by Dragon as unreasonable, but arguments they attribute to Dragon were never made, and nothing Dragon said was anything less than fully supported by the language of the claims and the intrinsic record.

The defendants offer their disclaimer-based argument despite the fact that DISH and Sirius sought and obtained a decision from the Patent Trial and Appeal Board invalidating the '444 Patent on the basis of a combination of "continuous recording devices." This success means that DISH and Sirius are estopped to claim that Dragon was wrong to argue that "continuous recording devices" can fall within the claims of the '444 Patent, much less to argue that Dragon's position was unreasonable. The argument made by DISH and Sirius, and the Board's adoption of the argument, also show that Dragon's contention that "continuous recording devices" can fall within the claims of the '444 Patent is not unreasonable. The defendants' motions should be denied.

## I.     THE CLAIM THAT DRAGON FAILED TO CONDUCT AN ADEQUATE PRE-FILING INVESTIGATION IS UNFOUNDED AND UNSUBSTANTIATED.

Although it did not file a timely Rule 11 motion, DISH and Sirius argue that this case is exceptional because Dragon did not conduct an "adequate pre-filing investigation." It is difficult to fit this argument within the usual section 285 analysis, and DISH and Sirius offer nothing at all to substantiate the pre-suit investigation argument.

The defendants point to no information revealed during the relatively short life of this case that was not known before Dragon filed suit. The defendants do not claim that Dragon was unaware of anything that a better or different investigation would have revealed. In short, the defendants offer no support of any kind for their pre-suit investigation arguments. It is not

enough to establish an inadequate pre-suit investigation to say that Dragon disagrees with the defendants, or to note that the Court ruled against Dragon, but the defendants do nothing more.[1]

## II. DISH AND SIRIUS ARE ESTOPPED TO ARGUE A DISCLAIMER OF "CONTINUOUS RECORDING DEVICES."

The doctrine of judicial estoppel prevents a party that benefits by taking a position in a legal proceeding from taking an inconsistent position in a later proceeding. *See generally Scarano v. Central R. Co.*, 203 F.2d 510, 513 (3d Cir. 1953). Judicial estoppel may be imposed if three conditions are satisfied: (1) the party to be estopped is asserting a position that is irreconcilably inconsistent with one he or she asserted in a prior proceeding; (2) the party changed his or her position in bad faith, *i.e.*, in a culpable manner threatening to the court's authority or integrity; and (3) the use of judicial estoppel is tailored to address the affront to the court's authority or integrity. *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 777-78 (3d Cir. 2001). "Bad faith" in this context does not require subjective bad faith. It is sufficient that a party asserted an inconsistent position that was accepted by a court or agency. *Id.* at 778. *See also Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. GMC*, 337 F.3d 314, 319-20 (3d Cir. 2003).

### A. DISH's and Sirius's IPR Position Is Inconsistent With Their Present Motions.

DISH and Sirius assert the disclaimer found by the Court — all "continuous recording devices" — as a basis for finding unreasonable Dragon's contention that "continuous recording devices" can fall within the claims of the '444 Patent, but they successfully argued before the Patent Trial and Appeal Board that the '444 Patent is invalid over a combination of "continuous

---

[1] DISH and Sirius mention in footnotes that Dragon unremarkably objected to producing or describing pre-suit investigation materials on the basis of the attorney-client privilege and the work product doctrine. DISH Br. at 12 n.7; Sirius Br. at 13 n.9. Recognizing the appropriateness of Dragon's objections, neither defendant filed a motion to compel.

recording devices."  DISH's and Sirius's arguments before the Board and this Court are obvious-obviously irreconcilably inconsistent.

DISH's petition for *inter partes* review of the '444 Patent asserted ten alleged bases of invalidity.  Ex.[2] I (DISH IPR Petition) at pp. A0874-A0936.[3]  The Board instituted trial on two grounds, one of which alleges obviousness based on a combination of U.S. Patent 5,241,428 ("Goldwasser") and U.S. Patent 5,126,982 ("Yifrach").  Ex. R (Initial Freedman Decl.[4]) at ¶¶14-15; Ex. J (DISH IPR Decision) at pp. A0956.  On June 15, 2016, the Board accepted DISH's and Sirius's arguments and held the challenged claims of the '444 Patent unpatentable in light of the combination of the "continuous recording devices" cited by DISH and Sirius. Supplemental Freedman Decl. at ¶¶ 6-11.

### 1. Goldwasser Is A "Continuous Recording Device."

DISH and Sirius relied on an embodiment described in Goldwasser as the "random access embodiment."  Ex. R at ¶¶ 19- 21.  Figure 4 of Goldwasser depicts an algorithm that describes the "control" of the storage and retrieval of information.  *Id.* at ¶¶ 22-24.  The algorithm shows a "continuous" loop of write operations.  There are no interrupts associated with the write/record operation, and it occurs "continuously."  "This process allows data representing the video signal to be continuously stored."  *Id.* at ¶ 24.

DISH's expert, Anthony Wechselberger, acknowledged that the control process described in Goldwasser Figure 4 describes a "continuous" recording process.  *See* Ex. L (Wechselberger Depo.) at pp. A1017-A1021; Ex. R  at ¶ 27.  Goldwasser is a "continuous recording device," as

---

[2] "Ex." refers to Exhibits in the Evidentiary Appendix

[3] Sirius later joined the DISH IPR.

[4] "Initial Freedman Declaration" refers to the March 4, 2016 Declaration of Immanuel Freedman, filed in connection with Dragon's opposition to the Rule 11 motions filed by AT&T, DirecTV and other defendants.  D.I. 152 (*Dragon Intellectual Property, LLC v. AT&T Services, Inc.*, C.A. No. 13-cv-02061-RGA).

the Court used that term, in finding a disclaimer of "continuous recording devices."  In its final element, Goldwasser Claim 1 includes a "means for controlling operation of said means for storing and said means for playback such that said converted signal can be continuously stored on said storage medium during either continuous or intermittent reconstitution [playback] of the stored signal as a video signal . . . ."  Ex G. (Goldwasser) at 9:34-58; Ex. R  at ¶¶ 25-26.  A person having ordinary skill in the art would understand Goldwasser to be a "continuous recording device" of the type found by the Court to have been broadly disclaimed during prosecution.  *Id.* at ¶¶ 28-30.

Goldwasser does not disclose a "keyboard having a record key and a playback key," and it does not disclose the unique "control circuit" of the '444 Patent.  Rather, Goldwasser discloses a "control panel" to which an address controller is responsive, but no details of the "control panel" are disclosed.  In the IPR, DISH and Sirius did not contend otherwise, and sought to combine keys from Yifrach to supplement the teaching of Goldwasser.

## 2.    Yifrach Is A "Continuous Recording Device."

Yifrach, like Goldwasser, is a continuous recording device.  Yifrach describes an audio device that uses a "cyclic storage device" as a "buffer" to continuously store content that is received by the device.  Ex. R (Initial Freedman Decl.) at ¶¶ 31-40; *see also* Ex. U (Final Written Decision) at p. A1222.  Yifrach describes its "buffer system" and "cyclic storage device" as "a digital storage device, such as a RAM (random access memory) having a storage capacity **for continuously storing the audio signals** last outputted by the demodulator 13 over a predetermined time interval."  Ex. F (Yifrach) at 3:3-10 (emphasis added); see also *id.* at 4:46-60.  A person having ordinary skill in the art would understand Yifrach to disclose a "continuous recording device" of the type the Court found disclaimed.  Ex. R  at ¶ 40; Supplemental Freedman Decl. at ¶¶ 11-12.

### 3. DISH, Sirius, And The Board Relied On "Continuous Recording Devices."

The Board found that "one of ordinary skill in the art would have been motivated to implement Goldwasser's user control panel with buttons as described in Yifrach." Ex. U at p. A1224. When it accepted DISH's and Sirius's argument that the '444 Patent is invalid over a combination of Goldwasser and Yifrach, the Board determined that "continuous recording devices" were not disclaimed during prosecution of the '444 Patent. A patent cannot be invalid over a combination of "continuous recording devices" if "continuous recording devices" are not within the scope of its claims. Having obtained an unpatentability decision based on the idea that "continuous recording devices" fall within the scope of the claims, DISH and Sirius are estopped to argue that "continuous recording devices" were disclaimed, or that it was wrong for Dragon to argue, as DISH and Sirius did, that they do.

DISH, Sirius, AT&T, and DirecTV chose not to address the inconsistent positions taken by DISH and Sirius and the Board's adoption of those positions. During the Rule 11 proceedings, the Winston Defendants sought to brush aside Dragon's evidence of the arguments made by DISH and Sirius by claiming that there is no inconsistency because the idea that a patent cannot be invalidated by devices that do not fall within its claims does not apply if the devices are asserted on obviousness, rather than anticipation, grounds. The Winston Defendants cited no authority in support of this argument, and none exists.

The Federal Circuit and its predecessor court have long held that a proposed obviousness combination that would change the fundamental or "basic principle" under which a primary reference was designed to operate is not a combination that would render an invention obvious. *In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984); *In re Ratti*, 270 F.2d 810, 813 (C.C.P.A. 1959); MPEP § 2143.VI. ("The Proposed Modification Cannot Change The Principle Of

Operation Of A Reference"). Any proposal to modify Goldwasser in a way that disturbed its "intended purpose" would have been futile, and DISH never proposed any such modification.

The Board could not have combined the Goldwasser "continuous recording device" with the Yifrach "continuous recording device" if to do so would have changed the principle of operation of either device. There can be no doubt that it is fundamental to both devices that they record "continuously." Ex. R) at ¶¶ 16, 27, 33 ; Ex. G  at 9:34-58; Ex. L  at pp. A1017-A1021; Ex. F  at 4:46-60. DISH, Sirius, AT&T, DirecTV and the other defendants have never contended otherwise.

In the reply in support of the Rule 11 motion, AT&T and DirecTV took a different approach, asking the Court not to consider the positions DISH and Sirius took in the IPR because Dragon and its lawyers did not rely on the evidence establishing that the DISH IPR was based on "continuous recording devices" before Dragon filed suit. D.I.[5] 162  at pp. 8-9. This mistaken argument turned out to be inconsequential when the motions were denied on other grounds, but it makes clear that AT&T and DirecTV had no answer on the merits then and, with seven months to think about the issue, the defendants do not even attempt a response.

### B.    DISH And Sirius Have Acted In Bad Faith.

Under Third Circuit law, bad faith is established when a party takes a position inconsistent with that presented to, and accepted by, another court or agency in a manner that threatens the integrity of the court. *Montrose Med. Grp.*, 243 F.3d at 778; *Dam Things from Den. v. Russ Berrie & Co.*, 290 F.3d 548, 559 n.16 (3d Cir. 2002). DISH and Sirius do not argue that the positions they took in the IPR proceedings are consistent with the arguments in their current motions. Allowing DISH and Sirius to obtain an invalidity finding based on continuous

---

[5] Dragon Intellectual Property, LLC v. AT&T Services, Inc., CA No. 13-cv-02061-RGA.

recording devices before the Board, and then an exceptional case determination based on an in-inconsistent position would threaten the integrity of this Court and make a mockery of the judicial system.

### C.     Denial Of The Motions Is Tailored To The Threat

A district court may not apply judicial estoppel "unless: (1) 'no sanction established by the Federal Rules or a pertinent statute is up to the task of remedying the damage done by a litigant's malfeasance;' and (2) 'the sanction [of judicial estoppel] is tailored to address the harm identified.'" *Montrose Med. Grp.*, 243 F.3d at 784 (brackets in original) (quoting *Klein v. Stahl GMBH & Co. Maschinefabrik*, 185 F.3d 98, 108, 110 (3d Cir. 1999). DISH and Sirius seek a finding that this case is exceptional because the '444 Patent was asserted against devices of the type that DISH and Sirius successfully argued render the '444 Patent invalid. There is no statute or Federal Rule sufficient to remedy the harm presented by the DISH and Sirius motions. The sanction of judicial estoppel is the only way to prevent the spectacle they advocate.

