IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DRAGON INTELLECTUAL PROPERTY, LLC,   )
  )
      Plaintiff,   )
  )
  )   C.A. No. 13-2066 (RGA)
      v.   )
  )
DISH NETWORK L.L.C.,   ) ████████████
  )
      Defendant.   )   REDACTED - PUBLIC VERSION
  )

DRAGON INTELLECTUAL PROPERTY, LLC,   )
  )
      Plaintiff,   )
  )
  )   C.A. No. 13-2067 (RGA)
      v.   )
  )
SIRIUS XM RADIO INC.,   ) ████████████
  )
      Defendant.   )

**DISH NETWORK L.L.C.'S AND SIRIUS XM RADIO INC.'S REVISED JOINT OPENING BRIEF IN SUPPORT OF THEIR MOTIONS TO DECLARE THIS CASE EXCEPTIONAL PURSUANT TO 35 U.S.C. § 285**

OF COUNSEL:

G. Hopkins Guy III
BAKER BOTTS L.L.P.
1001 Page Mill Road
Building One, Suite 200
Palo Alto, CA  94304-1007
(650) 739-7500

Ali Dhanani
Bradley Bowling
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX  77002-4995
(713) 229-1234

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com

*Attorneys for Defendant DISH Network L.L.C.*

Jamie R. Lynn
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004-2400
(202) 639-7786

POTTER ANDERSON & CORROON LLP
Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)

OF COUNSEL:

Hercules Plaza, 6th Floor
Wilmington, DE  19801
(302) 984-6000

Paul J. Andre
Lisa Kobialka
KRAMER LEVIN NAFTALIS & FRANKEL LLP
990 Marsh Road
Menlo Park, CA  94025
(650) 752-1700

provner@potteranderson.com
jchoa@potteranderson.com

*Attorneys for Defendant Sirius XM Radio, Inc.*

Mark A. Baghdassarian
Shannon H. Hedvat
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY  10036
(212) 715-9100

May 10, 2021

**TABLE OF CONTENTS**

I.     Nature and Stage of the Proceeding ...........................................................................1

II.    Summary of Argument ................................................................................................1

III.   Statements of Facts .....................................................................................................2

    A.   '444 Patent and its Prosecution History Disclaimer ...........................................2

    B.   Background of the Litigation ...............................................................................2

    C.   Accusations against DISH ...................................................................................3

       1.   Dragon's Initial Accusations Against DISH's Products .................................3

       2.   DISH Notifies Dragon ...................................................................................5

    D.   Accusations against SXM ....................................................................................6

       1.   Dragon's Accusations Against SXM's Products ............................................6

       2.   SXM Notifies Dragon ..................................................................................10

    E.   This Court Held That the '444 Patent Disclaimed "Continuous Recording" ......11

    F.   Unified Patents and DISH/SXM IPR Proceedings ............................................11

    G.   Defendants' Resolution of the District Court Case ............................................12

    H.   Dragon Counsel's Withdrawal ...........................................................................13

    I.   Denial of Defendants' § 285 Motions and Remand from Federal Circuit ...........14

IV.   ARGUMENT .............................................................................................................14

    A.   Legal Standard ..................................................................................................14

    B.   Defendants are Prevailing Parties .....................................................................15

    C.   The Case is "Exceptional" and Warrants An Award of Attorneys' Fees Against Dragon and its Counsel Freitas .............................................................................................15

       1.   Dragon and its Counsel Failed to Conduct a Proper Pre-Filing Investigation ..................16

       2.   Dragon and Freitas Continued Objectively Baseless Litigation Despite Early Warnings from DISH and SXM ......................................................................18

       3.   Dragon's Positions Regarding the Asserted Claims in the PTAB and Before This Court Were Diametrically Opposed ...........................................................20

    D.   DISH and SXM Should Be Awarded Their Attorneys' Fees From Both the PTAB Proceeding and This Litigation ........................................................................21

    E.   Dragon and Freitas Should Both Be Held Liable for Attorneys' Fees ................23

       1.   Statutory Language of § 285 Does Not Exclude Counsel's Exceptional Conduct ...........23

       2.   Dragon Has Largely Disappeared From the Case ........................................26

       3.   An Exceptional Case Finding Against Freitas is Necessary to Deter Future Frivolous Patent Assertions Against Defendants ...........................................27

V.     Conclusion ...............................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Amneal Pharm. LLC v. Almirall, LLC*,
  960 F.3d 1368 (Fed. Cir. 2020)............................................................................21

*Blackbird Tech LLC v. Health In Motion LLC*,
  944 F.3d 910 (Fed. Cir. 2019), *cert. denied*, 140 S. Ct. 2765 (2020).....................18

*Coghlan v. Starkey*,
  852 F.2d 806 (5th Cir. 1988) ...............................................................................25

*Deep Sky Software, Inc. v. Sw. Airlines Co.*,
  2015 WL 10844231 (S.D. Cal. Aug. 19, 2015) .................................................22, 23

*Dragon Intell. Prop., LLC v. Apple Inc.*,
  700 F. App'x 1005 (Fed. Cir. 2017) .....................................................................14

*Dragon Intell. Prop., LLC v. AT&T Services Inc.*,
  C.A. No. 13-2061-RGA, D.I. 110, Mem. Op. (D. Del. Sept. 9, 2015)........................ passim

*Dragon Intell. Prop., LLC v. DISH Network L.L.C.*,
  711 F. App'x 993 (Fed. Cir. 2017) .......................................................................14

*Dragon Intell. Prop., LLC v. DISH Network L.L.C.*,
  Case No. 19-1283 (Fed. Cir.)...............................................................................26

*Dragon Intell. Prop., LLC v. DISH Network LLC*,
  956 F.3d 1358 (Fed. Cir. 2020)...............................................................14, 15, 21

*Fox v. Vice*,
  563 U.S. 826 (2011)............................................................................................22

*Healey v. Chelsea Res., Ltd.*,
  947 F.2d 611 (2d Cir.1991).................................................................................25

*Howes v. Med. Components, Inc.*,
  761 F. Supp. 1193 (E.D. Pa.1990) ........................................................................22

*IA Labs CA, LLC v. Nintendo Co.*,
  2012 WL 1565296 (D. Md. May 1, 2012)...............................................................22

*In re Crescent City Estates, LLC*,
  588 F.3d 822 (4th Cir. 2009) ...............................................................................25

*Iris Connex, LLC v. Dell, Inc.*,
    235 F. Supp. 3d 826 (E.D. Tex. 2017) ...................................................................24

*Munchkin, Inc. v. Luv N' Care, Ltd*.,
    2018 WL 7504404 (C.D. Cal. Dec. 27, 2018) ........................................................22

*My Health, Inc. v. ALR Techs., Inc*.,
    2017 WL 6512221 (E.D. Tex. Dec. 19, 2017)........................................................22

*Nat'l Oilwell Varco, L.P. v. Omron Oilfield & Marine, Inc*.,
    676 F. App'x 967 (Fed. Cir. 2017) ........................................................................18

*Neft v. Vidmark, Inc.*,
    923 F.2d 746 (9th Cir. 1991) .................................................................................25

*Octane Fitness, LLC v. ICON Health & Fitness, Inc*.,
    572 U.S. 545 (2014).......................................................................................... passim

*Phonometrics, Inc. v. ITT Sheraton Corp*.,
    64 F. App'x 219 (Fed. Cir. 2003) ..........................................................................25

*Phonometrics, Inc. v. Westin Hotel Co.*,
    319 F.3d 1328 (Fed. Cir. 2003)..............................................................................25

*Pirri v. Cheek*,
    2021 WL 1081780 (Fed. Cir. Mar. 22, 2021).........................................................25

*PPG Indus., Inc. v. Celanese Polymer Specialties Co.*,
    840 F.2d 1565 (Fed. Cir.1988)...............................................................................22

*Roadway Express, Inc. v. Piper*,
    447 U.S. 752 (1980)..........................................................................................25, 26

*SAP Am., Inc. v. InvestPic, LLC*,
    2021 WL 1102085 (N.D. Tex. Mar. 23, 2021) ......................................................24

*Scott Paper Co. v. Moore Bus. Forms, Inc.*,
    604 F. Supp. 835 (D. Del. 1984).............................................................................22

*Stone Basket Innovations, LLC v. Cook Med. LLC*,
    892 F.3d 1175 (Fed. Cir. 2018)..............................................................................18

*Sullivan v. Hudson*,
    490 U.S. 877 (1989).................................................................................................21

*Thermolife Int'l LLC v. GNC Corp*.,
    922 F.3d 1347 (Fed. Cir. 2019)..................................................................16, 17, 18

*Unified Patents Inc. v. Dragon Intell. Prop., LLC,*
  IPR2014-01252 (PTAB) ................................................................................11