## III.    EACH OF DRAGON'S CLAIM CONSTRUCTION POSITIONS WAS WELL-FOUNDED.

### A.      "Broadcast Program Information" And "The Broadcast Program Information"

The defendants argue that Dragon's constructions of the terms "broadcast program information" and "the broadcast program information" were unreasonable, but they have difficulty recording what Dragon said, and they demonstrate nothing that was unreasonable. Much of what they say is plainly false. For example, AT&T and DirecTV state that "Dragon contended [in claim construction] that the word 'the' changed the meaning of the claim term 'broadcast program information' that appears twice in asserted claim 1." This is fantasy.

It is often said that "the same term or phrase should be interpreted consistently where it appears in claims of common ancestry." *See Epcon Gas Systems, Inc. v. Bauer Compressors,*

*Inc.*, 279 F.3d 1022, 1030 (Fed. Cir. 2002).  A more precise statement of the rule, however, is that "[a] word or phrase *used consistently* throughout a claim should be *interpreted consistently*." *See id.* at 1030-31 (quoting *Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998) (emphasis added in *Epcon*).  Regardless of whether the emphasis must be on the "appearance" of "the same term or phrase" or the "use" of "the same term or phrase," there is no rule requiring that "different" terms or phrases be interpreted "consistently."  One of the false attacks on Dragon was based on an attempt to transform the arguments Dragon made about the meaning of "different" phrases into arguments about the "same" phrase.  Now, DISH and Sirius call arguments about "different" phrases arguments about the same "phrase," and AT&T and DirecTV claim Dragon made an argument that bears no resemblance to anything it said.

The phrase "*broadcast program information*" appears in two places in Claim 1, once in the preamble, and once in the last element of Claim 1, where it is preceded by the definite article. The full term "*the broadcast program information*" does not appear anywhere else in Claim 1. Dragon argued that "broadcast program information" required no construction, or alternatively, that it should be construed as "program information that is broadcast."  *See* D.I. 77 at p. 19.  It gave one construction to the phrase "*broadcast program information*," and it applied the construction consistently.  No one has ever pointed to the assertion by Dragon of different or inconsistent meanings for this term.  When the Court suggested in the claim construction order that Dragon gave different meanings to the term, it did not cite any instance of Dragon doing so. *See* D.I. 110 at p. 6.  The charge is false.

### B. The Failed "Inconsistency" Argument.

#### 1. Infringement Contentions.

The defendants point to Dragon's infringement contentions, which did not contain claim constructions, and were not cited by the Court or other defendants in support of the

"inconsistency" argument DISH and Sirius seek to adopt, and that AT&T and DirecTV have re-repackaged.

Dragon's infringement contentions explained that "the broadcast program information" is the information that is stored after the record key is actuated, rather than any information that had been played or recorded before that time.  Dragon called the information that is stored when the record key is actuated "the information of interest" in Claim 1, as it plainly is.  The information stored after the record key is actuated is "stored," it is "retrieved," and it is "played back," fulfilling the purpose of the invention of the '444 Patent.

Dragon's explanatory reference in its infringement contentions was not a claim construction, and no one has previously suggested that it was.  Dragon did not say "broadcast program information" or "the broadcast program information" *means* "the information of interest," and it is silly to demean section 285 by claiming it did.  That aside, it is also difficult to understand why Dragon's explanation might be thought controversial in any way.

"The broadcast program information" is "the information of interest" in the context of Claim 1 because it is the information that is "substantially simultaneously recorded and played back."  The identification of "the broadcast program information" as the "information of interest" was not, and did not purport to be, a claim construction, any more than the identification in Dragon's infringement contentions of the "pause" button on the accused devices as the "record key" of Claim 1 purported to be a construction of the claim term "record key."

### 2.     Acknowledging The Use Of The Definite Article.

The defendants' second attempt to demonstrate "different" or inconsistent constructions of the same claim language fails because it is not based on the "same" claim language.  The defendants assert that Dragon made an unreasonable argument when it offered different

meanings for different claim language in a manner that is wholly consistent with the basics of English grammar, the specification of the '444 Patent, the law, and the language of Claim 1.

The defendants argue that by defining "*broadcast program information*" as "program information that is broadcast," and arguing that "*the broadcast program information*," as it is used in the body of Claim 1, refers to specific "program information that is broadcast," Dragon impermissibly and unreasonably offered "inconsistent" meanings for the same term. There is no sense in which this contention is even arguably true, and there is nothing unreasonable or exceptional about the arguments Dragon actually made.

"A definite article indicates that its noun is a particular one which is identifiable to the listener. It may be something that the speaker has already mentioned, or it may be something uniquely specified. The definite article in English, for both singular and plural nouns, is the." *Article (grammar),* www.en.wikipedia.org/wiki/Article_ (grammar). *See also Definition of "the"*, www.dictionary.com/browse/the ("used, especially before a noun, with a specifying or particularizing effect, as opposed to the indefinite or generalizing force of the indefinite article a or an"). The "specifying or particularizing effect" of the definite article in the phrase "the broadcast program information" is to refer to "specific" or "particular" broadcast program information, to wit, the broadcast program information whose storage is initiated after actuation of the record key. That "broadcast program information," and no other, is "the broadcast program information," and there is nothing wrong in saying so.

As Mr. Goldberg explains in a declaration to which no response was made by the parties that unsuccessfully sought Rule 11 sanctions, and which the current movants do not even acknowledge, "the broadcast program information" refers to specific "broadcast program

information," as one would conclude through the application of ordinary English grammar.  *See* Ex. S (Goldberg Original Decl.) at ¶¶ 28-31.

### 3.  The Mistaken "Antecedent" Argument.

DISH and Sirius (but not AT&T/DirecTV) attempt to explain the rule that identical language is generally given the same meaning wherever it appears in a patent by positing a "basic axiom that the former is the antecedent for the latter and must mean the same thing." Their "axiom" is a reflection of an attempt to rely on another mistaken attack on Dragon's claim construction position.

The defendants argued that the full phrase "*the broadcast program information*" could not be given a meaning that acknowledged the use of the definite article because doing so would render the claim indefinite.  Why?  Because the only place "*broadcast program information*" appeared before the use of "*the broadcast program information*" was in the preamble, and it was therefore necessary to construe "*the broadcast program information*" in a way that pointed to the preamble.  Without "*broadcast program information*" as a reference point, the defendants said, "*the broadcast program information*" would lack an "antecedent," and Claim 1 would be "indefinite."  This argument makes no sense in the context of Claim 1, and the apparent legal argument based on the "antecedent" idea is unsound.

"Lack of antecedent basis generally occurs when a claim first refers to an element using the words 'the' or 'said,' with no earlier recitation of the claimed element."  *Radware, Ltd. v. A10 Networks, Inc.*, 2014 WL 2738538, at *8 (N.D. Cal. Jun. 11, 2014) (citing MPEP § 2173.05(e) (9th ed. Mar. 2014)).  But "the failure to provide explicit antecedent basis for terms does not always render a claim indefinite.  If the scope of a claim would be reasonably ascertainable by those skilled in the art, then the claim is not indefinite."  *Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1359 (Fed. Cir. 2001) (quoting  MPEP § 2173.05(e) (6th ed. Rev.1, Sept.

1995)).  *See also Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367,

1376 (Fed. Cir. 2008) (relying on "the well-settled rule that claims are not necessarily invalid for

a lack of antecedent basis").

In *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1369 (Fed. Cir. 2006),

the International Trade Commission held a claim invalid on the theory that "'said zinc anode'

does not have an antecedent basis, the Commission explaining that the term 'zinc anode' does

not appear in the claim prior to the term 'said zinc anode.'" (internal quotation mark omitted).

That is apparently the nature of the "antecedent" argument made by the defendants and invoked

by DISH and Sirius.  But the absence of the term "zinc anode" was not sufficient to create an

"antecedent" problem.   "Claim definiteness," the Federal Circuit explained, "is analyzed 'not in

a vacuum, but always in light of the teachings of the prior art and of the particular application

disclosure as it would be interpreted by one possessing the ordinary level of skill in the pertinent

art.'"  *Id*. at 1371 (quoting *In re Moore*, 439 F.2d 1232, 1235 (C.C.P.A 1971)).

> The definiteness inquiry "focuses on whether those skilled in the
> art would understand the scope of the claim when the claim is read
> in light of the rest of the specification." *Union Pac. Res. Co. v.
> Chesapeake Energy Corp.*, 236 F.3d 684, 692 (Fed. Cir. 2001).
> Although neither the Commission nor the courts can rewrite claims
> to correct material errors, the issue here is not correction of error,
> but understanding of what the claim covers.  When the meaning of
> the claim would reasonably be understood by persons of ordinary
> skill when read in light of the specification, the claim is not subject
> to invalidity upon departure from the protocol of "antecedent
> basis."

*Id*.  Underscoring the absence of a requirement that a use of "said" or "the" before a reference to

a structure or feature inevitably be preceded by the prior usage of identical language to describe

the structure or feature, the court noted that the Manual of Patent Examining Procedure then in

effect stated that "[o]bviously, however, the failure to provide explicit antecedent basis for terms

does not always render a claim indefinite."  *Id*. (quoting MPEP § 2173.05(e) (8th ed. Rev. 2,

May 2004)).  As the Federal Circuit later stated, a term can be indefinite if it "does not have proper antecedent basis where such basis is not otherwise present by implication or the meaning is not reasonably ascertainable," which is not inevitably the case when an explicit antecedent is not present.  *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) (citing *Energizer Holdings*, 435 F.3d at 1370–71).  Moreover, the *Energizer Holdings* court noted, "an antecedent basis can be present by implication."  *Id*. at 1371 (quoting *Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 810 F.2d 1113, 1116 (Fed. Cir. 1987)).  *See also Personalized User Model LLP v. Google Inc.*, 2012 WL 295048, at *26 (D. Del. Jan. 25, 2012).

Many courts have recognized the principle that the absence of an antecedent basis for a term is not invariably fatal.  In January 2016, Chief Judge Stark observed that "[a] failure to provide antecedent basis does not necessarily render a claim indefinite."  *Yodlee, Inc. v. Plaid Techs., Inc.*, 2016 WL 204372, at *12 (D. Del. Jan. 15, 2016) (citing *Energizer Holdings*, 435 F.3d at 1370).  *See also Tarkus Imaging, Inc. v. Adobe Systems, Inc.*, 2012 WL 2175788, at *5 (D. Del. Jun. 14, 2012) ("An express antecedent basis is not required to render a claim definite.") (citing *Microprocessor Enhancement Corp.*, 520 F.3d at 1376).  In *Yodlee*, Chief Judge Stark held that the absence of an antecedent basis for the disputed term merely triggered a burden for the party challenging the validity of the patent to "prove by clear and convincing evidence that the lack of antecedent basis leave one of ordinary skill in the art unable to discern the boundaries of the claim 'based on the claim language, the specification, the prosecution history, and the knowledge in the relevant art.'" *Id*. (quoting *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1366 (Fed. Cir. 2011)).  Chief Judge Stark found that burden unmet.  *Id*.  This Court has also applied the same rules in rejecting a claim that the lack of an antecedent basis was fatal to a claim.  *United Video Properties, Inc. v. Amazon.com, Inc.*, 2012 WL 2370318, at *15 (D. Del.

Jun. 22, 2012) ("Amazon is correct that the term 'interactive program guide' does not explicitly appear in parent Claim 19, but Claim 27 is not thereby rendered indefinite because it still has a 'reasonably ascertainable meaning.'") (citing *Energizer Holdings*, 435 F.3d at 1370–71). The Court found the meaning of the challenged claim to be "clear notwithstanding the missing antecedent." *Id*. "The claims and specification are all directed to systems and methods involving interactive program guides. A person of ordinary skill in the art would not be confused by the fact that Claim 19 refers to 'the' interactive program guide rather than to 'an' interactive program guide." *Id*.