*Vehicle Interface Technologies, LLC v. Jaguar Land Rover North America, LLC,*
  C.A. No 12-1285, D.I. 148, Mem. Op. (D. Del. Dec. 28, 2015) ...............................30

*Vehicle Interface Techs. LLC v. Jaguar Land Rover N. Am. LLC,*
  639 F. App'x 651 (Fed. Cir. 2016) ...............................................................21

*Vehicle Operation Techs. LLC v. Am. Honda Motor Co. Inc.,*
  67 F. Supp. 3d 637 (D. Del. 2014)...............................................................11

*Vehicle Operation Techs. LLC v. Ford Motor Co.,*
  2015 WL 4036171 (D. Del. July 1, 2015) .........................................................15

## STATUTES

28 U.S.C. § 1927 ..............................................................................24, 25, 28

35 U.S.C. § 285 .............................................................................. passim

## OTHER AUTHORITIES

Federal Rule of Appellate Procedure 38 ................................................................24

Federal Rule of Civil Procedure 5 ...................................................................28

Federal Rule of Civil Procedure 11 ..................................................................24

Federal Rule of Civil Procedure 37 ..................................................................24

## I.      NATURE AND STAGE OF THE PROCEEDING

Defendants DISH Network L.L.C. ("DISH") and Sirius XM Radio Inc. ("SXM") (collectively "Defendants") respectfully provide the Court with revised briefing supporting their motions to declare this case exceptional pursuant to 35 U.S.C. § 285[1] and to award Defendants their prevailing party attorneys' fees and other costs against Plaintiff Dragon Intellectual Property, LLC ("Dragon") and Dragon's original counsel in this case, the law firm of Freitas & Weinberg LLP, as well as named partner Robert Freitas (collectively "Freitas").

## II.     SUMMARY OF ARGUMENT

As demonstrated in this case, Dragon and its counsel Freitas refuse to address the cost, expense, and harm they created in bringing these lawsuits.  This was not a close case; it was a calculated gamble to re-cast patent claims to recapture the patentee's own explicit disclaimers and make claims of infringement for functionality that the patentee previously admitted during prosecution was not its invention.  Dragon's infringement allegations were not only meritless and objectively unreasonable based upon the plain language of the asserted claims, but also its claim construction and infringement positions were clearly and unequivocally disclaimed (repeatedly) during the six years of prosecution of the asserted patent, as this Court's Markman Order confirmed.  Additionally, both pre-filing and during the lawsuit, Dragon and its counsel were aware of, and could have easily confirmed, how Defendants' accused products operated and the undeniable fact that the products could not infringe the plain language of the claims.  The accused DISH and SXM products actually show any user that recording begins immediately and continuously upon power-up or channel change and not as claimed in the '444 patent.  Early in the case, Defendants repeatedly warned Dragon that the products could not infringe.  But Dragon

---

[1]      *Dragon Intellectual Property LLC v. DISH Network L.L.C.*, C.A. No. 13-2066-RGA, D.I. 130 (D. Del. Aug. 24, 2014); *Dragon Intellectual Property LLC v. Sirius XM Radio Inc.*, C.A. No. 13-2067-RGA, D.I. 139 (D. Del. Aug. 25, 2014).

ignored the warnings and, to date, has never claimed to have conducted a pre-filing investigation.

Dragon and its only known owner – Mr. Kai Zhu – appear to have disappeared and Freitas has yet to acknowledge any responsibility for the harm created. As time has passed, if anything, the case has become more exceptional by the extremes to which Dragon and its counsel will go to avoid any responsibility.

## III.   STATEMENTS OF FACTS

### A.   '444 Patent and its Prosecution History Disclaimer

The application for U.S. Patent No. 5,930,444 ("'444 patent") was filed on April 28, 1994. During prosecution, there were six office actions, with each one including rejections based on U.S. Patent No. 5,134,499 ("Sata"). Sata teaches a recording device that "continuously records the video data concerning the television program of the channel tuned by the television tuner." *Dragon Intell. Prop., LLC v. AT&T Services Inc.*, C.A. No. 13-2061-RGA, D.I. 110, Mem. Op. at 7 (D. Del. Sept. 9, 2015). The applicant repeatedly responded to the Sata rejections by disclaiming coverage of "continuous recording" and by stating that the device claimed in the '444 patent does not begin recording until a record key is actuated. *Id.* at 7. The claims were also amended to highlight that record key actuation is needed to begin recording. *Id.*

### B.   Background of the Litigation

Having advised the public that its claims did not cover continuous recording, Dragon, represented by Freitas, filed suit on December 20, 2013, alleging that Defendants infringed the '444 patent. DISH D.I. 1.[2] On that same day, Dragon also filed suit against eight other defendants, including Apple, Inc., AT&T Services, Inc., and others (herein referred to as the "Unstayed Defendants"). On June 23, 2014, DISH first produced to Dragon publicly available

---

[2]   Citations to "DISH D.I." entries refer to the DISH matter (C.A. No. 13-2066). References to the SXM matter (C.A. No. 13-2067) are designated by "SXM D.I."

user manuals for the accused DISH products and supplemented that production over time. *See* DISH Ex. 1[3]. Similarly, on June 30, 2014, SXM produced to Dragon publicly available user manuals and confidential documents for the accused SXM products and continued to supplement its production, with both publicly available and internal documentation, over time. *See* SXM Ex. 1. In its August 29, 2014 Initial Infringement Contentions to DISH, Dragon asserted that DISH infringed claims 1, 2, 3, 4, 8, and 10 of the '444 patent. DISH Ex. 2. In its Initial Infringement Contentions to SXM served on August 29, 2014 and September 11, 2014, Dragon asserted that SXM infringed claims 1, 2, 3, 4, 7, and 8 of the '444 Patent. SXM Exs. 2 & 3.

### C. Accusations against DISH

#### 1. Dragon's Initial Accusations Against DISH's Products

In its Initial Infringement Contentions to DISH, Dragon accused DISH's Digital Video Recorder ("DVR") products of infringing the '444 patent. The accused DISH DVR products record satellite broadcast TV shows for viewing by the user at a later time. They operate by using "continuous recording" (which Dragon had disclaimed) of any live broadcast program without user intervention. In a feature that DISH calls "Auto Recording," the DISH DVRs initiate recording automatically and immediately without any user action when the system is turned on (to the last channel viewed) or upon user channel change. This feature is described in DISH's public user manuals. DISH Ex. 3 at 69; DISH Ex. 4 at 60.

This form of "continuous recording" was advantageous because the user did not have to press a RECORD key to start recording. Importantly, the user experience was better because it

---

[3]      Unless otherwise noted, exhibits identified as "DISH Ex. __" are attached to the concurrently filed Declaration of Jamie R. Lynn. Exhibits identified as "SXM Ex. __" are attached to the concurrently filed Declaration of Mark Baghdassarian.

allowed a user to simply tune to a channel and recording began automatically.[4]  If the user then decided to record the show for later, the user could then press a RECORD key, which simply saved the recording of the show that had already begun.  DISH Ex. 4 at 62-63.

As mentioned above, beyond being described in publicly available user manuals, DISH DVR operation is readily observable by users or subscribers.  Detailed technical analysis is not required to determine that DISH's accused products use "continuous recording," which was disclaimed in the '444 patent.  Any casual user can simply make a channel change and then watch a show for up to an hour.  DISH Ex. 5, Oct. 24, 2014 Letter at 4.  After some period, as short as a few seconds to as long as an hour, the user can press the RECORD key.  As described in the user manuals, a show records from the point of the first channel change, not from when the RECORD key was pressed.  DISH Ex. 4 at 61 ("you can only reverse back to the last channel change or back one hour, whichever occurs first").  After pressing the RECORD key, the user can go to the DVR program menu and retrieve the recorded show.  *Id.* at 62.  In every instance, the DVR recording can be seen as starting from the beginning of the channel change or when the DVR was first turned on and not when the RECORD key is pressed.  DISH Ex. 5.  Recording is never initiated from the press of the RECORD key on any DISH DVR, as the '444 patent claims require.  *Id.*  Even the most casual inspection of DISH accused products would have showed that there is no infringement.

Similarly, when a user presses the PAUSE key on any DISH DVR, the show is already recording.  *Id.*  "Pause" merely places a marker on the "continuous recording" already in progress at the point where PAUSE was pressed.  DISH Ex. 4 at 61.  Later pressing PLAY or PAUSE merely plays back the recording from that point, but the user could restart from any

---

[4]      Because DVRs do not have limitless storage, the amount of content stored when the DVR is "Auto Recording" was limited (*e.g.* two hours).  DISH Ex. 3 at page 69.

point in the recording.  DISH Ex. 5.  It would be readily apparent that recording had started before the PAUSE key was pressed by simply rewinding to a time period before PAUSE was pressed.  Thus, the DISH DVR PAUSE button never initiates any recording nor does it play back the recording from the initial start of the recording from the channel change or power-on.