The defendants made no attempt to prove that the alleged absence of an antecedent would leave one of ordinary skill "unable to discern the boundaries of the claim," relying instead on a conclusory *non sequitur* that an antecedent for "*broadcast program information*" is missing unless "*the broadcast program information*" is construed to refer to the use of "*broadcast program information*" in the preamble. The Court did not make a finding that Claim 1 could not be understood if the words in the preamble were not taken as an antecedent, and it did not provide analysis of the type it made in *United Video Properties*, or provide any analysis of why the standard set out by the Federal Circuit in *Energizer Holdings*, *Halliburton*, *Microprocessor Enhancement*, and other cases was met or not met.

There is no problem understanding Claim 1 if it is read as ordinary English grammar says it should be. *See* Ex. S.at ¶ 25. Indeed, the problem that led the defendants to assert the absence of an antecedent was that the language is not only understandable, it compels the adoption of the construction argued by Dragon. Because they could not defeat Dragon by taking its arguments on, the defendants retreated to the unsustainable "antecedent" argument.

This is what Claim 1 provides:

-14-

"substantially simultaneous recording and playback" is to occur.

"program information" is *what* will be "substantially simultaneously record[ed] and play[ed] back."

"substantially simultaneous recording and playback" will be achieved *when* the "record key is first actuated to begin a recording by initiating storage of the broadcast program information" in the memory unit, and

the "playback key is subsequently actuated to begin time delay playback of the recording from the beginning thereof"

"by initiating retrieval of the stored program information in said memory unit."

Thus,

said control circuit being configured so that substantially simultaneous recording and playback of program information is achieved when said record key is first actuated to begin a recording by initiating storage of the broadcast program information in said memory unit, and said playback key is subsequently actuated to begin time delay playback of the recording from the beginning thereof by initiating retrieval of the stored program information in said memory unit

There is no doubt about what is described by the reference to "the broadcast program information." Substantially simultaneous recording and playback of "program information" is achieved when "the program information," described as "the broadcast program information," is first "stored" and then "retrieved." "A recording" of "the broadcast program information" is begun by initiating storage of "the broadcast program information," and, after "the recording" is completed, retrieval of "the recording" is initiated and playback occurs. As Mr. Goldberg explains, a person having ordinary skill in the art would understand that "the broadcast program information" is what is stored, retrieved, and substantially simultaneously recorded and played back. And why not?

When Claim 1 was amended, the word "broadcast" was added to the claim without explanation, and the word "broadcast" did not appear in the preamble of Claim 1. There was no basis for a credible argument that Claim 1 was indefinite because the word "broadcast" or the phrase "the broadcast program information" did not appear in Claim 1 before "the broadcast program information." It was not just "reasonably ascertainable," it was clear as a bell that "the broadcast program information" was the specific "program information" to be "stored," "retrieved," and "played back." Only that which was "stored" could be "retrieved." If the point of the invention was "substantially simultaneous recording and playback," the same thing would obviously have to be recorded and played back. No one trying to understand would reasonably fail to understand, and Mr. Goldberg's testimony that a person having ordinary skill would understand the claim language and understand it exactly as Dragon argued it stands unchallenged.

It is difficult to understand the basis for an argument that Dragon's reliance on the plain reading of the claim language required by the simple English it contains could be portrayed as unreasonable or "exceptional." It is inconceivable that an attack on Dragon could be made without the slightest acknowledgement of the actual legal standard, or an attempt of some kind to satisfy it. But that is what happened.

### C. The Defendants' Reliance On AT&T's Non-Infringement Argument In Sheep's Clothing.

The construction of "broadcast program information" ultimately adopted by the Court included a narrowing of the word "broadcast" advocated by AT&T. *See* D.I. 110 p. 4 (construction: "programming information transmitted to all users"). AT&T's requirement that "broadcast" requires that the broadcast information be "transmitted to all users" is not consistent with the plain meaning of the term broadcast. *See* [www.dictionary.com/browse/broadcast?s=t](http://www.dictionary.com/browse/broadcast?s=t)

("verb (used with object), broadcast or broadcasted, broadcasting. 1. to transmit (programs) from a radio or television station.") ("noun 9. something that is broadcast.") ("adjective 14. (of programs) transmitted from a radio or television station."). AT&T's only support for this modification of the plain meaning of the term was a purported technical dictionary definition. AT&T supplied the dictionary, but it did not present any foundational expert testimony. None of the other defendants joined AT&T's proposal.

The Court "[found] as a fact" that the dictionary cited by AT&T provided the meaning of "broadcast" applicable to the '444 patent, but it had no basis for doing so. AT&T did not present any evidence that "broadcast" is a term of art, or otherwise has a special technical meaning that would be understood and applied by those having ordinary skill in the art. AT&T did not even offer any evidence supporting the idea that the dictionary it cited is relevant to the field of the invention of the '444 Patent. AT&T offered nothing more than the dictionary.

The dictionary cited by AT&T has nothing at all to do with the field of the invention. It addresses an entirely different technical field, and there is no justification for its use to construe the '444 Patent. There is no basis on which "broadcast" can be limited in the manner argued by AT&T. *See* Ex. S. at ¶¶ 19-25. AT&T's dictionary definition was not accompanied by any expert testimony establishing or suggesting that a person having ordinary skill in the relevant art would find the definition of interest in the interpretation of the claims of the '444 Patent. That the dictionary was given a "technical" moniker is not sufficient. Mr. Goldberg explained in his original declaration that a person having ordinary skill in the art would not rely on the AT&T dictionary because it addresses a completely different type of technology, and that resort to AT&T's dictionary was not necessary to interpret "broadcast program information." *See id.* Although they were aware of Mr. Goldberg's testimony before they filed these motions, and had

more than seven months to locate an expert to contest it, the defendants do not challenge Mr. Goldberg's testimony or even mention it.

When AT&T's narrow construction of broadcast was advocated, Dragon's former lawyer explained that it is not necessary for a "broadcast" to be "transmitted to all users" to be a "broadcast."  He used an example of a sporting telecast not sent to or seen by "all users," as in what is often called a "closed circuit broadcast."  Ex. E at pp. A0646-A0650.  "Closed circuit broadcast" is not an oxymoron.  *See, e.g.*, http://www.bloodyelbow.com2012/8/10/3233243/new-light-shed-on-closed-circuit-ufc-broadcasts-at-bars ("New Light Shed On Closed-Circuit UFC Broadcasts at Bars"); http://eric.ed.gov/?id=ED016399 ("A CLOSED-CIRCUIT DATA BROADCAST SYSTEM"); https://store.maxishare.com/closed-circuit-broadcast-rights--500001-p116.aspx (offer of "Closed Circuit Broadcast Rights"); https://en.wikipedia.org/wiki/Broadcasting_of_sports_events ("(the first actual broadcast was on closed-circuit in Maple Leaf Gardens in Spring 1952").

When Dragon's lawyer made a personal reference illustrating the point, the Court questioned whether closed circuit technology was known at the time of the application that led to the '444 Patent was filed.   Ex. E at p. A0670.  It was, of course, known in the early 1990s.  Later in the argument, counsel noted that closed circuit technology was not only known, but that "pay per view custom programming systems" were mentioned in the specification.  *Id*. at p. A0670.  *See* '444 Patent at 1:25.  Following this reference, the '444 Patent stated that VCRs were commonly used to store "broadcast information" from "all" of the sources listed, including closed circuit "pay per view" systems.  *See id*. at 1:26-36.

DISH quotes the Court as stating AT&T had a "technical dictionary," while Dragon had nothing more than an "Oregon Ducks story," but neither is quite accurate.  Dragon showed the

Court that pay per view programming, inherently not "transmitted to all users," was known when the application that led to the '444 Patent was filed, as it had been since at least the late 1950s. *See* http://www.espn.com/sports/boxing/news/story?id=2606226. And what AT&T tried to pass off as a "technical dictionary" was not a relevant one. There is no evidence justifying the narrow construction of "broadcast" advocated by AT&T, and no basis for any suggestion that Dragon's reliance on the ordinary meaning of the term, with support in the specification, was exceptional.

> **D.     The "Record Key" And Beginning "A Recording."**

The defendants also mention the construction of the term "record key," and in doing so repeat the defendants' mistaken approach based on the idea that the claim language specifies the beginning of "recording," rather than the beginning of "a recording." Dragon obviously cannot be faulted for reading the claim language as it is written.

There is no basis for a conclusion that the claim language *states* that "recording" begins when the record key is actuated, and the argument that the claim language *means* that "recording" begins when the record key is actuated is difficult to sustain. If the applicants meant to limit their invention by saying that there is no "recording" until the record key is actuated, that "recording" begins when the record key is actuated, they would have said it. The language and context of the claim and the prosecution history show that Dragon's reliance on the language of the claim as it was written was entirely reasonable.

> **1.     Claim Language: "A Recording," Not "Recording."**

The "record key" limitation appears, in relevant part, in the last element of Claim 1:

> . . . substantially simultaneous recording and playback of program information is achieved when said **record key** is first actuated **to begin a recording** by initiating storage of the broadcast program information in said memory unit, and said playback key is subsequently and solely actuated to begin time delay playback **of the recording** from the beginning thereof by initiating retrieval of **the stored program information** in said memory unit . . .

'444 Patent at 8:52-61 (emphasis added).  There should be no disagreement that, when the record

key is actuated, "a recording" is begun.  "A recording" is a noun.  The claim does not say that

"recording" begins when the record key is actuated.  There should also be no dispute that the use

of the noun form is confirmed by the later explanation that, when the playback key is actuated,

playback of "the recording" is begun.

Dragon proposed that "record key" is properly construed as "a key that, when actuated,

signals the control circuit to initiate storage of program information in the memory unit."  D.I. 77

at p. 48.  While it is not particularly ambitious, Dragon's construction is strongly supported in

the claim language.  Claim 1 states that actuation of the record key "initiat[es] storage of the

broadcast program information."  The specification confirms this.  *See* '444 Patent at 5:24-25

("Control circuit 14 initiates storing *information present on input 22* in *a recording* within

memory unit 12.") (emphasis added).  By specifying that it is information that is then "present on

input 22" whose storage is initiated, the specification also confirms that "the broadcast program

information" is information that is present after, not before, the record key is actuated.

The Court disagreed with Dragon's construction, construing the term as "key that, when

actuated, begins the recording process."  D.I. 110 at p. 10.  If this means that "initiation of

storage of the broadcast program information," it is in sync with Dragon's contention.  If, as

appears to be the case, it instead means "the recording device begins recording," that is not what

the claim language says, and there is nothing in the claim language itself that calls for this

construction. The claim language is agnostic to the question of whether a "recording process"

involving other information was underway when the record key is actuated, and, as explained

above, the recording of information that preceded the interruption that provides the occasion for

use of the invention of the '444 Patent would not be of interest in Claim 1.  *No one cares what*

*happens before the interruption.*  "A recording" of "the broadcast program information" is what matters.[6]

The defendants do not explain why Dragon is wrong.  A simple citation to the Court's order does not establish that Dragon's position was unreasonable.

### 2.  The Importation Dispute: "Basic Operation."

The Court also relied on the fact that there is a mention in the specification of "basic operation" that includes the recording device being "off."  '444 Patent at 5:20-22.  Dragon argued that reliance on this passage would represent a classic "cardinal sin" in the form of importation of a limitation from the specification.  *See Phillips*, 415 F.3d at 1319-20.  "[T]he distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice."  *Id.* at 1323 (quoting *Comark Comms., Inc. v. Harris Corp.*, 156 F.3d 1182, 1186–87 (Fed. Cir. 1998) ("there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification")).