### 2. **DISH Notifies Dragon**

On October 24, 2014, DISH notified Dragon by letter that the accused DISH DVRs were "continuously recording," and that there was no basis for its infringement allegations against DISH.  *Id*.  DISH was clear that any reasonable pre-suit investigation would have demonstrated that the DISH devices could not infringe the plain language of the asserted claims.  *Id*.

DISH noted that the plain language of the claims requires the use of a "record key," which, when actuated, begins the recording that can then later be watched by pressing a "playback key."  *Id*.  As explained in that letter and demonstrated by DISH's user manuals, the DISH products do not begin recording when a RECORD or PAUSE button is actuated, but instead the DISH products continuously record, regardless of the use of a RECORD or PAUSE button.  In addition to noting that the DISH products could not meet the plain language of the claims, DISH explained in its letter that this basic reading of the claim language was confirmed by the applicant's statements and prosecution disclaimer of devices that continuously record.

In its November 11, 2014 response, Dragon failed to address the concerns raised in DISH's letter.  Instead, to justify its claims, it attempted to re-write its infringement allegations by ignoring the claim language.  DISH Ex. 6, Nov. 11, 2014 Letter.  For example, for the term "the broadcast program information," Dragon's counsel attempted to replace it with the phrase "program information of interest" that did not otherwise exist in the asserted claims.  *Id*.[5]  Two

---

[5]     Dragon took a new position that "broadcast program information" should be construed differently than "***the*** broadcast program information" within the same claim.  *Id*. at 2.  Dragon

days later, DISH once again explained that its documentation or simple use of the DISH products would confirm non-infringement.   DISH Ex. 8, Nov. 13, 2014 Letter.   DISH requested that Dragon dismiss all claims against DISH and noted that it reserved its right to seek attorneys' fees under 35 U.S.C. § 285 based upon the objectively unreasonable positions Dragon and its counsel were taking in the litigation.   *Id.*   Critically, DISH warned Dragon and Freitas that its responses were attempting to reverse the clear disclaimer regarding "continuous recording."   *Id.*

### D.      Accusations against SXM

#### 1.      Dragon's Accusations Against SXM's Products

In its Initial Infringement Contentions to SXM, Dragon alleged that SXM infringed the Asserted Claims based on "products ... that include the ability to 'pause' live satellite radio broadcast programming."   SXM Ex. 2 at 2; SXM Ex. 3 at 2.   However, the accused SXM products store content automatically through continuous recording and, therefore, do not begin a recording upon the actuation of a record key or begin time delay playback of a recording upon the actuation of a playback key as required under the Asserted Claims.   *See generally* SXM D.I. 1, Ex. A, '444 Patent at Claim 1.

More particularly, Dragon's infringement theory identified the "Play/Pause Button" of the SXM accused products (a single button) as the claimed "record key" and "playback key," explaining that "[b]y pressing Play/Pause, the user can actuate the record key to begin a recording by initiating storage of the radio broadcast."   *See, e.g.*, SXM Ex. 3 at Chart 1 at 20.   In addition, as it did with DISH, Dragon tried to supplement its arguments against SXM through "Further Initial" Infringement Contentions, served on November 6, 2014, by claiming that the devices initiate storage of "the program information of interest" as opposed to the program

---

then served "Further Infringement Contentions" attempting to flesh out this argument.   DISH Ex. 7, Further Initial Infringement Contentions at 5.

content that has been recording since tuning to a channel.  *See, e.g.*, SXM Ex. 4 at Chart 1 at 21, Chart 2 at 15, Chart 3 at 15.  Under these "Further Initial" Infringement Contentions, Dragon argued that "when the pause (i.e., record) key is actuated, initiation of storage of the program information of interest (i.e., 'the' broadcast program, as opposed to any other program information) occurs."  *See, e.g.*, SXM Ex. 4 at Chart 2 at 12.

However, SXM's publicly available user manuals explain that the accused Play/Pause Button on the products only "mute the audio and mark the point in the broadcast so you can resume listening at a later time."  SXM Ex. 5 at SXM00001545.  Indeed, these publicly available user manuals describe that when a user tunes to a channel, the product "automatically begins storing the audio, enabling you to rewind at any time to replay the audio again."  *See, e.g.*, SXM Ex. 6 at SXM0004929.  If the channel is changed, the device then starts storing the broadcast content of that new channel and discards the content from the previous channel, irrespective of the use of the Play/Pause button.  *Id.* at SXM00004931 ("When the Receiver is tuned to another channel, all audio stored in the Instant Replay memory is erased and the tuned channel begins to play.").  By way of example, if a user tunes to channel 8 for thirty minutes, the device automatically and continuously records the content from channel 8 for that entire thirty-minute period.  If the user then tunes to channel 9, the device automatically begins storing the broadcast content from channel 9 and discards the content from channel 8.

Incredibly, Dragon's Further Initial Infringement Contentions recognize this non-infringing functionality and cite to the accused SXM SR-H1000 product's user manual discussing the continuous recording functionality: "[a]s soon as you tune to a channel, the tuner automatically begins storing the audio, enabling you to rewind at any time to replay the audio again."  SXM Ex. 6 at SXM00004929 (cited in the SXM Ex. 4, Further Initial Infringement

Contentions at Chart 2 at 8, 10, 12, 16).

Publicly available user manuals for other accused SXM products similarly describe how they automatically store or buffer content to enable users to rewind content without actuation of the Play/Pause button:

- Sportster 4 User Guide: "As soon as you tune to a channel, the radio automatically begins storing the audio, enabling you to rewind at any time to replay the audio again."  SXM Ex. 7 at SXM00002038 (cited in SXM Ex. 4, Further Initial Infringement Contentions at Chart 1 at 18-21);

- Starmate Replay User Guide: "As soon as you tune to a channel, the Receiver automatically begins storing the audio, enabling you to rewind at any time to replay the audio again."  SXM Ex. 8 at SXM00001973 (cited in SXM Ex. 4, Further Initial Infringement Contentions at Chart 1 at 18-21);

- Stiletto 2 and Stiletto 100 User Guides: "While listening to satellite radio, up to the most recent 60 minutes of the broadcast is stored in the temporary replay buffer."  SXM Ex. 9 at SXM00002749; SXM Ex. 10 at, SXM00008708) (cited in SXM Ex. 4, Further Initial Infringement Contentions at Chart 3 at 14-16); and

- Sirius-S50 User Guide: "While in the live environment, the broadcast to which you are listening is put into a replay buffer temporarily, up to the most recent 30-60 minutes (depending upon the content of the broadcast)."  SXM Ex. 11 at SXM00008360 (cited in Ex. 4, Further Initial Infringement Contentions at Chart 3 at 14-16).

Significantly, Dragon's complaint against SXM identifies two of these products – the Stiletto 100 and Stiletto 2 devices – as allegedly infringing, even though the publicly available user manuals clearly show that they do not use the claimed "record" and "playback" keys.  SXM D.I. 1 at ¶ 11.

Based on at least these publicly available user manuals, it is clear that the storage of the broadcast content in the accused SXM products is not triggered or actuated by pressing the accused Play/Pause button.  Instead, pressing the Play/Pause button allows the device to mark that position of the live broadcast at a specific point in time.  The device continues to store the broadcast content as the device had been doing since the user tuned to the channel.  SXM Ex. 4

at Chart 2 at 16 ("If you are unable to continue listening to a channel, but do not want to miss the broadcast, pressing the Play/Pause button will cause the Receiver to mute the audio and mark the point in the broadcast so you can resume listening at a later time." (citing SXM Ex. 6 at SXM00004929-30)).   In fact, the user manuals further explain that the accused devices continuously store content even after the memory of the device is full, independent of the Play/Pause button: "When memory becomes full, the oldest part of the replay buffer is deleted to make room for the new material so that the live broadcast can continue to be added to the replay buffer."  SXM Ex. 10 at SXM00008708.

Once the Play/Pause button is pressed again, the user is able to continue to listen to the broadcast content from the point when the Play/Pause button was initially pressed, not at the point where the recording began – *i.e.*, when the device was tuned to a channel.  *See, e.g.*, SXM Ex. 10 at SXM0008708 ("Press Play/Pause to begin playing a paused broadcast from the point at which it was paused."); SXM Ex. 12, SkyFi3 User Guide at SXM0001920 ("Content will resume playing [after pressing the Play/Pause button] from the location where it was paused ...").  At no point does the selection of the Play/Pause initiate storage of content or return the device to play back content from the point at which storage began (*i.e.*, upon tuning to a channel).

Moreover, operating these devices and reading the user manuals would have confirmed for Dragon that when the device is tuned to a channel for a few minutes, the user can rewind the content to the point in time when the channel was selected, independent of the Play/Pause Button.  SXM's internal documents produced in June 2014 – months before service of Dragon's Initial Infringement Contentions – also confirm this non-infringing operation of the accused devices.  *See, e.g.*, SXM Ex. 13, ███████████████████████████

████████████████████████████████████████████████████████



Despite this non-infringing operation of the accused products, Dragon nevertheless decided to maintain its suit against SXM.