The Court concluded that an exception to the anti-importation prohibition applied.  DISH makes no mention of the importation dispute, and it is not likely that a disagreement about the distinction between the importation of a limitation and reading claim language "in view of the specification," a type of disagreement that is common, and a distinction that "can be a difficult one to apply in practice," could provide a foundation for a finding of exceptionality.  *See DSS*

---

[6] DISH argued in the October 24, 2014 letter it claims served as notice that Dragon's infringement claims were "baseless" that "the recording" initiated by actuation of the "record key" and played back upon actuation of the "playback key" included information recorded before actuation of the "record key."  DISH asserted that infringement was not possible because actuation of the "playback key" did not begin playback starting from the oldest content existing in the buffered memory of the device.  D.I. 132-8, Ex. 5 at 5 ("[T]he 'play' button on the remote of the accused DISH devices merely causes playback from the time of the pause. The 'play' button does not cause playback from the time of the initiation of recording (power-on or the channel change).").  DISH has abandoned this plainly incorrect argument.

*Tech. Mgmt. v. Taiwan Semiconductor Mfg. Co.*, No. 2:14-CV-00199-RSP, 2016 U.S. Dist. LEXIS 141623, at *7 (E.D. Tex. Oct. 12, 2016) ("the Court questions, as a preliminary matter, whether a party's position taken during claim construction—a practice characterized by the Supreme Court as 'mongrel,' — can ever by itself make a case exceptional under § 285.") (rejecting argument that claim construction position and allegedly inconsistent positions taken in IPR qualified as "exceptional.") (internal citation omitted).

Such a finding would be especially difficult to sustain in this case.  It would be odd if the applicants intended to limit their invention to situations in which the recorder is "off" and not say so in the claim language.  It would be stranger still if they intended to require that "recording" begin with the actuation of the record key, and, rather than say so, they said instead that "a recording" of specified information was to begin by "initiating storage" of that information when the record key is actuated.

There is clear legal and factual room for questioning the Court's conclusion that an exception to the importation prohibition is available.  First, the comment on which the Court relied referred to "basic" operation, not all operation.  This is not a likely candidate for a generally applicable requirement that does not appear in, and is not easy to square with, the claim language.

None of the uses of "basic" in the '444 Patent justifies a conclusion that the Column 5 usage is a reference to "all" operation of the device of the invention.  If the defendants had taken the position that it was exceptionally unreasonable for Dragon to believe that the term "basic" is used to mean something other than "all," Dragon would have responded by contesting that notion, and asking why it is plausible to assume the applicants meant "all" when they said "basic."  Dragon would also have pointed out that this is the sole reference deemed worthy of

mention by the Court on the question of whether the recorder of the invention is "off," and sug-

suggested that the implausibility of a theory based on the idea that the applicants chose "basic"

when they meant "all," and then left no tracks anywhere else in the specification or prosecution

history to confirm their odd selection of "basic" as a synonym for "all."

The Court's conclusion was based on the idea that the reference in Column 5 is to "all

operation of all embodiments of the instant invention," rather than to "basic" operation, or

operation of an embodiment.  But Column 5 appears in a section of the patent that is headed

"Detailed Description of the Preferred Embodiments," and the discussion of Figure 2 begins with

a statement that Figure 2 shows a "second embodiment."  Both of these facts show that

embodiments are being discussed.  Does the reference to "the instant invention" so clearly

overcome these explanations of what is being discussed that Dragon has no right to advocate that

importation of the "off" concept is a garden variety "cardinal sin?"

The Court appears to have relied on a legal point raised for the first time in the

defendants' sur-reply claim construction brief to the effect that mention of "the instant

invention" requires that the Column 5 reference be understood to refer to "all" operation of the

invention, notwithstanding the use of "basic" to describe the operation that is being explained.

The case on which the defendants – and the Court, ultimately – relied for limiting "record key"

to a description of "the instant invention," *Verizon Services Corp. v. Vonage Holdings Corp.* 503

F.3d 1295, 1308 (Fed. Cir. 2007), does not describe an automatic rule of claim construction.

Claim construction seeks to ascertain the meaning of claim terms based on the language of the

claims as informed by the specification and, where relevant, the prosecution history.  *Rambus*

*Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1088 (Fed. Cir. 2003).

Limiting claim terms to embodiments described as "the instant invention" or "the present invention" is an exception to these ordinary rules of claim construction. *Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1398 (Fed. Cir. 2008); *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1136–37 (Fed. Cir. 2011) ("we have found that use of the phrase 'present invention' or 'this invention' is not always so limiting, such as where the references to a certain limitation as being the "invention" are not uniform, or where other portions of the intrinsic evidence do not support applying the limitation to the entire patent."); *Voda v. Cordis Corp.*, 536 F.3d 1311, 1320–21 (Fed. Cir. 2008); *Rambus*, 318 F.3d at 1094. The result in *Verizon* – that the claims were limited by a description in the specification of "the instant invention" – was based on the specific facts of that case and does not illustrate a bright line rule of claim construction.

Unlike in *Verizon*, the column 5 passage describing "basic operation" of the Figure 1 embodiment does not purport to describe the invention "as a whole." *Verizon Services Corp.*, 503 F.3d at 1308. In *Verizon*, the description of "the instant invention" the court found limiting appeared in a section of the specification titled "Disclosure of the Invention." *Id.* The column 5 passage in the '444 Patent appears under the heading "Detailed Description Of The Preferred Embodiments." In contrast to *Verizon*, the heading in the '444 Patent signals that more than one embodiment is to be described. The description in column 5 refers to the embodiment in Figure 1, and the specification goes on to describe other embodiments that do not suggest that "record key" must be limited to a key that begins any recording performed by the invention of Claim 1.

As recorded in the claim construction order, the defendants offered an excerpt of a sentence and declared that the "purpose of the invention" is "user control over recording." D.I. 110. at p. 11. It is wrong to declare that the "purpose" of the invention is something that appears in half of a sentence, without accounting for the other half. That aside, the "objects of the

invention" are described under the heading "Objects And Advantages," beginning in Column 2.

'444 Patent at 2:36-3:7.  None of the specified purposes includes "user control over recording."

The specification concludes by stating that it describes only preferred embodiments, that the specifics are exemplary, and that the invention should be understood "by the claims appended hereto and their legal equivalents."  '444 Patent at 8:21-27.  Arguments that the specification should apply to limit patent claims are common in every case.  This case is not "exceptional" because Dragon advocated the usual rule.

### 3.    Clarifying Amendment: The Three "Hows."

The Court also relied on an amendment of Claim 1 to support its construction.  The Court stated in its claim construction opinion, that the applicants' "device does not begin recording until the user actuates the record key."  D.I. 110 at 10.  That is not what the amendment says.  The Court's comment does not include the indefinite article "a," and thus does not reflect the structure of the claim language.  If the Court's conclusion was intended as a statement of what appears in the amendment, the Court's statement is incorrect.  If it was intended as a summary of what the amendment accomplished, the Court's statement is no more than debatable.

The original claim language states that "substantially simultaneous recording and playback of program information is achieved when said record key is first actuated to initiate storage of the program information in said memory unit."  The original claim language states that, when the record key is actuated, "storage of the program information" that is the subject of the "substantially simultaneous recording and playback" is initiated.  The language is agnostic as to whether storage of other information previously occurred, and also to whether the recorder was "on" before the record key is "first actuated."  When the record key is actuated, storage of "the program information," what was later identified as "the broadcast program information," is initiated.  The storage of this information could be initiated under circumstances involving the

prior storage of other information, or not.  "Recording" could have been underway when storage of "the program information" was initiated, or not.

The amended claim language preserves the options available under the original language. There is nothing stating that the recorder is "off" when the record key is actuated, and no change sufficient to create a new scenario in which the recorder is off.  The claim language is not dramatically changed.

The amended claims states that "substantially simultaneous recording and playback of program information is achieved when said record key is first actuated to begin a recording by initiating storage of the program information in said memory unit."  In the amended claim language, "storage of the program information" is still initiated.  The amended language explains that "a recording" (plainly not "recording") is begun by the initiation of storage of the information.  This is consistent with the explanation in the specification that it is only "the information present on input 22" that is stored "in a recording within memory unit 12" when the record key is actuated.  *See* '444 Patent at 5:24-25.  The change in the claim language does not suggest a disclaimer of all devices that continuously record.  If, as is the case, devices with that characteristic fell within the prior claim language, they fall within the amended language.

As Dragon explained during the claim construction process, a person having ordinary skill in the art would not understand the amended claim language to indicate that actuation of the record key "begins recording."  Ex. S at ¶¶ 93-95.  That is simply not what the claim language says.  A person having ordinary skill in the art would understand that "a recording" could begin by the initiation of storage of the information that followed the interruption, regardless of whether the device happened to be "continuously recording" and previously recorded other

information that was not missed by the user.  *Id*.  Mr. Goldberg's testimony to this effect has never been challenged.

### E. "To Begin A Recording By Initiating Storage Of The Broadcast Program Information In Said Memory Unit"

AT&T and DirecTV (but not DISH and Sirius) also mention Dragon's construction of "to begina recording by initiating storage of the broadcast program information in said memory unit" but, again, they do not explain why Dragon's construction of this term was incorrect or exceptional.  AT&T and DirecTV say only that "Dragon's proposed construction of 'to begin a recording by initiating storage of the broadcast program information in said memory unit' attempted to read out the requirement 'to begin a recording.'"  What on earth does that mean?  AT&T and DirecTV do not explain or substantiate this claim.

Dragon proposed to construe this term as "to initiate storage of the broadcast program information in the memory unit such that the information can be retrieved from the beginning and without missing any of the program information broadcast during the interruption."  D.I. 110. at p. 12.  The Court rejected Dragon's construction on the basis that it would cover "continuous recording devices" that the Court found to be disclaimed.  *Id.*  Dragon explains below why the disclaimer that the Court found is not correct, but AT&T's and DirecTV's motion does not argue that Dragon was incorrect because of a disclaimer.

AT&T and DirecTV may be referencing the Court's comment that "Plaintiff's construction eliminates 'to begin a recording' and instead focuses on retrieval of information." *Id.*  The exact meaning of the Court's comment is not entirely clear, but Dragon's construction does not eliminate "to begin a recording."

Dragon's construction refered to "initiation of storage of the broadcast program information in the memory unit."  Rather than "eliminating" "to begin a recording," it fully

accounts for it.  Claim 1 refers to "begin[ning] a recording *by initiating storage in said memory unit*."  "Beginning a recording" happens when "storage" of "the broadcast program" is "initiated."  Dragon's construction also makes clear that the information that is stored can then be retrieved from memory after the interruption without missing any of the content presented during the interruption.  Dragon's claim construction is entirely consistent with the claim language.

## IV.     THE DEFENDANTS FAILED TO PRESENT EVIDENCE SUFFICIENT TO SUPPORT A DISCLAIMER FINDING.

"The party seeking to invoke prosecution history disclaimer bears the burden of proving the existence of a 'clear and unmistakable' disclaimer that would have been evident to one skilled in the art." *Trivascular, Inc. v. Samuels*, 2016 WL 463539 at *4 (Fed. Cir. Feb. 5, 2016) (citing *Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1371 (Fed. Cir. 2007); *Inventio AG v. ThyssenKrupp Elevator Ams. Corp.*, 5 F. Supp. 3d 665, 672 (D. Del. 2013) ("a disavowal of claim scope 'must be both clear and unmistakable to one of ordinary skill in the art'") (citing *Elbex*, 508 F.3d at 1371).  *See Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 996 (Fed. Cir. 2006) ("Our primary focus in determining the ordinary and customary meaning of a claim limitation is to consider the intrinsic evidence of record, *viz.,* the patent itself, including the claims, the specification and, if in evidence, the prosecution history, from the perspective of one of ordinary skill in the art.") (citing *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312–17 (Fed. Cir. 2005) (*en banc*)).  Longstanding Federal Circuit case law establishes that this cannot be done without appropriate expert testimony.