### 2. SXM Notifies Dragon

On December 15, 2014, SXM notified Dragon that its continued pursuit of the action was frivolous and demanded that Dragon immediately dismiss the case. SXM Ex. 14. Specifically, SXM's counsel outlined how the accused products cannot infringe the '444 Patent in light of (1) the clear and unequivocal statements made in the prosecution history of the '444 Patent that disclaimed continuously recording devices, and (2) the unquestionable operation of the accused SXM products (described above). *Id.*

SXM also reiterated the baseless nature of Dragon's case against SXM because the '444 Patent was invalid for the reasons described in the Defendants' invalidity contentions. *Id.* Dragon, and in particular Freitas, never responded to SXM's letter and continued to deny the unequivocal operation of the accused SXM products. Indeed, in response to SXM's request that Dragon admit that "when the Play/Pause button on the Accused Products is selected to pause audio content, the audio content that is subsequently paused would have been stored into memory without the selection of the Play/Pause button," on February 2, 2015, Dragon failed to acknowledge the functionalities in the accused products, simply stating that: "Dragon denies that in every case in which the record key on the accused products is actuated, all of the information that is broadcast after actuation of the record key 'would have been stored into memory,' with or without actuation of the record key." *See, e.g.*, SXM Ex. 15 at 11-12.

### E.       This Court Held That the '444 Patent Disclaimed "Continuous Recording"

The Court agreed with Defendants that the '444 Patent disclaimed "continuous recording."  In its Markman Order, the Court held that, during the prosecution of the '444 patent when responding to the ***six separate rejections*** regarding the Sata reference, "applicants clearly and unequivocally disclaimed 'continuous recording' devices.  I have only once seen a clearer case of prosecution disclaimer."  *Dragon Intell. Prop., LLC v. AT&T Services Inc.*, C.A. No. 13-2061-RGA, D.I. 110, Mem. Op. at 7 (D. Del. Sept. 9, 2015) (citing *Vehicle Operation Techs. LLC v. Am. Honda Motor Co. Inc.*, 67 F. Supp. 3d 637, 650-51 & n.6 (D. Del. 2014)).

### F.       Unified Patents and DISH/SXM IPR Proceedings

On August 5, 2014, non-party Unified Patents filed an *inter partes* review ("IPR") challenging claims 1, 2, 7, 8, 10, 13, and 14 of the '444 patent before the Patent and Trademark Appeals Board ("PTAB").  During the Unified IPR proceedings, Dragon attempted to distinguish the '444 patent claims from the prior art with statements suggesting that the '444 patent invention began a recording only by pressing a record key:  "[I]n [the prior art] ... there's no reference to how recording is begun."  *Unified Patents Inc. v. Dragon Intell. Prop., LLC*, IPR2014-01252, Paper No. 57, at 40 (PTAB Nov. 2, 2015).

After Dragon received the § 285 warning letters and failed to drop its lawsuit, on December 23, 2014, DISH also filed an IPR believing it to be the least expensive method then available for resolving the dispute.  The PTAB instituted trial for claims 1-4, 7-10, 13 and 14 (which included all asserted claims) on July 17, 2015.  On March 17, 2015, all of the defendants filed a motion to stay the litigation.  DISH D.I. 74.  On April 10, 2015, during oral arguments on the motion, DISH's counsel explained that DISH viewed Dragon's infringement allegations as having no merit, that DISH had previously sent Dragon a letter explaining why this was an exceptional case under § 285, and that DISH had moved forward with a cost-efficient IPR

11

proceeding as it viewed the patent as clearly invalid as well.  DISH D.I. 87 at 25.  Following oral arguments, the Court granted a stay of proceedings for DISH and SXM (who joined in DISH's IPR) and proceeded with litigation as to the Unstayed Defendants.  DISH D.I. 86; SXM D.I. 102.

On February 5, 2016, the PTAB issued a Final Written Decision for the Unified Patents IPR, finding unpatentable claims 1, 2, 7, 8, 10, 13, and 14 of the '444 patent.  The IPR trial oral hearing for the DISH/SXM IPR occurred on February 9, 2016, during which Dragon's counsel took a position supporting the "continuous recording" disclaimer created by the prior art Goldwasser reference:

> So, we don't dispute that in Goldwasser it does mention the action recording, ***but it does not teach anything about how to begin a specific recording.*** …. And in our patent, in claim 1, that means that ***you have to press a record key to specifically begin a recording***. ***That's what the claim language says.***

DISH Ex. 9 at 21:1-6 (PTAB Oral Argument, Mar. 8, 2016) (emphasis added).  This is in clear distinction to and contrary to Dragon's district court position that its claims could cover any system that records prior to pressing a record key as long as the recording captured the "program information of interest."   Critically, Dragon never proposed the broader construction of "broadcast program information" to the PTAB nor did it attempt to propose two different meanings for this same term in the same claim even though the standard for claim construction in an IPR was broader than in the district court.  In fact, Dragon did the opposite – arguing a broad interpretation in the District Court to capture the Defendants' products while arguing the narrower construction before the PTAB.

On June 15, 2016, the PTAB issued a Final Written Decision for the DISH/SXM IPR finding unpatentable claims 1-4, 7-10, 13 and 14.  DISH Ex. 10.

### G.    Defendants' Resolution of the District Court Case

Though DISH's and SXM's district court cases were stayed just prior to the claim

construction hearing, DISH and SXM participated in all briefing with co-defendants. Relying on the Court's September 15, 2015 Markman Order,[6] DISH and SXM entered a stipulation and order on April 26, 2016 confirming non-infringement of DISH's and SXM's accused products. DISH D.I. 116; SXM D.I. 129. The Court entered judgment in favor of Defendants the next day on April 27, 2016. DISH D.I. 117; SXM D.I. 130.[7] On August 24, 2016 and August 25, 2016 respectively, DISH and SXM filed their Motions to declare the case exceptional. DISH D.I. 130; SXM D.I. 139.[8]

## H. Dragon Counsel's Withdrawal

On October 28, 2015, Freitas filed a motion to withdraw as counsel for Dragon, claiming an undisclosed conflict between Freitas and Dragon. (DISH D.I. 92). On December 11, 2015, Timothy Devlin entered a limited appearance for Dragon (DISH D.I. 97), and on August 15, 2016, J. James Li entered an appearance on behalf of Dragon (DISH D.I. 128). DISH and SXM served their motions not only on Dragon's then-current counsel, but also on Freitas & Weinberg LLP and the named-partner from that firm (Robert Freitas) as the § 285 motion pertains to them. DISH and SXM do not seek any claim against Mr. Devlin or his firm, Mr. Li or his firm, or prior Delaware counsel from the Bayard Firm.

---

[6]     *Dragon Intell. Prop., LLC v. AT&T Services Inc.*, C.A. No. 13-2061-RGA, D.I. 110 (D. Del. Sept. 9, 2015).

[7]     In accordance with the Court's Order (DISH D.I. 116 ¶ 17), DISH propounded limited interrogatories and requests for production on Dragon on July 14, 2016. The discovery requests sought information regarding Freitas' conduct and control of the litigation, specifically concerning: (a) contingency agreements; (b) statements to Dragon that the case was high risk or whether Dragon accepted the high risk; (c) statements identifying Dragon's investors; and (d) statements regarding Dragon's ability to pay a judgment. DISH Ex. 11, DISH's First Set of Limited Requests for Production; DISH Ex. 12, DISH's First Set of Limited Interrogatories to Dragon. Dragon refused to respond to these discovery requests. DISH Ex. 13, Dragon's Objections and Responses to DISH's 1st Set of Limited Interrogatories; DISH Ex. 14, Dragon's Objections and Responses to DISH's 1st Set of Limited Requests for Production.

[8]     By stipulation, the effect of the final judgment was delayed. DISH D.I. 120 & 123.

I.      **Denial of Defendants' § 285 Motions and Remand from Federal Circuit**

While the parties were briefing Defendants' exceptional case motions, Dragon appealed its loss before this Court as well as its loss before the PTAB to the Federal Circuit.   Oral arguments for both of those appeals were heard on the same day – October 5, 2017.   On November 1, 2017, the Federal Circuit affirmed the PTAB's determination in the DISH/SXM IPR that the challenged claims of the '444 Patent are invalid.   *Dragon Intell. Prop., LLC v. DISH Network L.L.C.*, 711 F. App'x 993, 998 (Fed. Cir. 2017).   Consequently, the Federal Circuit dismissed the appeals from this Court as moot.   *Dragon Intell. Prop., LLC v. Apple Inc.*, 700 F. App'x 1005 (Fed. Cir. 2017).