The defendants do not identify (a) the level of ordinary skill in the art at the time the application for the '444 Patent was filed; or (2) present proper evidence of how a person having ordinary skill in the art would understand the claim language and the prosecution history.  The

defendants rest entirely on lawyer argument about the conclusions the Court reached based sole-solely on lawyer argument.

It is not enough to suggest, as the Winston Defendants did in their failed Rule 11 motion, that the Court made a disclaimer finding "based on the intrinsic evidence, which the Court is certainly empowered to do." *See* D.I 110 at pp. 6-7. The question is not what the Court thinks about the intrinsic record, but how the intrinsic record would be understood by a person having ordinary skill in the art.

The Federal Circuit established long ago that judges and PTO officials may not rely on a personal understanding of evidence governed by the person having ordinary skill standard. Even the experts on the Patent Trial and Appeal Board must base their decisions on evidence showing how a person having ordinary skill in the art would understand the relevant intrinsic and extrinsic evidence. *See Brand v. Miller*, 487 F.3d 862, 869 (Fed. Cir. 2007) ("We therefore hold that, in the context of a contested case, it is impermissible for the Board to base its factual findings on its expertise, rather than on evidence in the record, although the Board's expertise appropriately plays a role in interpreting record evidence."); *In re Zurko*, 258 F.3d 1379, 1383 (Fed. Cir. 2001). *Cf. Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1164 (Fed. Cir. 2006) ("In making obviousness determinations, the test is 'whether the subject matter of the claimed inventions would have been obvious to one skilled in the art at the time the inventions were made, *not* what would be obvious to a judge after reading the patents in suit and hearing the testimony.'") (citing *Panduit Corp. v. Dennison Mfg. Co.*, 774 F.2d 1082, 1092 (Fed. Cir. 1985)).

Mr. Wechselberger, DISH's expert in the *inter partes* review of the '444 Patent, argued that the level of ordinary skill is "a Bachelor's Degree in Electrical Engineering or Computer Science or a similar technology degree and at least one year of industry experience related to

audio/video processing in consumer appliances, with particular emphasis on analog and digital television signals." Ex. H (Wechselberger Decl.) ¶ 48. Dr. Hemami, Unified Patents' expert in a second *inter partes* review, offered a level of skill in the art that was similar.[7] The expert testimony provided by Mr. Goldberg and Dr. Freedman that is discussed below is based on a comparable level of ordinary skill. The defendants offered no evidence of the level of skill during the claim construction process, and they offer none in support of their current motion.

A determination of the level of ordinary skill in the art and the presentation of expert testimony based on that level are not required when the patent and the prior art references are "so easily understandable" as to make a "factual determination of the level of skill in the art [] unnecessary." *Chore-Time Equip., Inc. v. Cumberland Corp.*, 713 F.2d 774, 779 (Fed. Cir. 1983). Otherwise, a tribunal may not substitute its judgment for the evidence necessary to support a finding dependent on the understanding of a person having ordinary skill in the art. *See Brand*, 487 F.3d AT 869; *In re Zurko*, 258 F.3d at 1383. *Cf. Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1164 (Fed. Cir. 2006) ("In making obviousness determinations, the test is 'whether the subject matter of the claimed inventions would have been obvious to one skilled in the art at the time the inventions were made, *not* what would be obvious to a judge after reading the patents in suit and hearing the testimony.'") (citing *Panduit Corp. v. Dennison Mfg. Co.*, 774 F.2d 1082, 1092 (Fed. Cir. 1985)) (emphasis in original).

---

[7] According to Dr. Hemami, "a person of ordinary skill in the field [] would be very familiar with image and video compression, processing, and transmission. Such a person would understand digital video, the differences between analog and digital video, and analog-to-digital conversion to obtain digital video from analog video; video compression and video compression standards (including the audio component of the standards), and hardware/software associated with digital audio/video storage and playback (e.g., remote controls and video playback devices), including compression software and hardware and memory devices."

## V.     THERE IS NO PROVEN OR PROVABLE DISCLAIMER OF "CONTINUOUS RECORDING DEVICES."

### A.     The Sata Reference.

The disclaimer on which the defendants rely is alleged to have occurred in connection with arguments made during prosecution regarding U.S. Patent 5,134,499 ("Sata").  Sata is directed to a device that is able to record, and to play back, from "even in the middle of a recording."  Ex D (Sata) at 1:21-25.  This functionality is useful for applications such as "instant replay" technology, and the applicants were not challenged when they described Sata as equipment that would be used in a studio-type setting.  Ex. S . at ¶ 115.

Sata says that one of its purposes is to enable playback of the recorded content while the device is recording so that, for example, instant replay can be achieved.  However, beyond saying that the device should be capable of playing back information "even in the middle of a recording," Sata does not disclose details about how playback is achieved, or disclose the special mechanism used to control the playback.  The absence of a disclosure about how playback could be initiated by the Sata device was central to the arguments made by the applicants for the '444 Patent in distinguishing their invention from Sata.

### B.     The Defendants' Disclaimer Argument Oversimplifies The Comments Made During Prosecution.

In its opinion on claim construction, the Court found that "[t]he applicants repeatedly distinguished Sata on the basis that Sata records continuously, and the claimed device does not begin recording until the user actuates the record key."  D.I. 110 at p. 7.  This conclusion unfairly emphasizes information suggesting a disclaimer over information that both clearly does not suggest a disclaimer and more accurately captures the points made by the applicants.  Under the law, and under a fair reading of the prosecution history, the Court's interpretation of the prosecution history is subject to reasonable dispute.

The applicants' distinction of Sata was not as simple as suggested by the Court.  None of the comments by the applicants was directed to a disclaimer of the broad class of devices that "continuously record." Supplemental Goldberg Decl. at ¶¶ 14-16; Ex. S at ¶¶ 44-52, 71-130. Some of the comments clearly distinguish both the invention of the '444 Patent and devices like the defendants' accused products from Sata.  In each case, the applicants' comments were directed to Sata and its specific features.  Generating a broad disclaimer of a class of products based on these comments is not consistent with the governing legal standards.

That Sata "records continuously" would not have served to overcome the arguments made by the examiner.  When the claims of the '444 Patent were eventually allowed, there was no mention of "continuous recording," and not the slightest indication that Sata's status as a "continuous recording device" was even relevant to patentability.  The examiner understood that Sata "records continuously," but he found Sata to anticipate the claims of the '444 Patent, or to render them obvious.

The defendants' burden was therefore to demonstrate that the applicants broadly disclaimed a class of products, even though the fact that Sata was a "continuous recording device" was not central to the patentability of the claims of the '444 Patent.  In these circumstances, it is exceedingly difficult to conclude that a disclaimer "clearly and unmistakably" occurred, and even more difficult to use section 285 to stifle Dragon's ability to advocate a contrary position.  *See Trivascular*, 2016 WL 463539, at *5 ("Since the Examiner ultimately allowed the claims over the prior art without the proposed amendment, it is difficult to see how a skilled artisan could interpret the proposed amendment as a disclaimer required for patentability.  Indeed, Samuels offered several other amendments as possible bases for

distinguishing the prior art . . .").  By quoting the Court's order, without any expert testimony, the defendants did not meet that burden.

### C.     Foundations: The September 9, 1993 Response.

As originally filed, the application for the '444 Patent included claims that required "a keyboard having a record key and a playback key."  Ex. B (Prosecution File History)  at pp. A0036-A0037.  The examiner rejected those claims in a May 5, 1993 Office Action on the basis that Sata "inherently" disclosed "a keyboard having a record key and a playback key."  Ex S at ¶¶ 75-76.  On September 9, 1993, the applicants filed a response to the rejection.  Ex. S at ¶¶ 77-78.

> The Examiner well notes that Sata fails to teach the keyboard of the instant invention, or any means for initiating recording or playback of information.  Applicant respectfully asserts that this, together with the omission of how interface 10 supplies control signals to system controller 12, and other elements, indicates that the cited invention is incomplete, and must be used with other equipment in order to perform its own functions, in turn suggesting that the cited invention is a piece of studio type equipment, which continuously records and plays back, and not a conventional recorder suggested by the Examiner.  Thus the obviousness of adding to Sata the keyboard with record and playback keys of the instant invention is respectfully traversed.  Indeed, applicant asserts that these structural differences, along with the absence of control scenario and elements to implement starting or stopping or proceeding with recording and playback functions emphasize the patentable distinguishability from Sata of the instant invention as set forth in claims 1 and 5-8 of the application, as well as the claims depending therefrom.

Ex. S at. ¶ 77 (citing Ex. B  at pp. A0073-A0074).  In this first response to the examiner's "inherency" rejection, the applicants make various comments about Sata.  They call it an "incomplete" (and thus not clearly invalidating) device, and they make various remarks about its characteristics.  The Court did not cite this statement as evidence of a disclaimer of "continuous recording devices," and it would not support a "clear and unmistakable" disclaimer of

"continuous recording devices."  Ex. S at ¶ 77.  These comments provide an important backdrop to everything that followed.

### D.  The February 2, 1994 Response And The Idea Of "Graceful Recovery."

The Court also did not cite the applicants' February 2, 1994 response to the Examiner's December 1, 1993 Office Action.  The examiner had again rejected the claims on the basis that "a keyboard having a record key and a playback key" was "inherently" disclosed in Sata.  Ex. S at ¶ 85-86 (quoting the Examiner:  "if the apparatus does not have a means for powering the system; a keyboard (with keys) to initiate playback or recording, how does the device operate." *[sic]*).

The applicants explained that Sata does not inherently disclose the keyboard, because it is not designed to allow "graceful recovery from an interruption," as did the applicants' invention:

> Accordingly, applicant therefore agrees that it is not known how the device of Sata operates without a keyboard or any other means for controlling the initiation of recording or playback.  It is not clear by any means that Sata even intends to provide any control at all over the point at which recording or playback begins and ends.  Thus, construed in the light most favorable to Sata (again, for the sake of argument only,) the prior art device, at best, is continually recording and playing back.  **This does not achieve the utility of the instant invention, because the user cannot gracefully recover from an interruption without being able to initiate playback from the point of interruption, nor at a time after conclusion of the interruption.**  Since the prior art makes no mention whatever of the desirability of controlling the point of the recording at which playback is to begin, nor controlling the point in time at which such playback is to begin, it cannot be argued that it would be obvious to add and change structure as necessary to achieve an unsuggested function.

Ex. S at ¶ 89 (emphasis added).  The distinction being made was between the invention and devices that could not "gracefully recover from an interruption."  Sata is not distinguished because it "is continually recording and playing back."  It is distinguished because by *merely* recording and playing back, *i.e.*, not playing back from the point of an interruption, Sata would

-34-

not allow the user "gracefully [to] recover from an interruption."  Ex. S at ¶¶ 87-88.  The point

is not simply that Sata is "continually recording," it is that Sata does nothing more, and does not

allow the user to "gracefully recover from an interruption."  "Continuous recording devices" that

allow "graceful recovery" are not distinguished.

When the defendants argued this passage, they unfairly excerpted it, and left out language

clearly refuting the disclaimer they allege.  Although they later included the full passage, when

they argued the February 2, 1994 submission, they did not.  The defendants deleted the part of

the sentence emphasized above beginning with the word "because."  When they did so, they

substituted a period for the language explaining why Sata does not "achieve the utility of the

instant invention."

Sata "makes no mention whatever of the desirability of controlling the point of the

recording at which playback is to begin, nor controlling the point in time at which such playback

is to begin," but the defendants' devices do.  The applicants' comments do not serve to disclaim

products that operate as the defendants' products operate.