Back before the District Court, the judgments of noninfringement were vacated as moot. DISH D.I. 168 at 7.   With respect to Defendants' § 285 motions, even though the Court found that "Defendants identify behavior that [he] might properly have sanctioned under Section 285" (DISH D.I. 170 at 4), the Court held that it could not find DISH and SXM were "prevailing parties" because, after the vacatur of the noninfringement judgments, their victories were ultimately before the PTAB (*Id*. at 2, n.1).

On subsequent Appeal, the Federal Circuit held that DISH and SXM had "successfully rebuffed Dragon's attempt to alter the parties' legal relationship in an infringement suit" and therefore "DISH and SXM are prevailing parties."   *Dragon Intell. Prop., LLC v. DISH Network LLC*, 956 F.3d 1358, 1361-62 (Fed. Cir. 2020).   The case was remanded for reconsideration of the Defendants § 285 Motions.   *Id*. at 1362.

IV.     **ARGUMENT**

A.      **Legal Standard**

"The court in exceptional cases may award reasonable attorney fees to the prevailing party."  35 U.S.C. § 285.  Under the statute, there are two basic requirements:  (1) that the party

seeking fees is a "prevailing party"; and (2) that the case is "exceptional."

The Supreme Court has defined an "exceptional" case as "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). District courts should determine whether a case is "exceptional" in the exercise of their discretion on a case-by-case basis, considering the totality of the circumstances. *Id.* Relevant factors for consideration include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 554 n.6 (internal quotations marks omitted). A movant must establish its entitlement to attorneys' fees under § 285 by a preponderance of the evidence. *Id.* at 557-58. As this Court has previously held, a case may be found exceptional and fees awarded where the exceptional conduct is based upon a purely legal argument, because one of the factors to consider in deciding whether a case is exceptional is objective unreasonableness (both in the factual and legal components of the case). *See Vehicle Operation Techs. LLC v. Ford Motor Co.*, 2015 WL 4036171, at *3 (D. Del. July 1, 2015).

### B.     Defendants are Prevailing Parties

The Federal Circuit has already held that "DISH and SXM are prevailing parties." *Dragon Intell. Prop.*, 956 F.3d at 1362.

### C.     The Case is "Exceptional" and Warrants An Award of Attorneys' Fees Against Dragon and its Counsel Freitas

This case "stands out from others" based upon: (1) the clear failure by Dragon and Freitas to conduct an adequate pre-filing investigation; (2) Dragon's and Freitas' refusal to acknowledge the express language of the claims as applied to the accused products and continued pursuit of

15

frivolous litigation after being notified of the meritless positions; and (3) the inconsistent positions that Dragon took in the related IPR proceedings and this Court concerning the scope of the asserted claims of the '444 patent.

### 1. Dragon and its Counsel Failed to Conduct a Proper Pre-Filing Investigation

First, Dragon and Freitas clearly failed to conduct an adequate pre-filing investigation.[9] Recent cases confirm this can be an important factor in assessing the exceptionality of a case.

In *Thermolife Int'l LLC v. GNC Corp.*, 922 F.3d 1347, 1350 (Fed. Cir. 2019), Thermolife alleged infringement of various supplements. The claims required a supplement to contain at least 1 gram of L-arginine or a similar compound. *Id*. at 1351-52, 1355. But the accused supplements did not contain the required quantity. *Id*. at 1354 n.5. Worse still, defendants argued, the "plaintiffs would have discovered that the accused products did not infringe had they read the labels on the accused products and conducted simple tests before suing." *Id*. at 1354.

The district court agreed, finding that "either plaintiffs ***did not examine the accused products' labels*** before filing or, if they did, they ***ignored clear label indications of less than one gram of L-arginine***" and "it was ***unreasonable to dispense with (undisputedly available) testing*** to identify ingredients and their amounts in the accused products, which were 'publicly available.'" *Id*. at 1355 (emphasis added). Thus, the district court found "strong evidence that had Plaintiffs conducted any ***reasonable*** pre-filing investigation, they would have been on notice that at least some of the products in this litigation could not have infringed." *Id*. (emphasis added). On appeal, the Federal Circuit held "that ***the district court in this case acted within its discretion in determining***, on the limited arguments plaintiffs made in response to the fee

---

[9] In response to an interrogatory covering pre-suit investigations, Dragon failed to identify ***any*** efforts or investigation made prior to filing its lawsuit against DISH. *See* DISH Ex. 15 at 14-15. Dragon's correspondence is equally silent as to any pre-suit investigation.

motions, *that plaintiffs did not conduct an adequate pre-suit investigation into infringement by Hi-Tech and Vital*." *Id*. at 1356 (emphasis added).  Critically, that finding alone "would suffice to support the exceptional-case determination." *Id*.

Testing of accused products may not always be required, but "[w]hether testing is necessary for a responsible accusation of infringement necessarily depends on the availability of the products at issue, the existence and costs of testing, and whether other sufficiently reliable information exists." *Id*. at 1360.  In *Thermolife*, the Federal Circuit pointed out that it was undisputed that: (1) "all the relevant products were publicly available"; (2) "plaintiffs could have determined the amounts of L-arginine or its hydrochloride salt … by performing … a 'simple test'"; and (3) the record does not reveal "that plaintiffs performed such a test." *Id*. at 1360.

The facts here are even more clear and "exceptional."  As explained in sections III(C) & (D) above, the accused DISH and SXM products were publicly available (with publicly available manuals that were referenced in the infringement contentions) and simple usage of the products showed infringement was impossible.  Dragon and Freitas should have performed a "simple test" by merely using a DISH DVR or a SXM radio product to learn that they performed the clearly disclaimed "continuous recording."  The products demonstrate "continuous recording" by simple operation; recording is performed without user action and begins "continuously" on power-up and at every channel change.  On these facts, the suits against DISH and SXM are cases "in which there was no adequate substitute for simple testing of publicly available products." *Thermolife,* 922 F.3d at 1360.

Thus, the facts in the present case are more egregious than *Thermolife*.  No "testing" was required – simply buying the product and using the accused recording functionality would have revealed to the naked eye that no infringement was possible; no laboratory testing or expert

inspection was required.  Here "the exercise of even a modicum of due diligence by [Dragon], as part of a pre-suit investigation, would have revealed the weaknesses in its litigation position." *Blackbird Tech LLC v. Health In Motion LLC*, 944 F.3d 910, 916 (Fed. Cir. 2019), *cert. denied*, 140 S. Ct. 2765 (2020).

2.    **Dragon and Freitas Continued Objectively Baseless Litigation Despite Early Warnings from DISH and SXM**

Recent Federal Circuit decisions also confirm that notice provided from the party seeking fees is also an important consideration:

> Recently, we have stressed that one consideration that can and often should be important to an exceptional-case determination is whether the party seeking fees "provide[d] early, focused, and supported notice of its belief that it was being subjected to exceptional litigation behavior."

*Thermolife*, 922 F.3d at 1357 (quoting *Stone Basket Innovations, LLC v. Cook Med. LLC*, 892 F.3d 1175, 1181 (Fed. Cir. 2018)).  "[T]he presence of such notice, followed by continuation of litigation, can be a factor in justifying an award of attorney's fees."  *Id*. at 1358 (citing *Nat'l Oilwell Varco, L.P. v. Omron Oilfield & Marine, Inc*., 676 F. App'x 967, 973 (Fed. Cir. 2017)).

In this case, both DISH and SXM provided express notice to Dragon and Freitas that their infringement positions were untenable.  *Supra* §§ III(C) & (D).  DISH's and SXM's letters explained not only why the plain language of the claims (supported by clear and repeated prosecution disclaimer) could not cover the "continuous recording" operation of the accused products, but also why Dragon's Infringement Contentions demonstrated that no reasonable basis existed for continuing the lawsuit.  DISH Ex. 5; SXM Ex. 14.  Thus, not only could Dragon and Freitas have easily tested their infringement theories before filing suit, but even if they had not, they were provided with express notice of the exceptionality of their behavior in further pursuing those theories.

Rather than ending the cases, Dragon and Freitas unnecessarily escalated and continued

to litigate them. Dragon's meritless positions were further confirmed during the claim construction briefing for the '444 patent. During briefing, DISH and SXM, with the Unstayed Defendants, pointed out the clear claim language that necessarily excluded "continuous recording" devices. DISH D.I. 78 at 75-80.

Faced with these arguments, Dragon and Freitas ignored not only the plain claim language excluding "continuous recording" products, but also the six supporting prosecution disclaimers with respect to the term "the broadcast program information." Instead of addressing the arguments, they attempted a nonsensical and unsupportable legal argument: ***namely that the repeated prosecution disclaimers concerning the scope of the claims were not relevant to claim construction***, but instead were related to prosecution history estoppel. *Id*. at 12-15. Specifically, they argued: "Dragon notes that claim 1 makes no reference to 'continuous recording' devices, and no purpose is served by reference to matters that do not appear in the claim, or in Dragon's construction." *Id.* at 80. The prosecution history raised during the claim construction briefing showed six distinct rejections of the asserted claims based on the Sata reference and the applicant's explicit and repeated disclaimer of "continuous recording" devices in its Office Action responses. Dragon and Freitas simply ignored this history.