A person having ordinary skill in the art would understand the applicants' comments to

be directed to the absence of any disclosure of a way to enable "graceful recovery from an

interruption," and would not read the passage with the biased eye the defendants did and adopt

the interpretation they argued.  A person having ordinary skill would not understand the

applicants to be distinguishing Sata on the basis that it was "a continuous recording device"

because they plainly were not.  Ex. S at ¶¶ 87-88.  The defendants' carve out of an important part

of the February 2, 1994 comments provides no support for a disclaimer finding, much less for a

finding that it was "exceptional" to read the entire passage and take a position entirely that is

fully justified when the entire passage is read.

### E.      The April 28, 1994 Preliminary Amendment.

The passage from the February 2, 1994 response cited above was repeated verbatim when

the applicants submitted a response to a February 23, 1994 advisory action on April 28, 1994.

Ex. B at p. A0103.  The applicants also submitted amended claim language.  The Court relied on

the amended claim language in the April 28, 1994 response in finding a disclaimer.

The Court's order includes excerpts from the applicants' response to the office action as

follows:

> The applicants explained the amendment: "Claim 1 has been
> further amended to recite how the structure of the instant invention
> begins a recording upon a first actuation of the record key ....
> Accordingly, the instant invention as claimed is further
> distinguished from the structure of Sata, wherein recording ... is
> continuous, and never initiated or stopped ...."

These excerpts do not appear together in the prosecution history.  Rather, the Court took portions

of the applicants' comments italicized by the defendants and combined them.  As explained

below, the result was a presentation of the applicants' remarks that is not complete, or fairly

representative of what they said.  The portions of the response not cited by the Court include

important information that is not consistent with the conclusion that a disclaimer occurred.

By April 28, 1994, the examiner had rejected the claims in the pending application for a

third time based on Sata.  The advisory action reasserted prior rejections.  Ex. S at ¶ 91.  The

prior rejections had asserted that all elements of the pending claims were disclosed by Sata, with

the exception of the "keyboard having a record key and a playback key" limitation and the

"means for powering the device" limitation.  *Id.*

The examiner asserted that although the keyboard limitation was not disclosed, a

"keyboard having a record key and a playback key" was "obviously included" in the Sata device.

Ex. S at ¶¶ 83, 91.  The statement that the keyboard limitation is "obviously included" in Sata

appears to be a poorly phrased anticipation rejection, based on the idea that the keyboard, alt-although not disclosed, is "inherent" in Sata. That was the argument the applicants had to meet. By this point in the prosecution, the examiner understood that Sata continuously recorded, but he claimed that the missing elements were nonetheless present in Sata. It would have been pointless to attempt to distinguish Sata on the basis that it was a continuous recording device, and the applicants did not do so.

The applicants amended then-pending Claim 1 as follows (strikethrough indicates omitted language; underline indicates additions):

> . . . so that substantially simultaneous recording and playback of program information is achieved when said record key is first actuated to <u>begin a recording by initiating</u> ~~initiate~~ storage of the program information in said memory unit, and said playback key is subsequently actuated <u>to begin time delay playback of the recording from the beginning thereof by initiating</u> ~~initiate~~ retrieval of the program information stored in said memory unit<u>, with the interval of the time delay being the same as the time elapsed</u>

Ex. S at ¶ 95.

It is not entirely clear whether the Court understood the amendment to show, as the Court stated in its claim construction opinion, that the applicants' "device does not begin recording until the user actuates the record key." That is plainly not what the amendment says. The Court's comment does not include the indefinite article "a," and thus does not reflect the structure of the claim language using a verb ("recording") rather than a noun ("a recording"). (As explained above, the language shows that "a recording" is made and that "the recording" is retrieved. There is no doubt that a noun structure is used, and that the amendment does not state that "recording" begins.) If intended as a statement of what appears in the amendment, the Court's statement is incorrect. If intended as a summary of what the amendment accomplished, the Court's statement is debatable.

The original claim language states that "substantially simultaneous recording and play-back of program information is achieved when *said record key is first actuated to initiate storage of the program information* in said memory unit."  The original claim language states that, when the record key is actuated, "storage of the program information" is initiated.  The language is agnostic as to whether storage of other information previously occurred.  As noted above, the claim language's agnosticism is not surprising because the invention is not concerned with what occurs before the record key is actuated.  Any information that was recorded before that time is not to be played back.  Any such information is unrelated to the interruption that creates a need for "substantially simultaneous recording and playback."  The patent does not require that "recording" have begun or forbid that "recording" has begun.  *The patent, like the user whose enjoyment of the broadcast is interrupted, does not care about anything that might have been recorded before the interruption.*

When the record key is actuated, storage of "the program information," *i.e.*, the information of interest in this invention, is initiated.  The storage of this information could be initiated under circumstances involving the prior storage of other information, or not.  "Recording" could have been underway when storage of "the information" of interest was initiated.

The amended claim language preserves the options available under the original language.  It states that "substantially simultaneous recording and playback of program information is achieved when said record key is first actuated to begin a recording by initiating storage of the program information in said memory unit."  In the amended claim language, "storage of the program information" is still initiated.  The amended language explains that "a recording" (plainly not "recording") is begun by the initiation of storage of the information.  This change

does not suggest a disclaimer of all devices that continuously record.  If, as is the case, devices with that characteristic fell within the prior claim language, the situation was not changed.

Dragon explained during claim construction that a person having ordinary skill in the art would not understand the amended claim language to indicate that actuation of the record key "begins recording, Ex. S at ¶¶ 93-95, and that is not what the language says.  A person having ordinary skill in the art would understand that "a recording" could begin by the initiation of storage of the information of interest, regardless of whether the device happened to be "continuously recording" and previously recorded other information.  *Id.*

The applicants' explanation of the amendment to the claim language did not suggest a disclaimer of the type argued by the defendants:

> Claim 1 has been further amended to recite how the structure of the instant invention begins a recording upon a first actuation of the record key, and begins simultaneous playback from the beginning of the recording upon a subsequent actuation of the playback key, and how the interval of time delay during simultaneous recording and playback is defined.

Ex. S at ¶ 96 (citing Ex. B at p. A0100).

"How the structure of the instant invention begins a recording upon a first actuation of the record key" – "by initiating storage of the program information"

"How the structure of the instant invention begins simultaneous playback from the beginning of the recording upon a subsequent actuation of the playback key" – "by initiating retrieval of the program information stored in said memory unit."

"How the interval of time delay during simultaneous recording and playback is defined" – "with the interval of the time delay being the same as the time elapsed"

The Applicants continued:

> Accordingly, the instant invention as claimed is further distinguished from the structure of Sata, wherein recording (as

-39-

> explained at column 6 lines 44-49) is continuous, and never initiat-
> initiated or stopped [8], and wherein (at column 5 lines 62-67)
> initiation of playback requires some addressing command data
> (read designating data and track designating data described at
> column 6 lines 8-11) the implementation of which is **expressly**
> undisclosed.  Applicant again asserts that the failure to disclose
> this essential information leaves the Sata reference fatally flawed
> as inoperative and incomplete, impossible to be practiced as taught
> without undue experimentation, and therefore improper to cite as a
> reference, let alone that it suggests or motivates combination with
> other teachings or that it otherwise be modified in a manner
> required to meet the structure of the instant claims.

Ex. S at ¶ 100 (citing Ex. B at p. A0100-A0101).  Sata is described as having continuous

recording, but that is not the basis on which it is distinguished, and the abbreviation of the

excerpt leaves out language that is necessary to understand what the applicants were saying.  The

prosecution history must be evaluated as a whole, and so must individual comments.  *See*

*Storage Tech. Corp.*, 329 F.3d at 833-34.  Sata has "continuous" recording, which is "never

initiated or stopped," and the initiation of Sata's playback function requires commands that are

"**expressly** undisclosed.  Applicant[s] again assert[] that the failure to disclose this essential

information leaves the Sata reference fatally flawed as inoperative and incomplete, impossible to

be practiced as taught . . . "  Ex. S at ¶ 96.  This is not a "clear and unmistakable" disclaimer of

all "continuous recording" devices.  It is a specific distinction of a specific device that lacks a

disclosure of how playback begins.  Arguing the language as it is written is not "exceptionally

meritless."

　　　The Federal Circuit recently cautioned against the finding of a disclaimer when multiple

grounds of distinction appear in comments in the prosecution history.  *See Avid Tech.*, 2016 WL

363410, at *4 ("The language on its face does not exclude a central controller that performs only

---

[8] The defendants' excerpt, quoted by the Court, ends here.

one or the other of the two stated functions—which would have been the meaning if the phrase had used 'or' rather than 'and.'").  The applicants made reference to continuous recording, but, in the sentence the defendants cut off just before the "and," they also made reference to other factors, both the requirements for the initiation of playback and the fact that Sata fails to disclose essential information.  Does the full passage show a disclaimer?  It certainly "does not do so clearly, as would be required to find a disclaimer. . . ."  *See id*.

It is reasonable to read the applicants' comments as not strictly or broadly based on the idea that Sata is a continuous recording device.  We suggest it is essential not to read them as the Court did.  It is simply not true, for example, that the applicants were clearly and unmistakably saying that Sata did not match the pending claims solely because it employed continuous recording.  If they intended a broad statement of disclaimer, based solely on the use of continuous recording, what was the point of mentioning Sata's failure to explain the implementation of playback, or noting the Sata playback implementation details?  A "clear and unmistakable" disclaimer of all continuous recording devices might have been made if the applicants' statement ended where the defendants' excerpt ends.  But it doesn't.

It is also significant to the question of a disclaimer that, in the Office Action that followed the April 28, 1994 response, the examiner again rejected the pending claims (as amended) on the basis that Sata "inherently" disclosed the keyboard limitation.  If there had been a disclaimer of all "continuous recording" devices, wouldn't that have resulted in allowance of the claims if it is true that the claims do not cover "continuous recording" devices?

### F.      The May 19, 1995 Response.

The Court cited the May 19, 1995 response to the Office Action that followed the April 28, 1994 preliminary amendment.

-41-

The examiner had again rejected the pending claims on the basis that Sata inherently disclosed "a keyboard having a record key and a playback key." Ex. S at ¶¶ 103-104 ("Hence, the actuation of the record key and the playback key is considered to be an inherent characteristic of Sata et al."). The applicants "repeated and reasserted" their prior arguments to address the "inherency" argument. Ex. S at ¶ 105.

The applicants also argued:

> In the Official Action dated 11/17/94, the Examiner states that he considers actuation of a record key and a playback key to be an inherent characteristic of Sata, et al. Applicant respectfully submits that this argument is totally unsupported by the facts. Where a reference teaches a device that explicitly records continuously and all the time, it would not be obvious to add a record key to control a function for which no control scenario is provided. Similarly in the case of the playback, it is not obvious to add the playback key of the present invention because there is no way such a key can provide the read designating data and track designating data essential to the recorder taught by Sata.

Ex. S at ¶ 107. The defendants again selectively cited the discussion, mentioning only the record key discussion. That discussion would not support a broad disclaimer of all "continuous recording devices." The applicants' comment speaks only to "function[s] for which no control scenario is provided." There is no suggestion that this is true with respect to all devices to which the "continuous recording device" label can be applied. There is no distinction of the defendants' accused products, which have a need to control the initiation of recording upon an interruption, and have keys used for this function. The defendants argue that their devices do not employ the type of control that is relevant, but that is a disputed point, and the principal basis for the defendants' position is their disclaimer argument. They cannot succeed with a circular argument based on this comment that both establishes a disclaimer and places their products outside of the claims of the '444 Patent.

-42-

The defendants' disregard of the discussion of the playback key is also significant.  As with various of the other comments made during prosecution, the comments about the record key and the playback key cannot be read in isolation.  Only by doing so is it possible to suggest the possibility of a disclaimer that might be relevant.  The discussion of the non-obviousness of the playback key is not based on any consideration relevant to the broad disclaimer claimed by the defendants.  When the comments are read together, as they and the rest of the prosecution history must be, the case for the broad disclaimer claimed by the defendants disappears.