Separate from its untenable positions concerning "continuous recording" and related prosecution disclaimer, Dragon and Freitas took an objectively unreasonable position seeking to have the term "broadcast program information" construed differently than the term "***the*** broadcast program information" in the ***same claim***, ignoring a basic axiom that the former is the antecedent basis for the latter and means the same thing. *Dragon Intell. Prop., LLC v. AT&T Services Inc.*, C.A. No. 13-2061-RGA, D.I. 110, Mem. Op. at 6-8 (D. Del. Sept. 9, 2015).

During the May 2015 Markman hearing, the Court also noted the untenable positions that

Dragon and Freitas were taking by attempting to argue that the claim term had not been limited by an amendment to overcome prior art – arguing the term meant the same thing before and after the amendment. *Id.* at D.I. 101, Markman Tr. at 108 (D. Del. Sept. 9, 2015). Nevertheless, Dragon and Freitas continued to pursue Dragon's claims against DISH and SXM following the '444 patent Markman hearing. When the Court issued its Markman Order in September 2015, it noted that the PTO had rejected the patent claims six times based upon the Sata reference, which disclosed "continuous recording," and found that Dragon had not provided a good reason to depart from the "well-established presumption" that all uses of "broadcast program information" should have the same meaning. *Id.* at D.I. 110, Mem. Op. at 6 (D. Del. Sep. 9, 2015). The Court also found that "applicants clearly and unequivocally disclaimed 'continuous recording' devices. I have only once seen a clearer case of prosecution disclaimer." *Id.* at 7.

Despite the clear loss, it took ***more than 6 months*** after the September 2015 Markman Order – and over a year after DISH's and SXM's letters notifying Dragon of its meritless infringement positions – for Dragon to stipulate to non-infringement for DISH and SXM.

### 3.   Dragon's Positions Regarding the Asserted Claims in the PTAB and Before This Court Were Diametrically Opposed

Dragon not only continued to litigate this case despite being aware of the plain language and repeated prosecution disclaimer, but took positions in the IPR proceeding that were diametrically opposed to its positions in this litigation in an attempt to save its claims from cancellation. In the IPR, Dragon sought to adopt the disclaimers to narrow its claims and avoid cancellation; in this Court, Dragon sought to ignore the disclaimer to broaden its claims to cover Defendants' products.

In Dragon's oral arguments during the IPR proceedings, Dragon flipped positions regarding the scope of its patent claims, stating, "So, we don't dispute that in Goldwasser it does

20

mention the action recording, but it does not teach anything about how to begin a specific recording. … ***And in our patent, in claim 1, that means that you have to press a record key to specifically begin a recording. That's what the claim language says.***"   DISH Ex. 9 T 21 (emphasis added).

In its infringement contentions and during Markman briefing, Dragon ignored this limitation and broadly claimed that the recording could have begun earlier but the pause key was the point of recording that the user was "interested in."  This also explains why they argued for two different constructions of "broadcast program information" – it allowed Dragon to try to avoid the "continuous recording" disclaimer.

### D.   DISH and SXM Should Be Awarded Their Attorneys' Fees From Both the PTAB Proceeding and This Litigation

DISH's request for its attorneys' fees includes both fees for this litigation as well as the related IPR proceeding for the asserted '444 patent.[10]  Defendants acknowledge that, in *dicta* in the most recent appeal, the Federal Circuit stated "we see no basis in the Patent Act for awarding fees under § 285 for work incurred in *inter partes* review proceedings that the Appellants voluntarily undertook" and remanded that issue to this Court.  *Dragon Intell. Prop.*, 956 F.3d at 1362.  However, there is a strong basis for such fee shifting.

First, the Supreme Court has held that "[w]here administrative proceedings are intimately tied to the resolution of the judicial action and are necessary to the attainment of the results Congress sought to promote by providing for fees, they should be considered part and parcel of the action for which fees may be awarded."  *Sullivan v. Hudson*, 490 U.S. 877, 878 (1989). Recently, the Federal Circuit cited to *Sullivan* in denying PTAB fees in a case where an IPR was

---

[10]     Defendants are entitled to, and are seeking an exceptional case finding for, any fees incurred as a result of Dragon appealing the Court's claim construction determinations.  *See Vehicle Interface Techs. LLC v. Jaguar Land Rover N. Am. LLC*, 639 F. App'x 651 (Fed. Cir. 2016).  (Notably, Freitas represented the losing party in that exceptional case too.)

filed **before** a civil action was filed. *Amneal Pharm. LLC v. Almirall, LLC*, 960 F.3d 1368, 1372 (Fed. Cir. 2020). But that is not the case here – DISH and SXM filed their IPRs only after it became clear that Dragon and Freitas were persisting in a case with no viable infringement theory. In this case, the IPR was intimately tied to the resolution of the action.

And district courts have awarded § 285 fees incurred for both post-grant patentability challenges and the underlying litigation. The Eastern District of Texas granted fees for work on an IPR because "the defendants never would have sought IPR if they had not been sued for allegedly infringing the [asserted] patent." *My Health, Inc. v. ALR Techs., Inc*., 2017 WL 6512221, at *6 (E.D. Tex. Dec. 19, 2017), *appeal dismissed*, 2018 WL 3559236 (Fed. Cir. June 13, 2018). The Central District of California also included IPR fees in a fee award because "[b]ut for the filing of the patent infringement claim in this case, LNC would not have incurred attorneys' fees and costs for the IPR and Federal Circuit appeal." *Munchkin, Inc. v. Luv N' Care, Ltd*., 2018 WL 7504404, at *7 (C.D. Cal. Dec. 27, 2018) (citing *Fox v. Vice*, 563 U.S. 826, 836 (2011)), *rev'd on other grounds*, 960 F.3d 1373 (Fed. Cir. 2020). In the Southern District of California, Southwest was awarded attorneys' fees related to a concurrent *inter partes* reexamination proceeding that resulted in the cancellation of subject claims. *Deep Sky Software, Inc. v. Sw. Airlines Co.*, 2015 WL 10844231, at *1 (S.D. Cal. Aug. 19, 2015).[11] In granting Southwest's request, the court noted that the Federal Circuit had interpreted attorneys' fees to include those sums that the prevailing party incurs in the preparation for and performance of

---

[11]     Beyond these cases, other courts have similarly granted § 285 fee requests for Patent Office proceedings. *See IA Labs CA, LLC v. Nintendo Co.*, 2012 WL 1565296, at *4 (D. Md. May 1, 2012) (awarding fees for work done during reexamination proceedings) *aff'd*, 515 F. App'x 892 (Fed. Cir. 2013); *Howes v. Med. Components, Inc.*, 761 F. Supp. 1193, 1198 (E.D. Pa.1990) (reexamination proceedings); *Scott Paper Co. v. Moore Bus. Forms, Inc.*, 604 F. Supp. 835, 838 (D. Del. 1984) (awarding fees for reissue proceedings); *see also PPG Indus., Inc. v. Celanese Polymer Specialties Co.*, 840 F.2d 1565, 1568 (Fed. Cir.1988) (reissue proceedings).

legal services related to the suit and noted that "just as the parties envisioned when they jointly moved to stay this case, the reexamination proceedings essentially substituted for work that would otherwise have been done before this court." *Id.* at *2.

Especially important here is that the cases against DISH and SXM were stayed, and thus DISH and SXM utilized the IPR proceeding as an alternative and more cost-effective forum to address Dragon's frivolous allegations. In addressing this issue during oral argument on the stay motion, DISH's counsel described why it filed the IPR petition – it was thought to be cheaper in the long run. DISH Ex. 16, Tr. of Mot. to Stay at 25, 27. To deny Defendants' request for attorneys' fees incurred in the IPR proceedings would paradoxically punish Defendants for using an alternative and more cost-effective forum to resolve the dispute between the parties.

### E.   Dragon and Freitas Should Both Be Held Liable for Attorneys' Fees

DISH and SXM respectfully request that the Court find this case exceptional and award DISH and SXM their attorneys' fees against ***both*** Dragon and Freitas. Where Freitas controlled much, if not all, of the exceptional behavior and stood to gain from the success of the case, liability should be joint and severable.

### 1.   Statutory Language of § 285 Does Not Exclude Counsel's Exceptional Conduct

The plain language of § 285 does not preclude awarding fees against a party's counsel. *See* 35 U.S.C. § 285. Rather, § 285 places that decision within the Court's discretion, stating: "The court in exceptional cases may award reasonable attorney fees to the prevailing party."