The defendants chose to dial in on a part of the applicants' argument.  Dragon says it is wrong to do so.  Dragon's argument that the passage must be read as a whole and together is correct, and Dragon's conclusion that no disclosure is shown when the passage is read as it must be is reasonable.  *See Avid Tech.*, 2016 WL 363410, at *4.  If there is an argument to be made by the defendants, it is not an argument that is sufficient to demonstrate that Dragon's argument to the contrary is "exceptional" under section 285.

### G.      The November 15, 1995 Response.

The Court also cited, but did not discuss, the applicants' November 15, 1995 response.  The November 15, 1995 paper responds to another Sata-based rejection on the basis of what appears to be the same, previously asserted inherency argument, as prosecution was nearing its end.  Throughout the process, the applicants had argued that Sata was an incomplete invention, the operation of which was not known or explained.  *E.g.*, Ex. B at p. A0073.  The applicants also made various arguments in an attempt to distinguish Sata.  Despite this, they faced yet another challenge from the examiner.

The examiner again argued that it "would have been obvious if not inherent" to add the claimed keyboard to Sata.  Ex. S at ¶ 111.  The applicants reasserted arguments they had

previously made regarding why the keyboard limitation is not "inherent or obvious," and made

some additional remarks.  Ex. S at ¶ 112.  In particular, the applicants argued (in part) that:

> Regarding the Examiner's contention that it would be "obvious if not inherent" to add a keyboard having a record key and a playback key to Sata, applicant asserts that this is not so in the case of Sata.  Sata's device not only fails to include a record key, it cannot accommodate a record key since it is always recording.  So far as structure necessary to implement a control scenario is concerned, Sata teaches in a totally different direction by explicitly requiring full time recording operation and some sort of undefined operator console capable of generating read designating data and track designating data necessary to find the desired starting place for playback in a full time recording device.  To do as the Examiner suggests here, it would be necessary to disregard Sata's requirement that the device be recording at all times, and that the read designating data and track designating data be used for retrieval of stored information.  There is nothing within the teachings of Sata that would suggest or motivate such action.

Ex. S at ¶ 112 (citing Ex. B  at pp. A0145-A0146).  The applicants' comments about the record

key struck a more confident note than before.  They previously portrayed Sata as lacking in

essential information, "inoperative and incomplete, impossible to be practiced as taught without

undue experimentation, and therefore improper to cite as a reference."  Ex. B at p. A0100.  They

also argued that "it is not known how the device of Sata operates without a keyboard or any other

means for controlling the initiation or recording of playback."  Ex. B at p. A0088.  Here, they

purported to know what Sata could "accommodate," but their new position fared no better than

the prior ones.  The applicants' new approach did not persuade the examiner.

In the Office Action subsequent to the November 15, 1995 response, the Examiner again

asserted that the record key and playback keys were inherent in Sata, rejecting any suggestion

that Sata could not accommodate a record key.  Ex. S at ¶ 120 ("as the Examiner has previously

explained it would have been obvious to one of ordinary skill in the art at the time of the

invention to readily recognized that if a user desire to record a television program, the record key

(on the inherent operator console) would have to be actuated by the user; then if the user wishes

to watch, i.e. the first 15-minute part of the 2-hour program (which is capable in Sata et al.; col.

7, lines 28-33), the user would have to actuate the playback key (on the inherent operator

console).").

The Federal Circuit has held that when an applicant has made an erroneous statement

during prosecution, the statement has not been repeated, and the patent allowed for other reasons,

the statements are "not clear and unmistakable enough to invoke the doctrine of prosecution

history disclaimer." *Ecolab*, 569 F.3d at 1343. In *Ecolab*, the accused infringer argued that

claim language involving a solution that "consists essentially of" certain chemicals could not be

read to encompass products that contain more than one antimicrobial agent, because such

solutions had been disclaimed. *Id.* During prosecution, the applicants argued that unlike the

prior art, which used more than one antimicrobial agent, its solution included a "sole"

antimicrobial agent. *Id.* In response, the examiner pointed out that the claim language "which

consists essentially of" was not limited to solutions with only one agent. *Id.* Following the

examiner's clarification, the allegedly disclaiming statements were not repeated, and the claims

were allowed over the cited art, without any change to the "consists essentially of" language. *Id.*

The Federal Circuit concluded that:

> a reasonable reader of this prosecution history could conclude that
> FMC's initial statements that PAA is the sole antimicrobial agent
> used in its claimed method were hyperbolic or erroneous, that the
> Examiner corrected FMC's error in the following communication,
> that FMC recognized its error and never again repeated or relied
> upon the erroneous rationale, and that the claims were allowed for
> reasons independent of the allegedly disclaiming statements. Thus,
> when FMC's statements are considered in the context of the
> prosecution history as a whole, they simply are not clear and
> unmistakable enough to invoke the doctrine of prosecution history
> disclaimer."

*Id.* The applicants' hyperbole contradicting their prior comments is deserving of no different a fate. The applicants' new comment that Sata "cannot accommodate a record key" was, as measured by their prior statements and the examiner's inherency rejections, "hyperbolic or erroneous." The comment was not repeated in subsequent correspondence with the Patent Office, and it was not previously made. When the claims were ultimately allowed, they were allowed without any change to the "record key" limitation, and for reasons that had nothing to do with "continuous recording devices" or anything having to do with Sata and a record key. Ex. S at ¶¶ 126-130.

It is also important that the comment about what Sata could "accommodate" cannot be generalized to all "continuous recording devices." The applicants were speaking of a specific device with a specific feature set. They referred to "the case of Sata" when they spoke of "Sata's device." Nothing in their words "clearly and unmistakably" purported to broadly address all continuous recording devices.

### H.    Subsequent Prosecution History and Allowance.

The defendants do not rely on any prosecution history after the November 15, 1995 response, perhaps because the conclusion of prosecution makes clear that the claims were not allowed on any basis dependent on a conclusion that "continuous recording devices" were disclaimed, and, indeed, confirms that no such disclaimer was made or understood to have been made.

After the November 15, 1995 response, the Examiner again rejected the claims on the basis that Sata "inherently" disclosed the keyboard of the Applicants' invention. Ex. S at ¶ 120. On July 22, 1996, the applicants responded by arguing that "while the physical differences between Sata and the instant invention may be small, they are not insignificant, in so far as the instant invention satisfies a long felt need for a solution to the interruption problem every

program viewer or listener has experienced." Ex. S at ¶¶ 121-122.  Here, the applicants returned

to their early, overriding theme, that Sata did not solve the problem addressed by the invention of

the '444 Patent because it did not allow recovery from an interruption.  Again, the failure of Sata,

unlike the defendants' accused products, to satisfy the essence of the invention was the point of

distinction.  It was not critical that, as the examiner had long understood, Sata "continuously

recorded."

The statement highlighted above shows that the applicants continued to distinguish their

invention on the basis that it was directed to a device that would enable a user to capture content

presented during an interruption, and to be able to replay that content upon actuation of the

playback key.  *Id.*  Sata could not do that, but the defendants' accused products do precisely that.

The invention of the '444 Patent, and the accused products, are distinguished from Sata, but the

invention is not distinguished from the accused products.

The applicants further explained that their arguments and associated amendment to the

claims:

> **address the control circuitry and the control scenario**
> **implemented thereby**, which **serve to distinguish Sata from the**
> **structure of the instant invention which is suited to the graceful**
> **recovery from interruption.** With the instant invention, **the**
> **desired portion is defined ahead of time by the ringing of the**
> **telephone, doorbell or other event** to which the user may respond
> by initiating recording before discontinuing program perception to
> tend to the interruption. **Similarly distinguishing from Sata, with**
> **the instant invention the point from which playback is to begin**
> **is always known to be at the beginning of the recording, and no**
> **particular read designating or track designating data is**
> **needed.**

Ex. S at ¶¶ 123-124 (emphasis added).  "Continuous recording" is not mentioned.  The accused

products and the invention of the '444 Patent are "suited to the graceful recovery from

interruption."  The accused products and the invention of the '444 Patent allow the definition of

-47-

the "desired portion."  The accused products and the invention of the '444 Patent allow

knowledge of "the point from which playback is to begin," and neither requires "particular read

designating or track designating data."  The accused products and the invention of the '444

Patent are distinguished from Sata, not from each other.

After the July 22, 1996 response, two interviews between the applicants' attorney and the

Patent Office occurred.  Upon the Examiner's suggestion, a supplemental amendment to the

claims was made to clarify that the playback key was "subsequently <u>and solely</u> actuated to begin

time delay playback . . . ."  Ex. S at ¶¶ 127-130 (underlining indicates amended claim language).

The applicants explained that the "addition of 'and solely' to the base apparatus and method

claims more clearly point out and distinctly claim the function of the playback key and

associated control circuitry by which the instant invention achieves utility heretofore unmatched

in the field through automatic indexing of the playback function so as to enhance the seamless

recovery effect."  Ex. S at ¶ 128.  The claims were thereafter allowed.  *Id.*  at ¶¶ 129-130.

The claims were allowed following the amendment that clarified operation of the

playback key.  The amendment had nothing to do with anything that might be argued to address

even the possibility of a disclaimer of "continuous recording devices."

*Ex post* consideration of the prosecution history shows no suggestion of an understanding

that the claims of the '444 Patent were allowed on the basis of a disclaimer of "continuous

recording devices."  In 2013, during supplemental examination proceedings, the Patent Office

stated that based on its review of the "entire prosecution history of the '444 Patent (albeit with an

emphasis on Notice of Allowance) . . . the prosecution history does not expressly indicate an

express reason for allowance."  Ex. S at ¶¶ 136-142 (quoting Ex. C at p. A0401 (¶ 14)).  A

person having ordinary skill in the art would find it highly relevant to the question of a

disclaimer that the Patent Office never suggested that the claims were allowed because of a dis-

disclaimer of "continuous recording devices."

## VI.    THE DEFENDANTS' MISREPRESENTATION OF THE IPR PROCEEDINGS.

The defendants also claim these cases are exceptional because Dragon allegedly took

"diametrically opposed" (DISH and Sirius) or "conflicting" (AT&T and DirecTV) positions

before this Court and before the PTAB.  This argument is, a shameful attempt to distract

attention from the fact that DISH and Sirius obtained invalidation of the patents based on a

combination of devices they have told this Court were disclaimed.

The defendants claim that while "Dragon sought to adopt the disclaimers to narrow its

claims and avoid cancellation [in the DISH IPR proceeding]; in the District Court, Dragon

sought to ignore the disclaimer to broaden its claims to cover Defendants' DVR products."

DISH Br. at p. 15; Sirius Br. at p. 10; AT&T/DirecTV Br. at p. 15 ("In the concurrent *inter*

*partes* review proceedings, Dragon sought to *adopt* the prosecution disclaimers to save its claims

from cancellation, while in the district court, Dragon sought to *ignore* the disclaimers to broaden

its claims.") (emphasis in original).  The defendants cite no submission or utterance from Dragon

of "disclaimer" or any of form of the word.  Dragon never argued that any cited reference could

not invalidate the '444 Patent because of statements the applicants made during prosecution, or

because the claims of the '444 Patent do not cover "continuous recording devices."

As discussed above, DISH asserted the Goldwasser and Yifrach references as

invalidating prior art in the IPR proceeding.  Dragon  argued that Goldwasser failed to disclose

the "keyboard having a record key and playback key" and "control circuit" limitations (as the

Patent Office had found during Supplemental Examination of the '444 Patent).  Supplemental

Goldberg Decl. ¶¶ 15, 17-24; Supplemental Freedman Decl. at ¶ 7.  Dragon further argued that

the combination of Goldwasser and Yifrach was not sufficient to render the '444 Patent obvious. There was no reason to argue that anything was "disclaimed" to "save" the '444 Patent.