The Supreme Court's decision in *Octane Fitness* rejected the "unduly rigid" prior application of § 285 and stated that it "impermissibly encumbers the statutory grant of discretion to district courts." 572 U.S. at 553. The Supreme Court stated that § 285 is "patently clear" in imposing "one and only one constraint on district courts' discretion to award attorney's fees in

patent litigation: The power is reserved for 'exceptional' cases.'" *Id*. at 553.  And § 285 states only that fees may be awarded *to* a prevailing party; but does not specify *from whom* the fees must be paid.  Under *Octane Fitness*, therefore, there are no limitations, including in the statute, regarding against whom fees may be assessed.

Although the Federal Circuit has yet to address this specific issue post-*Octane Fitness*, commentary supports finding counsel liability under § 285: "where the patentee is an asset-less [patent] 'troll,' shifting fees is a hollow victory."[12]  Specifically, because the purpose of § 285 is to prevent a gross injustice, a winning party should not be forced to bear the entire burden of its own counsel's fees in cases of unfairness or bad faith in the conduct of the losing party.

The Eastern District of Texas recently addressed a similar circumstance in explaining why failing to hold similarly-situated non-parties liable results in perverse incentives:  "Congress enacted Section 285 to provide incentives to defend against frivolous infringement claims because doing so benefits the public," and "if recourse can only be had against a judgment-proof shell company, no such incentive exists."  *Iris Connex, LLC v. Dell, Inc.*, 235 F. Supp. 3d 826, 846 (E.D. Tex. 2017).  Citing *Iris Connex*, another court allowed the joinder of counsel to a suit for fees because counsel "may also be held liable for attorney fees under § 285."  *SAP Am., Inc. v. InvestPic, LLC*, 2021 WL 1102085, at *8 (N.D. Tex. Mar. 23, 2021).

Attorneys have long been held responsible for conducting litigation in bad faith or advancing exceptionally meritless claims.  For example, Federal Rule of Appellate Procedure 38 allows an award of fees for frivolous appeals "to the appellee," but is silent as to who must pay.

---

[12]     *See* DISH Ex. 17, "When Dreams Come True?  Using Section 285 to Impose Fees against a Losing Patentee's Lawyers" (Landslide Magazine, Jan. 2015).

Under Rule 38, however, awards are assessed against the attorneys, the party, or both.[13]   *See Pirri v. Cheek*, 2021 WL 1081780, at *7 (Fed. Cir. Mar. 22, 2021); *Phonometrics, Inc. v. Westin Hotel Co.* ("*Phonometrics I*"), 319 F.3d 1328, 1332-33 (Fed. Cir. 2003) ("[W]e direct the sanction to Phonometrics and ***its attorney, Mr. Sutton, jointly and severally***.") (emphasis added)[14]; *Coghlan v. Starkey*, 852 F.2d 806, 818 (5th Cir. 1988) ("[M]any cases under [R]ule 38 assess sanctions against offending counsel, alone or jointly with the client . . . .") (citing cases).

---

[13]      Unlike § 285, some statutes or rules explicitly permit sanctions against attorneys. *See, e.g.*, 28 U.S.C. § 1927 (permitting sanctions against "[a]ny attorney or other person admitted" to practice); Fed. R. Civ. P. 11 (permitting sanctions against "attorney"); Fed. R. Civ. P. 37(a)(4) (permitting sanctions against "party or attorney . . . or both").  However, when the statute or rule is silent as to attorneys, courts are split as to attorney liability.  *See, e.g., In re Crescent City Estates, LLC*, 588 F.3d 822, 825 (4th Cir. 2009) (stating, regarding 28 U.S.C. § 1447(c), that "no circuit court has confronted this issue, and the district courts that have addressed it are badly divided") (citing conflicting district court cases); *Neft v. Vidmark, Inc.*, 923 F.2d 746, 747 (9th Cir. 1991) (inferring that award against counsel improper where copyright fee-shifting statute, 17 U.S.C. § 505, does not mention attorneys); *Healey v. Chelsea Res., Ltd.*, 947 F.2d 611, 624 (2d Cir.1991) ("When a fee-shifting statute that authorizes the courts to award attorneys' fees to prevailing parties does not mention an award against the losing party's attorney, the appropriate inference is that an award against attorneys is not authorized."); *but see Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765 (1980) ("There are ample grounds for recognizing, however, that in narrowly defined circumstances federal courts have inherent power to assess attorney's fees against counsel.").

[14]      While in a subsequent *Phonometrics* case, the Federal Circuit rejected the applicability of § 285 fees to attorneys, that case was in the pre-*Octane Fitness* context.  *Phonometrics, Inc. v. ITT Sheraton Corp.* ("*Phonometrics II*"), 64 F. App'x 219, 220 (Fed. Cir. 2003) (nonprecedential).  Moreover, there, the Federal Circuit addressed the district court's finding that "unjustified, vexatious and bad faith maintenance of the lawsuit is deserving of an award of fees and costs pursuant to both 28 U.S.C. § 1927 and 35 U.S.C. § 285," and that the plaintiff and its attorneys were "jointly and severally liable" for such behavior.  *Id*.  The Court "affirm[ed] the district court's decision to award fees and costs under 35 U.S.C. § 285 and 28 U.S.C. § 1927" but vacated on the issue of joint and several liability between the party and its attorneys and remanded for the court to "specify the appropriate separate liability of Phonometrics and of its counsel."  *Id*. at 222-23.  Critically, the Court cited no authority for why the party and its attorneys could not be joint and severally liable under § 285.  *Id*. at 222.  But the decision in *Phonometrics II* was nonprecedential and preceded *Octane Fitness*'s directive to read the statute without adding additional requirements to its application.  And in *Phonometrics II*, where both § 285 and § 1927 fees were awarded, the deterrent effect on both parties and their attorneys was already achieved without joint and several liability under § 285.  Defendants respectfully submit that applying the teachings of *Octane Fitness* demands a different result.

The Supreme Court has made clear that "[i]f a court may tax counsel fees against a party who has litigated in bad faith, it certainly may assess those expenses against counsel who willfully abuse judicial processes." *Roadway Exp.*, 447 U.S. at 766. The Supreme Court highlighted a district court's "inherent power" to assess attorneys' fees against counsel who act in bad faith. *Id.* at 765-66. Here, the fee-shifting to a prevailing party in an "exceptional" case under § 285 would be subverted if Freitas were permitted to hide as a "non-party" behind a judgment-proof shell despite his behavior. This is especially true where Freitas effectively controlled the case, and was in a position to benefit from winning the case financially.

## 2.   Dragon Has Largely Disappeared From the Case

Since the first briefs on § 285, a key issue in this case has remained the culpability (and liability) of Freitas for the case's exceptionality. *See* DISH D.I. 131 at 16-19. Defendants argued, and it has not been disputed, that "Freitas was the only party that effectively controlled the case, and was in a position to benefit from winning the case financially." *Id* at 19. It was also unrebutted that "Dragon is believed to be a judgment-proof assertion entity." *Id*. at 2. Now, that concern is proving true.

Although the Court recently granted Dragon's motion to join in a Motion filed by Freitas (DISH D.I. 192 at 5), Dragon has long ceased substantive involvement in the case. In the most recent appeal to the Federal Circuit, Dragon did not file its own brief. Rather, it filed a Notice of Joinder with Freitas's brief. *Dragon Intell. Prop., LLC v. DISH Network L.L.C.*, Case No. 19-1283, D.I. 53 (Fed. Cir., April 11, 2019). Dragon also did not appear before the Federal Circuit, having waived its right to oral argument. *Id.*, D.I. 97; *id.*, D.I. 98. Similarly, after this Court ordered the parties to submit a joint status letter (DISH D.I. 176) and a joint schedule for revised briefing (DISH D.I. 194), neither Dragon nor Mr. Zhu responded or participated (DISH D.I. 178; DISH D.I. 196). Dragon's only action has been to join Freitas's earlier motion. DISH D.I. 183.

26

Other than filing a motion to join, Dragon as a corporate entity appears to have stopped operating.  As of May 2021, Dragon's status with the State of Delaware, where it was formed, remains: "Cease Good Standing."  DISH Ex. 18.  Defendants understand this is the result of Dragon not paying its taxes to the State of Delaware.

As for Mr. Zhu, the only known shareholder in Dragon, when his California law license was subject to suspension in 2019 and he was placed on probation, he failed to satisfy the conditions of his probation or respond to the Office of Probation of the State Bar of California ("the Office").  DISH Ex. 19, 2-4.  When the Office moved to revoke Mr. Zhu's probation of his suspension, he "neither responded to the motion nor requested a hearing."  *Id*. at 1.  The California Supreme Court ultimately suspended Mr. Zhu's law license in October 2020.  DISH Ex. 20 (*En Banc* Order of the Supreme Court of California).

These actions only confirm that Dragon is an unfunded judgment-proof assertion entity.