During oral argument in the DISH IPR, Dragon argued that Goldwasser does not disclose the claimed "record key" in the passage the defendants cite in their papers: "So, we don't dispute that in Goldwasser it does mention the action recording, but it does not teach anything about how to begin a specific recording. . . . ***And in our patent, in claim 1, that means that you have to press a record key to specifically begin a recording. That's what the claim language says***." DISH Br. at p. 15 (emphasis added by DISH).  Dr. Zhu made specific reference to the claim language (". . . begin a recording.  That's what the claim language says"), and that Goldwasser does not contain a button that will, upon actuation, "begin a recording."  '444 Patent at 8:55-57 ("said record key is first actuated to <u>begin a recording</u> by initiating storage of the broadcast program information in said memory unit").  DISH's argument that Dragon "flipped positions" by referencing claim language at issue in the IPR proceedings and the district court is not true.

DISH also argues that "[i]n its infringement contentions and during *Markman* briefing, Dragon ignored this limitation and broadly claimed that the recording could have begun earlier but the pause key was the point of recording that the user was 'interested in.'"  DISH Br. at 15. Dragon offered a construction of "record key."  What is the limitation Dragon "ignored?"  There is nothing inconsistent between Dragon's argument in the DISH IPR that Goldwasser did not disclose a key that "begins a recording" and Dragon's claim construction position in this Court that "record key" should be construed as "a key that, when actuated, signals the control circuit to initiate storage of program information in the memory unit."

DISH also states that Dragon "argued for two different constructions of 'broadcast program information' – the construction 'program information of interest' allowed Dragon to try

to avoid the 'continuous recording' disclaimer." DISH Br. at 15. Dragon's position on claim construction was that "broadcast program information" did not require construction, or alternatively, that it should be construed as "program information that is broadcast." D.I. 77 at p. 19. As discussed above, Dragon's proposed construction of "the broadcast program information" made no mention of "program information of interest." D.I. 110. at p. 4. If DISH is referring to Dragon's infringement contentions, also discussed above, explanations of Dragon's infringement theory are not Dragon's proposed claim constructions.

DISH and Sirius (but not AT&T or DirecTV) also claim that Dragon took similarly "inconsistent" positions in the Unified Patents IPR. DISH Br. at p. 6; Sirius Br. at p. 10. Again, DISH and Sirius cite none of Dragon's filings, instead pointing to a dishonestly excerpted portion of the oral argument. *Id.* In the cited passage, Dragon's lawyer was arguing that Goldwasser and another reference, Ulmer, do not disclose the "keyboard having a record key and a playback key" or "control circuit" limitations, and that a combination of them would not render the challenged claims obvious. Dragon's lawyer argued that "what's missing with them together is the same thing that's missing from each of them independently, and it's the same thing. So, what's missing from each is the record key and the playback key and the specific control circuit . . . . in Goldwasser, there's a reference to a control panel. There's no reference to how recording is begun, for example. And that's the same problem that we have in Ulmer. There is a discussion that recording takes place, playback takes place, but there's no discussion of how that's done and there's no discussion of any control circuit and how it interacts with the control key and playback key of the keyboard." Ex. Z (Unified IPR Tr.) at pp. A1275-A1276. There is nothing inconsistent in this argument with anything Dragon has argued before this Court. There is no attempted "adoption" of a disclaimer, or anything remotely like it.

The defendants' arguments read as though someone was given an instruction to find an "inconsistent" position taken by Dragon in the IPR proceedings in an effort to blunt the force of the fact that DISH and Sirius succeeded in invalidating the patent based on "continuous recording devices."  Although they have had more than seven months since Dragon filed papers in this court demonstrating that DISH and Sirius used continuous recording devices to invalidate the '444 Patent, this is the best they could come up with.

## VII.  DISH IS NOT ENTITLED TO IPR ATTORNEY FEES.

DISH and Sirius claim that the fees they incurred in connection with prosecuting the IPR proceedings they initiated are recoverable under section 285.  DISH and Sirius are incorrect.

Nothing in the text of section 285 suggests that fees are recoverable for proceedings other than the proceeding in which fees are sought.  The "exceptional case" motions do not claim that these cases are exceptional based on positions taken on validity issues.  No proceedings related to the validity of the patent took place before this Court.  The judgment to which the parties stipulated was one of non-infringement based on the Court's claim construction.  The parties made no mention of validity, and no validity issues were presented to or decided by this Court. *Id.*  An award of fees from an IPR is not appropriate where the IPR proceeding did not result "in rulings that were important to the court's final decision in the lawsuit." *Chaffin v. Braden*, No. CV 6:14-0027, 2016 WL 5372540, at *2 (S.D. Tex. Sept. 26, 2016) ("No findings or conclusions from the PTAB in its decision denying the IPR Petition were 'crucial' to this Court's ruling on summary judgment. Instead, Defendants obtained summary judgment from this Court on the issue of noninfringement, not invalidity.").

The mostly unpublished cases on which DISH and Sirius rely involve cases in which Patent Office proceedings effectively substituted for district court proceedings. *See Deep Sky Software, Inc. v. Sw. Airlines Co.*, No. 10-CV-1234-CAB, 2015 WL 10844231, at *1 (S.D. Cal.

Aug. 19, 2015) ("the PTO's cancellation of the asserted '770 Patent claims on grounds of inva-invalidity disposed of plaintiff's complaint here and made defendant the prevailing party."); *Scott Paper Co. v. Moore Business Forms, Inc.*, 604 F.Supp. 835, 838 (1984) (similar; "[t]he Court finds that this activity in the peculiar circumstances of this litigation was 'necessary to the case' . . ."); *IA Labs CA, LLC v. Nintendo Co.*, No. CIV. PJM 10–833, 2012 WL 1565296, at *4 (D. Md. May 1, 2012) *aff'd*, 515 Fed. App'x. 892 (Fed. Cir. 2013) (reexamination fees awarded where patent was also held invalid in district court); *Howes v. Med. Components, Inc.*, 761 F. Supp. 1193, 1198 (E.D. Pa. 1990) (reexamination fees awarded as "reasonably necessary to this litigation").  That is not the case here.

DISH and Sirius also claim that they pursued IPR because they believed IPR to be the "least expensive" and most "cost-efficient" way to dispose of Dragon's case.  DISH Br. at 6-7; Sirius Br. at 15.  DISH and Sirius are wrong on that as well.  The claim construction order was entered in this case on September 9, 2015.  Dragon proposed in September 2015 that it and DISH stipulate to non-infringement in light of the Court's claim construction order.  Ex. V (9/18/16 email from Dragon to DISH).  DISH responded by rejecting Dragon's proposal, and insisting that Dragon dismiss its case with prejudice, agree to cancel all claims of its patent, and waive its right to appeal.  Ex. W (9/23/15 email from DISH to Dragon).  The parties stipulated to non-infringement in April 2016.  The decision on DISH's IPR petition issued in June 2016.  Between September 2015 and April 2016, various events in the IPR took place that would have been unnecessary if DISH and Sirius had proceeded, as the other defendants did, only in district court.  Had DISH and Sirius stipulated to non-infringement when Dragon first proposed it nine months before the Final Decision issued, the cases would have been "over" nine months sooner.

DISH and Sirius also conveniently ignore the fact that, if their current positions have merit, they could have disposed of this case by filing timely Rule 11 motions. Timely filing of a Rule 11 motion is what the law expects of a party seeking the recovery of attorneys' fees. The approach taken by DISH and Sirius, in which a litigant finds as many ways to spend money as possible and then tries to blame its profligacy on the opponent after it wins is not consistent with basic concepts of mitigation of damages, or the specific timeliness requirements that led the Court to deny the Rule 11 motions filed by the other defendants.

The PTAB proceedings had nothing to do with the resolution of Dragon's claims before this Court, and were not necessary to the stipulated judgment of non-infringement. DISH and Sirius should not be rewarded with a windfall because their lawyers decided to pursue a path that is not related to its "exceptional case" theory, and that is hard to square with its contention that Dragon's infringement claims were "objectively baseless" from the start of the case.

## VIII.   THE DEFENDANTS IDENTIFY NO OTHER INDICIA OF EXCEPTIONALITY.

Dragon had a good faith belief in the correctness of its position at all times, and the defendants point to nothing that suggests otherwise. Dragon did not settle with any of the defendants for "nuisance value" amounts. Indeed, Dragon declined a multimillion dollar settlement offer. *See* Ex. AA.

The defendants' motions make no mention of litigation misconduct of the type that has been found to support an exceptional case finding, such as discovery abuse, or frivolous or serial motions, or continuing to pursue a case after an adverse ruling that renders a party's position unsustainable. Here, Dragon immediately engaged with the Defendants following the issuance of the Court's claim construction order, sought to put in motion a process moving toward a stipulation for entry of judgment of non-infringement, and assured the non-stayed defendants that it would no longer litigate the cases on the merits before this Court pending entry of

judgment.  Exs. X (email to AT&T counsel); Y (email to DirecTV counsel).  In short, Dragon acknowledged the significance of the Court's order, and acted responsibly in seeking to move the case toward appeal in an orderly fashion.

The only comment that DISH and Sirius make that smacks of "litigation misconduct" is the suggestion that Dragon declined for a period of time to dismiss the case against DISH after the Court's claim construction order.  *See, e.g.,* DISH Br. at 14 ("Nevertheless, Dragon and Freitas continued to pursue Dragon's claims against DISH following the '444 patent Markman hearing. . . . it took more than 6 months after" the hearing for Dragon to dismiss its claims.).  If this is intended to be a suggestion of "misconduct," it is easily addressed.

As the Court is aware from prior proceedings, after the claim construction order issued, Dragon immediately engaged with the Winston Defendants about a stipulation of non-infringement.  While the parties initially agreed on this procedure, the Winston Defendants, AT&T, DirecTV, and the other defendants never delivered the promised draft of undisputed facts, and instead adopted an unsuccessful Rule 11 strategy.

At the time the claim construction order issued, the DISH and Sirius matters were stayed. Immediately after entry of the claim construction order on September 9, 2016, Dragon's counsel sought to engage DISH's counsel in a process that would lead to entry of judgment of non-infringement.  Ex. V (9/18/15 email).  DISH refused to participate in such a process.  The stay remained in place until entry of judgment on or about April 26, 2016.  D.I. 116 (DISH); D.I. 129 (Sirius).  DISH and Sirius notified the Court on June 17, 2016 of the decision in the IPR.  D.I. 121 (DISH); D.I. 134 (Sirius).

DISH and Sirius know Dragon did not "delay" stipulating to non-infringement while the cases were stayed.  DISH and Sirius refused to participate in the orderly process Dragon

suggested and preferred to wait on the sidelines while it watched AT&T, DirecTV, and the Winston Defendants pursue unsuccessful Rule 11 motions.  Only when those motions had run their courses did DISH (and the other defendants) participate in preparing stipulations of non-infringement.  There was no "delay," and DISH's and Sirius's suggestion to the contrary is unfair.

## IX.    CONCLUSION.

For the foregoing reasons, the Court should deny the defendants' motions.


Dated:  October 20, 2016                      DEVLIN LAW FIRM LLC


                                              By: */s/ Timothy Devlin*
                                              Timothy Devlin (#4241)
                                              tdevlin@devlinlawfirm.com
                                              1306 N. Broom Street, 1st Floor
                                              Wilmington, DE 19806
                                              Phone: (302) 449-9010
                                              Fax: (302) 353-4251

                                              LILAW INC.
                                              J. James Li (*Pro hac vice*)
                                              5050 El Camino Real, Suite 200
                                              Los Altos, CA 94022
                                              Phone: (650-521-5956)
                                              lij@lilaw.us

                                              *Attorneys for Plaintiff*
                                              *Dragon Intellectual Property, LLC*