### 3. An Exceptional Case Finding Against Freitas is Necessary to Deter Future Frivolous Patent Assertions Against Defendants

From the outset, this case was litigated in an unreasonable manner.  As discussed above, Dragon and Freitas never performed a pre-filing investigation.  If they did, they simply ignored the clear prosecution disclaimers, the undeniable operation of the accused products, and Defendants' notice letters.  Freitas was responsible for the exceptional claim construction and infringement positions that Dragon took throughout the case.  Moreover, throughout the case, Freitas made personal attacks against the character of DISH's lawyers and continued to pursue unnecessary and frivolous motions.

### (i)     Personal Attacks

In 2016, Freitas complained that it had not been properly served with papers in a companion case (C.A. No. 13-02061-RGA, D.I. 148).  To avoid any similar claims in this case,

DISH engaged a process server to personally serve each of Robert Freitas, Jason Angell, and the Freitas Firm with DISH's Motion for § 285 fees.  Mr. Angell confirmed service, but Mr. Freitas refused to do so.  Incensed, Mr. Freitas proceeded to send emails to the lead counsel on the case – Hopkins Guy – attacking the judgment and character of DISH's attorneys:

> Jamie Lynn lacks the judgment to be placed in charge of your malicious pursuit of the motion against me. …  Please make sure that Jamie is not in a position to do any further damage. …  You should also think twice before sending any more emails written by Jamie.  When emails are sent from your address, you are responsible for the content.  Jamie thinks it is OK to make things up.  Don't you know better?

DISH Ex. 21 at 3-4.  After Mr. Freitas acknowledged that he had been served under Federal Rule of Civil Procedure 5, DISH no longer sought personal service.

However, Freitas's conduct continued.  After the appeal was filed, and as required by the Rules of Appellate Procedure, DISH's counsel emailed Dragon and Freitas regarding settlement discussions, stating: "Per Federal Rule of Appellate Procedure 33, counsel for DISH is open to discuss settlement with counsel for any party that believes such discussions would be productive.  Please let us know if you have a proposal or would like to schedule a time to discuss any such proposal."  DISH Ex. 22 at 7.  In response, Mr. Freitas incredibly stated that he, Mr. Angell, and the Freitas Firm would release DISH and its lawyers (although there was no claim against DISH or DISH's lawyers) if, among other things, he received a personal apology that stated:

| DEMANDED PERSONAL APOLOGY |
| --- |
| Dear Bob, <br><br> Litigation in general, and patent litigation in particular, is often difficult and contentious.  Parties sometimes say things, or take actions, they later regret. DISH Network, LLC, Baker Botts L.L.P., Hopkins Guy, and Jamie Lynn sincerely apologize for the unfounded accusations they made against Jason Angell, Freitas & Weinberg LLP, and you in the Dragon Intellectual Property, LLC litigation.  Jason, FAW, and you did not engage in any conduct violative of 35 U.S.C. section 285 or 28 U.S.C. section 1927, or any other rule or standard applicable to conduct by lawyers, and we apologize for wrongly suggesting otherwise. <br><br> DISH, Baker Botts, Hopkins Guy, and Jamie Lynn separately apologize to the |

> Angell and Freitas families for inexcusably sending process servers to their homes on multiple occasions. We acknowledge that doing so was improper, and entirely unnecessary under Federal Rule of Civil Procedure 5(b)(2)(B)(i), and we deeply regret any harm our unfortunate actions may have caused Jason or you or your families.
>
> DISH, Baker Botts, Hopkins Guy, and Jamie Lynn acknowledge that Jason, you, and all of your colleagues acted honorably and in good faith at all times. We should not have suggested otherwise, and we regret having done so.

*Id.* at 5-6. DISH rejected the proposal.

Yet Freitas continued by demanding an in-person settlement conference, eventually sending a personal diatribe to Jamie Lynn – one of DISH's counsel of record. *Id.* at 1. The email stated that the arguments made on appeal were "frivolous" and did not have the "slightest bit of merit." *Id.* 1-2. DISH and SXM prevailed on those arguments. The statements included:

- "It's too late to pretend that your dishonest pursuit of unjustified claims against me is a noble legal endeavor. You showed your true colors when the Rule 33 compliance issue arose, as you have throughout."

- "You are responsible for unjustifiably putting all of this in motion, and you are responsible for the continued pursuit of what you started."

- "None of the arguments made in your brief has the slightest bit of merit."

- "Are the responsible individuals at Baker Botts patting you on the back for the arguments you have made in a stubborn attempt to make something of Judge Andrews' harsh language? Is there someone at Baker Botts who expects your appeal to succeed? Anyone on your side who is interested in the development of the law would drop this appeal like a hot rock. There is no basis on which a reasonable litigant could realistically expect to succeed."

- "Your attempt to disown what you have done and are doing is not convincing, and it won't fool anybody. You persist in a claim against me you have acknowledged to be inconsistent with Federal Circuit case law. Your brief includes only frivolous arguments and ignores the controlling Supreme Court and Federal Circuit decisions."

- "It's too late to try to turn this into the legitimate pursuit of a ruling on disputable legal issues. You've laid down too many tracks in too many ways over too long a time."

*Id.* at 1-3. DISH won the appeal that Mr. Freitas so vociferously contended was frivolous.

### (ii)     Unnecessary and Frivolous Motions

Although the Federal Circuit previously rejected Freitas's arguments that there is no case or controversy for the Court to consider § 285 fees, Freitas filed yet another motion raising the same issues.  DISH D.I. 180.  The Court rejected those arguments (DISH D.I. 192 at 2-4), but Freitas's persistence in raising arguments that "the Federal Circuit has considered on two previous occasions" (*id.*), one of which was in the *same matter*, further evidences the unreasonable manner in which Freitas has litigated this case.  Importantly, these are not arguments by Dragon, but by Freitas alone, who has been the driving factor in this entire case.

\* \* \* \* \*

As noted in *Octane Fitness*, relevant factors for consideration include "frivolousness, motivation, objective unreasonableness (both in the factual and *legal components* of the case) and the need in particular circumstances to advance considerations of compensation and *deterrence*."  572 U.S. at 554 n.6 (internal quotations marks omitted, emphasis added).  It should be noted that this Court has dealt with other exceptional cases led by the Freitas firm and Robert Freitas. *See Vehicle Interface Technologies, LLC v. Jaguar Land Rover North America, LLC*, C.A. No 12-1285, D.I. 148, Mem. Op. (D. Del. Dec. 28, 2015).  Freitas should not be permitted to file frivolous and objectively unreasonable lawsuits using judgment-proof assertion entities as a shield.  An exceptional case finding holding Freitas jointly and severally liable with Dragon would be the precise type of deterrent that the Supreme Court contemplated in *Octane Fitness*.

## V.     CONCLUSION

Dragon's and Freitas's conduct here – which "stands out from others" under the *Octane Fitness* standard – has made this case exceptional.  Based on the facts of this case, Defendants respectfully request that the Court award DISH and SXM their fees incurred in this lawsuit against Dragon and Freitas under § 285 jointly and severally.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

_____

OF COUNSEL:

G. Hopkins Guy III
BAKER BOTTS L.L.P.
1001 Page Mill Road
Building One, Suite 200
Palo Alto, CA  94304-1007
(650) 739-7500

Ali Dhanani
Bradley Bowling
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX  77002-4995
(713) 229-1234

Jamie R. Lynn
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004-2400
(202) 639-7786

Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com

*Attorneys for Defendant DISH Network L.L.C.*

POTTER ANDERSON & CORROON LLP

*/s/ Philip A. Rovner*

_____

OF COUNSEL:

Paul J. Andre
Lisa Kobialka
KRAMER LEVIN NAFTALIS & FRANKEL LLP
990 Marsh Road
Menlo Park, CA 94025
(650) 752-1700

Mark A. Baghdassarian
Shannon H. Hedvat
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY  10036
(212) 715-9100

May 10, 2021

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
Hercules Plaza, 6th Floor
Wilmington, DE  19801
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

*Attorneys for Defendant Sirius XM Radio, Inc.*

### CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on May 10, 2021, upon the following in the manner indicated:

Timothy Devlin, Esquire                                    *VIA ELECTRONIC MAIL*
DEVLIN LAW FIRM LLC
1306 North Broom Street, First Floor
Wilmington, DE  19806
*Attorneys for Plaintiff*

J. James Li, Ph.D.                                               *VIA ELECTRONIC MAIL*
LILAW INC.
5050 El Camino Real, Suite 200
Los Altos, CA  94022
*Attorneys for Plaintiff*

FREITAS ANGELL & WEINBERG LLP                                  *VIA FEDEX*
350 Marine Parkway, #200
Redwood City, CA  94065

Robert Freitas, Esquire                                        *VIA FEDEX*
FREITAS ANGELL & WEINBERG LLP
350 Marine Parkway, #200
Redwood City, CA  94065


                                        */s/ Rodger D. Smith II*
                                        _____
                                        Rodger D. Smith II (#3778)