# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

---

DRAGON INTELLECTUAL PROPERTY, LLC,

              Plaintiff,

    v.

DISH NETWORK, LLC,

              Defendant.

                           C. A. No. 13-2066-RGA

---

**PLAINTIFF DRAGON INTELLECTUAL PROPERTY, LLC'S RESPONSE TO DISH'S**
**FIRST SET OF REQUESTS FOR ADMISSION**

       Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, Plaintiff Dragon

Intellectual Property, LLC ("Plaintiff"), through its undersigned counsel, hereby submits the

following Objections and Responses to the First Set of Request forAdmissions (Nos. 1-15)

("RFAs") served by Defendant Dish Network, LLC's ("Defendant"). Plaintiff reserves the

right to supplement these responses and objections to the extent allowed by the Federal Rules

of Civil Procedure and the Local Rules of this Court.

## <u>GENERAL STATEMENTS</u>

       1.     Plaintiff incorporates by reference each and every general objection set forth

belowinto each specific response.  The specific response may repeat a general objection for

emphasis or some other reason. The failure to include any general objection in any specific

response shallnot be interpreted as a waiver of any general objection to that response.

1

2.      By responding to Plaintiff's Request for Admissions, Plaintiff does not waive any objection that may be applicable to: (a) the use, for any purpose, by Plaintiff, of any information or documents given in response to Plaintiff's Request for Admissions; or (b) the admissibility, relevancy, or materiality of any of the information or documents to any issue in this case.

3.      No incidental or implied admissions are intended by the responses herein. The fact that Plaintiff has responded or objected to any Request for Admission should not be taken as an admission that Plaintiff accepts or admits the existence or relevance of any requested documentor "fact" set forth or assumed by such request. Nothing in Plaintiff's objections or responses should be taken as any admission or statement regarding the appropriate scope of any claim or construction of any claim term or phrase.

4.      Plaintiff's responses to Plaintiff's Request for Admissions are made to the best of Plaintiff's present knowledge, information, and belief. Plaintiff reserves the right to supplement andamend these responses should future investigation indicate that such supplementation or amendment is necessary. Plaintiff reserves the right to make any use of, or to introduce at any hearing and at trial, information or documents that are responsive to Plaintiff's Request for Admissions, but discovered subsequent to Plaintiff's service of these responses, including, but not limited to, any information or documents obtained in discovery herein.

5.      By stating that it will provide information in response to any particular Request for Admission, Plaintiff makes no representation that any such information exists.

## GENERAL OBJECTIONS

Plaintiff makes the following General Objections to every paragraph of DEFENDANT's First Set of Request for Admissions. Each of these objections is incorporated into the Specific Objections set forth below, whether or not separately set forth therein.

1.      Plaintiff objects to all instructions, definitions, and Request for Admissions to the extent that they are overly broad, unduly burdensome, oppressive, or inconsistent with, or purport to impose obligations on Plaintiff that are broader than or inconsistent with the obligations imposed by the Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Local Rules of the District of Delaware, and/or any applicable regulations and case law, particularly to the extent that compliance would force Plaintiff to incur a substantial expense that outweighs any likely benefit of the discovery. Plaintiff's responses, regardless of whether or not they include a specific objection, do not constitute an adoption or acceptance of the definitions and instructions that Defendant seeks to impose, nor any fact or contention assumed or implied in a Request for Admission.

2.      Plaintiff objects to all instructions, definitions, and Request for Admissions to the extent that they seek the disclosure of information protected by any of the attorney-client privilege, work-product doctrine, common interest privilege, joint defense privilege, or other applicable privileges or protections. Plaintiff does not intend to provide such privileged or protected documents or information. Any inadvertent disclosure of any such documents or information is not to be deemed a waiver of any applicable privilege or protection, and Plaintiff expressly reserves the right to object to the introduction at trial or any other use of such information that may be inadvertently disclosed. Plaintiff also objects

to all instructions, definitions, and Request for Admissions to the extent that they purport to require Plaintiff to provide more information than the rules and laws of the Court require in claiming attorney-clientprivilege, work product protection, or other privileges or protections.

3.       Plaintiff objects to all instructions, definitions, and Request for Admissions to the extent that they seek documents and information that are neither relevant to any party's claims ordefenses in this dispute, not proportional to the needs of the case, nor reasonably calculated to lead to the discovery of admissible evidence.  None of Plaintiff's responses to Defendant'sRequest for Admissions shall be deemed to constitute an admission as to the response's relevance, nor is it intended to waive any right to object to its admissibility at trial.

4.       Plaintiff objects to all instructions, definitions, and Request for Admissions to the extent they are vague, ambiguous, fail to describe the information sought with the required reasonable particularity, or are so unintelligible that Plaintiff cannot respond. Unless instructed otherwise, Plaintiff shall give the terms of these Request for Admissions their ordinary and plain meanings. Plaintiff shall not be held responsible where its interpretation of these Request for Admissions does not comport with Defendant's intentions. Failure to identify with specificity the terms or phrases that are vague or ambiguous shall not be construed as a waiver of this general objection, nor shall it be construed as an admission that the terms or phrases are understood in the context of the RFAs.

5.       Plaintiff objects to all instructions, definitions, and Request for Admissions to the extent that they seek documents that are not, or information that is not, in Plaintiff's possession, custody or control. Plaintiff further objects to each and every instruction,

definition, and Request for Admission to the extent that it seeks information that is already in Defendant's possession or is equally available to Defendant from other sources that are more convenient, less burdensome,or less expensive.

6.      Plaintiff will not produce information that is already in Defendant's possession and does not intend to produce information that Defendant has an ample opportunity to discover via sources that are publicly available or are equally or more readily available to Defendant than they are to Plaintiff. Plaintiff objects to each and every Request for Admission to the extent that it is duplicative or cumulative of other discovery sought by Defendant or provided for in the patent and other rules applicable to the case.

7.      Plaintiff objects to each and every instruction, definition, and Request for Admission to the extent that the burden or expense of the proposed discovery outweighs its likely benefits, given the needs of the case, the amount in controversy, the parties' resources, theimportance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

8.      Plaintiff objects to each and every instruction, definition, and Request for Admission herein to the extent that it is overly broad, unduly burdensome, and/or oppressive. Plaintiff further objects to all instructions, definitions, and Request for Admissions on the ground that they seek to impose obligations on Plaintiff that are unduly burdensome, especially to the extent that requested materials are publicly available or burdensome to search for or obtain.

9.      Plaintiff objects to all instructions, definitions, and Request for Admissions on thegrounds that they seek documents and information that are confidential and/or proprietary, contain trade secrets or other confidential research, development, financial, or commercial

information of Plaintiff or third parties, or otherwise contain or reflect sensitive private or non- public information prohibited from disclosure by law. Plaintiff will only disclose confidential and/or proprietary information subject to and in accordance with the protective order entered or to be entered by the Court, and only to the extent that Plaintiff can do so consistently with its legaland confidentiality obligations.

10.     Plaintiff objects to all instructions, definitions, and Request for Admissions to the extent that the scope of materials that Defendant seeks is not limited to a relevant and reasonable period of time.

11.     Plaintiff objects to each Request for Admission to the extent that it purports to attribute any special or unusual meaning and/or scope to any technical terms or phrases.

## SPECIFIC OBJECTIONS AND RESPONSES

Without waiver of and subject to the foregoing General Objections, Plaintiff specifically responds to the Request for Admissions as follows.

**REQUEST FOR ADMISSION NO. 1:**

Admit that Dragon has one member or owner: Mr. Kai Zhu.

**RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

Admitted.

**REQUEST FOR ADMISSION NO. 2:**

Admit that Kai Zhu has been the only member or owner of Dragon since its formation.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

Denied.  Kai Zhu has been the only owner and member of Dragon since September 8, 2013, after Jing Sun transferred all her member interests, rights, assets, properties, and liabilities to Kai Zhu.

**REQUEST FOR ADMISSION NO. 3:**

Admit that Dragon has had no employees since its formation.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Admitted.

**REQUEST FOR ADMISSION NO. 4:**

Admit that Dragon has never enacted any bylaws.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Denied.  Dragon enacted bylaws and adopted an operating agreement on July 18, 2012. Said documents are being produced in response to Defendant's Second Set of Requests for Production.

**REQUEST FOR ADMISSION NO. 5:**

Admit that Dragon has never maintained company records.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

Denied.

**REQUEST FOR ADMISSION NO. 6:**

Admit that Dragon has never been capitalized.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

Denied.

**REQUEST FOR ADMISSION NO. 7:**

Admit that Dragon has never held any of its assets in a trust.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

Admitted.

**REQUEST FOR ADMISSION NO. 8:**

Admit that, for all time since the filing of this lawsuit, Dragon's liabilities have exceeded its assets.

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

Dragon objects to this request as vague and ambiguous with respect to the term "liabilities." Liabilities, as Dragon understands the term, cannot be determined in advance, and any legitimate business activity inherently involves risks including with respect to incurring liabilities. Subject to and without waiving the foregoing objection: Denied.

**REQUEST FOR ADMISSION NO. 9:**

Admit that Dragon has no personal property.

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

Admitted.

**REQUEST FOR ADMISSION NO. 10:**

Admit that Dragon has no real property.

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

Admitted.

**REQUEST FOR ADMISSION NO. 11:**

Admit that Dragon has no intangible assets, other than the Asserted Patent.

**RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

Denied. Dragon filed applications for patent(s) and thus owned intellectual properties other than the Asserted Patent.

**REQUEST FOR ADMISSION NO. 12:**

Admit that Dragon has not received any funding from any third-party litigation finance or funding arrangement.

**RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

Dragon objects to this RFA because it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, the common interest doctrine, or other applicable law, privilege, or protection.

**REQUEST FOR ADMISSION NO. 13:**

Admit that Dragon has insufficient funds or assets to satisfy the $1,456,273.49 judgment to DISH.

**RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

Admitted.

**REQUEST FOR ADMISSION NO. 14:**

Admit that Dragon had a contingency fee arrangement with Freitas.

**RESPONSE TO REQUEST FOR ADMISSION NO. 14:**

Dragon objects to this RFA because it calls for the disclosure of information protected by the attorney-client privilege, work product doctrine, the common interest doctrine, or other applicable law, privilege, or protection.

**REQUEST FOR ADMISSION NO. 15:**

Admit that Dragon ceased being in good standing in the State of Delaware as of June 1, 2021.

**RESPONSE TO REQUEST FOR ADMISSION NO. 15:**

Dragon objects to this RFA because it seeks admission of a legal conclusion with respect to the term "good standing."  Subject to and without waiving the foregoing objection, Dragon admits that at least as of June 21, 2021, it is no longer in good standing with the State of Delaware Division of Corporations.

Dated: August 3, 2022

DEVLIN LAW FIRM LLC

*/s/ Timothy Devlin*
Timothy Devlin (No. 4241)
1526 Gilpin Avenue
Wilmington, DE 19806
Phone: (302) 449-9010
tdevlin@devlinlawfirm.com

*Attorneys for Plaintiff*
*Dragon Intellectual Property, LLC*

-8-

## CERTIFICATE OF SERVICE

It is certified that a copy of the foregoing has been served on Defendant via electronic

mail transmission addressed to the person(s) below:

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Rodger D. Smith II
rsmith@morrisnichols.com
Lucinda C. Cucuzzella
ccucuzzella@morrisnichols.com

BAKER BOTTS L.L.P.
G. Hopkins Guy III
hop.guy@bakerbotts.com
Bradley Bowling
brad.bowling@bakerbotts.com
Ali Dhanani
ali.dhanani@bakerbotts.com
Jamie R. Lynn
jamie.lynn@bakerbotts.com

LILAW INC.
J. James Li
lij@lilaw.us

FREITAS & WEINBERG LLP
Robert E. Freitas
rfreitas@fawlaw.com

Dated: August 3, 2022

/s/ Timothy Devlin
Timothy Devlin (No. 4241)

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| |
|---|
| DRAGON INTELLECTUAL PROPERTY, LLC, |
| Plaintiff, |
| v. |
| DISH NETWORK, LLC, |
| Defendant. |

C. A. No. 13-2066-RGA

**PLAINTIFF DRAGON INTELLECTUAL PROPERTY, LLC'S RESPONSE TO DISH'S**
**SECOND SET OF LIMITED REQUESTS FOR INTERROGATORIES**

Pursuant to Fed. R. Civ. P. 26 and 33, Plaintiff Dragon Intellectual Property, LLC

("Plaintiff") hereby respond to Defendant's Second Set of Limited Requests Interrogatories

(Nos. 1-3) (each, an "Interrogatory," collectively, the "Interrogatories") as follows:

## <u>GENERAL STATEMENTS AND OBJECTIONS</u>

1.      Plaintiff incorporate by reference each and every general objection set forth below

into each specific response. The specific response may repeat a general objection for emphasis or

some other reason. The failure to include any general objection in any specific response shall not

be interpreted as a waiver of any general objection to that response.

2.      By responding to Defendant's Interrogatories, Plaintiff do not waive any

objection that may be applicable to: (a) the use, for any purpose, by Defendant, of any

information or documents given in response to Defendant's Interrogatories; or (b) the

admissibility, relevancy, or materiality of any of the information or documents to any issue in

this case.

3.      No incidental or implied admissions are intended by the responses herein. The

fact that Plaintiff have answered or objected to any Interrogatory should not be taken as an admission that Plaintiff accept or admit the existence of any "fact" set forth or assumed by such request. Nothing in Plaintiff's objections or responses should be taken as any admission or statement regarding the appropriate scope of any claim or construction of any claim term or phrase.

4.      Plaintiff's responses to Defendant's Interrogatories are made to the best of Plaintiff's present knowledge, information, and belief. Plaintiff reserves the right to supplement and amend these responses should future investigation indicate that such supplementation or amendment is necessary. Plaintiff reserves the right to make any use of, or to introduce at any hearing and at trial, information or documents that are responsive to Defendant's Interrogatories, but discovered subsequent to Plaintiff's service of these responses, including, but not limited to, any information or documents obtained in discovery herein.

5.      By stating that it will provide information in response to any particular Interrogatory, Plaintiff make no representation that any such information exists.

**<u>GENERAL OBJECTIONS</u>**

1.      Defendant's First Set of Common Interrogatories define "Plaintiff" as Dragon Intellectual Property, LLC

2.      Plaintiff objects to each Interrogatory to the extent that it purports, through Defendant's instructions, definitions or otherwise, to impose burdens or duties that exceed the scope of reasonable and permissible discovery under the Federal Rules of Civil Procedure.

3.      Plaintiff objects to each Interrogatory to the extent that it is overbroad, unduly burdensome, oppressive, or constitutes an abuse of process, particularly when the request is unduly burdensome in view of the cost necessary to investigate weighed against Defendant's need for the information or document.

4.      Plaintiff objects to each Interrogatory to the extent that it seeks information or documents protected by the attorney-client privilege, work product doctrine, the common interest doctrine, or any other applicable law, privilege, or protection. The production of any privileged information or document by Plaintiff is unintentional, and Plaintiff does not intend to waive any applicable objection or privilege as a result of such unintentional production. Except for items Plaintiff may from time to time decide to include, Plaintiff will not log protected items in connection with or in relation to the subject of this litigation dated subsequent to its commencement.

5.      Plaintiff objects to each Interrogatory to the extent that it might be construed as calling for a legal conclusion. Any responses or the production of documents by Plaintiff shall not be construed as providing a legal conclusion regarding the meaning or application of any terms or phrases used in Defendant's interrogatories.

6.      Plaintiff objects to each Interrogatory to the extent that it seeks information or documents already in the possession of Defendant, or in the public domain and that are as readily available to Defendant as they are to Plaintiff.

7.      Plaintiff objects to each Interrogatory, and to the accompanying definitions and instructions, to the extent that they seek information or documents that Defendant can obtain from other parties just as readily as from Plaintiff.  In particular, Plaintiff objects to Defendant's defining the terms "Plaintiff," "You," and "Your" to include third parties.

8.      Plaintiff objects to each Interrogatory, and to the accompanying definitions and instructions, to the extent that they seek information or documents beyond Plaintiff's possession, custody, or control, or that calls for Plaintiff to prepare documents or things that do not currently exist.

9.      Plaintiff objects to each Interrogatory to the extent that it seeks information or documents that are cumulative or duplicative of information or documents already provided by Plaintiff.

10.      Plaintiff objects to each Interrogatory as overbroad and unduly burdensome to the extent that it is unlimited in temporal scope or otherwise not limited to a time frame relevant to this litigation.

11.      Plaintiff objects to each Interrogatory to the extent that it seeks documents or information that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

12.      Plaintiff objects to each Interrogatory to the extent that it seeks information or documents that Plaintiff are not allowed to disclose pursuant to either a court order or pursuant to confidentiality obligations or agreements with third parties.

13.      Plaintiff objects to each Interrogatory to the extent that it is vague and ambiguous.

14.      Plaintiff objects to each Interrogatory to the extent that it is duplicative of any other interrogatory.

15.      Plaintiff objects to each Interrogatory to the extent that it lacks foundation or assumes facts that are incorrect or unknown to Plaintiff.

16.      Plaintiff objects to each Interrogatory to the extent that it seeks discovery of material within the scope of Federal Rule of Civil Procedure 26(b)(4), and therefore constitutes an improper and premature attempt to conduct discovery of expert opinion.

17.      Plaintiff objects to each Interrogatory, and to the accompanying definitions and instructions, to the extent that they ask for information or documents "concerning" or

"relating to" the subject matter of the request on the grounds that such instructions, definitions, and requests are overly broad and impermissibly seek the mental impressions and thoughts of counsel in violation of the work product doctrine.

18.     Plaintiff objects to each Interrogatory to the extent that it purports to attribute any special or unusual meaning and/or scope to any technical terms or phrases.

19.     Plaintiff objects to each interrogatory, and to the accompanying definitions and instructions, to the extent that they purport to alter the plain meaning and/or scope of any terms or phrases in any specific request and thereby render such request vague, ambiguous, overly broad or uncertain.

## RESPONSES

### INTERROGATORY NO. 1:

Explain Dragon's ability, or lack thereof, to satisfy the $1,456,273.49 judgment to DISH.

### RESPONSE TO INTERROGATORY NO. 1:

Plaintiff incorporates the General Objections set forth above as if fully set forth herein. Plaintiff further objects to this Interrogatory as vague and ambiguous particularly with respect to the term "explain."

Subject to and without waiving the objections set forth above, Plaintiff responds as follows:

Dragon was formed in 2012 when the industry of patent enforcement by Non-Practicing Entity (NPE) was at its peak.  At that time, the NPE business model was very successful and looked promising.  Dragon took tremendous effort to study this industry segment and identified the Asserted Patent as a promising potential asset.  Because nearly all NPE patent enforcement

campaigns relied on contingency fee based legal representation, Dragon believed with the

Asserted Patent as a very valuable patent, it would have no problem to attract contingency-fee

based legal counsel or otherwise attract investments. As such, Dragon projected it just needed the

initial funding to acquire the Asserted Patent, and it just did so.  Indeed, Dragon was able to

successfully to secure full contingency-fee based legal representation for its patent enforcement

campaign and did not need any substantial additional capital for its operation.

The U.S. Supreme Court, however, issued it landmark *Alice Corp. v. CLS Bank*

*International* opinion in 2014 that fundamentally changed the patent enforcement industry which

became very adverse to patent owners, as any attorney knowing patent enforcement and patent

litigation would know.  Dragon's business could not escape this industry-wide downturn and

went sour.  Eventually, Dragon became under-capitalized and could not maintain its good

standing.

Plaintiff's investigation is ongoing and Plaintiff reserves the right to supplement or

amend these responses based on additional discovery and investigation.

### INTERROGATORY NO. 2:

Explain Dragon's efforts to initially capitalize the company and all efforts taken until
present to keep the company adequately capitalized.

### RESPONSE TO INTERROGATORY NO. 2:

Plaintiff incorporates the General Objections set forth above as if fully set forth herein.

Plaintiff further objects to  this Interrogatory as vague and ambiguous particularly with respect to

the term "explain."

Subject to and without waiving the objections set forth above, Plaintiff responds as

follows:

Initially Dragon was sufficiently capitalized by its members, Jing Sun and Kai Zhu, to

acquire the Assert Patent as a valuable asset in good faith. The relevant documents in connection with its acquisition of the Asserted Patent are being produced. Because of the U.S. Supreme Court's 2014 *Alice Corp. v. CLS Bank International* opinion, Dragon's business environment became very difficult and the NPE patent enforcement business model because almost unsustainable. To this day, Dragon still believes the strength and value of its Asserted Patent. But as litigation is inherently risky, Dragon could not control its bad lucks.  Dragon, did, however, tried its best to keep its business going by working with contingency-fee based legal counsel.

Plaintiff's investigation is ongoing and Plaintiff reserves the right to supplement or amend these responses based on additional discovery and investigation.

**INTERROGATORY NO. 3:**

Explain Dragon's efforts to maintain sufficient regard for corporate formalities and identify any documents supporting your contentions.

**RESPONSE TO INTERROGATORY NO. 3:**

Plaintiff incorporates the General Objections set forth above as if fully set forth herein. Plaintiff further objects to  this Interrogatory as vague and ambiguous particularly with respect to the term "explain."

Subject to and without waiving the objections set forth above, Plaintiff responds as follows:

Dragon has been operating as a single-member limited liability company since September 8, 2013.  It has obtained all Delaware and IRS statuses and the corresponding documents are being produced.  Dragon enacted bylaws and an operating agreement earlier on, and that document is also being produced.

Plaintiff's investigation is ongoing and Plaintiff reserves the right to supplement or amend these responses based on additional discovery and investigation.

Dated: August 3, 2022

DEVLIN LAW FIRM LLC

*/s/ Timothy Devlin*
Timothy Devlin (No. 4241)
1526 Gilpin Avenue
Wilmington, DE 19806
Phone: (302) 449-9010
tdevlin@devlinlawfirm.com

*Attorneys for Plaintiff*
*Dragon Intellectual Property, LLC*

## CERTIFICATE OF SERVICE

It is certified that a copy of the foregoing has been served on Defendant via electronic

mail transmission addressed to the person(s) below:

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Rodger D. Smith II
rsmith@morrisnichols.com
Lucinda C. Cucuzzella
ccucuzzella@morrisnichols.com

BAKER BOTTS L.L.P.
G. Hopkins Guy III
hop.guy@bakerbotts.com
Bradley Bowling
brad.bowling@bakerbotts.com
Ali Dhanani
ali.dhanani@bakerbotts.com
Jamie R. Lynn
jamie.lynn@bakerbotts.com

LILAW INC.
J. James Li
lij@lilaw.us

FREITAS & WEINBERG LLP
Robert E. Freitas
rfreitas@fawlaw.com

Dated: August 3, 2022

/s/ Timothy Devlin
Timothy Devlin (No. 4241)

# EXHIBIT C

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF DELAWARE

3  DRAGON INTELLECTUAL          )
   PROPERTY, LLC,               )
4                               )
              Plaintiff,        )   Case No.:
5                               )   C.A.No.13-2066(RGA)
     v.                         )
6                               )
   DISH NETWORK, L.L.C.,        )
7                               )
              Defendants.       )
8  _____ )

9

10

11

12          DEPOSITION OF KAI ZHU

13          November 8, 2022

14              8:57 a.m.

15          Palo Alto, California

16

17

18

19

20       REPORTED BY:

21       Tammy Moon, CSR No. 13184, RDR, CRR

22

23

24       Job #:218935

25

1  you able to meet with anybody in preparation for
2  today's deposition?
3      A.   No.
4      Q.   Did you discuss this deposition with
5  anybody on the phone?
6      A.   No.
7      Q.   What about email?
8      A.   No.
9      Q.   Did you communicate with Tim Devlin about
10 this deposition at all?
11     A.   Not since I received your notice.
12     Q.   Okay.  And after receiving that notice, did
13 you two prepare for the deposition together at all?
14     A.   No.
15     Q.   And what about Freitas?  Were you able to
16 contact Freitas?
17     A.   No.
18     Q.   Did you email or call Freitas before this
19 deposition?
20     A.   No.
21     Q.   Okay.  Do you know if Freitas is aware of
22 the deposition?
23     A.   I have no idea.
24     Q.   Did you leave him any voice mails?
25     A.   No.

1      Q.   Okay.  What can you tell us about the
2  documents that you reviewed in preparation for the
3  deposition?
4      A.   I just kind of -- just reviewed the
5  document that I produced -- that Dragon produced.
6      Q.   Did you review the topics that were listed
7  in the amended notice?
8      A.   Yes.
9      Q.   Okay.  Actually, let's go ahead and turn to
10 that real quick, and I'll mark that as an exhibit.
11 I see that you have a copy in front of you, but I'm
12 going to hand you one that's marked.
13     A.   Sure.
14     Q.   Give me just one moment.
15          (Brief pause.)
16     Q.   Okay.  Mr. Zhu, this is DISH's notice of
17 deposition to Dragon.  This was filed on May 5th,
18 2022, and I'm marking this as Exhibit 1.
19          (Exhibit 1 was marked for identification.)
20     Q.   Can you take a look at that briefly.
21     A.   Thank you.
22     Q.   Do you recognize the document?
23     A.   Yes.
24     Q.   All right.  Does that accurately reflect
25 the notice that you had received?

1      A.   I think so.
2      Q.   All right.  Can you turn to page nine of
3  Exhibit 1.
4      A.   Yes.
5      Q.   Do you see the topics that are listed
6  there?
7      A.   Yes.
8      Q.   Did you review each of those topics when
9  you were preparing for this deposition?
10     A.   Kind of.
11     Q.   What do you mean "kind of"?
12     A.   I just reviewed it, yes.
13     Q.   Okay.  So what about the interrogatories
14 that you had answered in this case?  Do you remember
15 answering any of DISH's interrogatories?
16     A.   Yes, but that was a while ago.  At that
17 time, that --
18          (Reporter clarification.)
19     A.   The counsel, my prior counsel, recently
20 withdrew -- they just filed the answer -- the
21 response, I should say.
22     Q.   So did you -- did you draft those
23 responses?
24     A.   I -- yes, I reviewed -- draft and reviewed,
25 yes.

1      Q.   All right.  Well, I'm actually going to
2  hand you a copy real quick.  I'm going to mark this
3  as Exhibit 2.
4          (Exhibit 2 was marked for identification.)
5      Q.   And these are Dragon's responses to DISH'S
6  second set of interrogatories.  And I believe that
7  you had served these -- when was it?  On August 3rd,
8  2022.
9          So here.  Can you take a look at that and
10 tell me if you recognize it.
11          (Brief pause.)
12     A.   Yes.
13     Q.   Okay.  So did you supply these answers to
14 Devlin --
15     A.   Yes.
16     Q.   So he didn't supply these answers to you?
17     A.   Dragon supplied such information, yes.
18     Q.   I see.  Okay.
19          Did you review any documents to help you
20 answer those interrogatories?
21     A.   Yes.
22     Q.   Which documents did you review?
23     A.   The documents I produced to you.
24     Q.   Okay.  Were there any other documents that
25 you had reviewed to help you answer those

Page 30

1  interrogatories?
2      A.   No.  If there was, I would have produced
3  them.
4      Q.   I see.
5      A.   Because I'm no longer in possession of
6  those documents, if there was any.
7      Q.   Okay.  Did you review these answers that
8  you provided to prepare for today's deposition at
9  all?
10     A.   Yes.
11     Q.   All right.  What about your request for
12 admissions?  Let's turn to those now.
13          So I'm going to mark these as Exhibit 3.
14          (Exhibit 3 was marked for identification.)
15     Q.   These are Dragon's responses to DISH'S
16 first set of request for admission.  And these, I
17 believe, you served on the same day: August 3rd,
18 2022.  Do you recognize this document?
19     A.   Yes.
20     Q.   All right.  So did you prepare these
21 admissions with anybody's help?
22     A.   No.
23     Q.   Did you work with Tim Devlin at all to
24 prepare those admissions?
25     A.   They kind of just formatted and make the --

Page 31

1  just kind of editorial change.  But Dragon supplied
2  the substance.
3      Q.   Okay.  Did you review any documents to help
4  you prepare those responses?
5      A.   Yes.
6      Q.   Were those the documents that you had
7  produced in this case?
8      A.   I produced everything that I had.
9      Q.   Okay.  Let's go ahead and move on, then, to
10 the request for production.
11          So for the record, Exhibit 4 is Dragon's
12 response to DISH's second set of request for
13 production.  And these also were served on the same
14 day: August 3rd, 2022.
15          (Exhibit 4 was marked for identification.)
16     Q.   Mr. Zhu, can you take a look at that and
17 tell me if you recognize it.
18          (Brief pause.)
19     A.   Yes.
20     Q.   Did you work with Tim Devlin to prepare the
21 responses to these requests for production?
22     A.   I think so.
23     Q.   Did you provide all documents that you had
24 in your possession that were responsive to those
25 requests?

Page 32

1      A.   I think if there was anything, yes, I did.
2      Q.   Okay.  So are you withholding any documents
3  for privilege?
4      A.   No.
5      Q.   There are no documents that you are
6  withholding in this case based on privilege?
7      A.   Let me just make sure of that.
8          Actually, anything regarding the Request
9  for Production No. 7 and any litigation, financing,
10 this document would privilege.
11     Q.   Okay.  So you do have documents that are
12 responsive to those requests that you did not
13 produce?
14     A.   Right.
15     Q.   And can you describe those documents
16 briefly.
17     A.   Yes.  They were related to the contingency
18 fee agreement between Dragon and its prior counsel,
19 the Freitas firm.
20     Q.   Okay.  Anything else?
21     A.   No.
22     Q.   You mentioned third-party funding or
23 third-party financing.  Do you have any documents
24 relating to that topic that you are withholding?
25     A.   Well, like I said, it was between Dragon

Page 33

1  and the Freitas firm.  So I'm not sure what you mean
2  by "third party."  There were two parties.
3      Q.   So outside of Freitas, there was no other
4  party that was involved in financing the litigation?
5      A.   No.
6      Q.   Okay.  Are you withholding any other
7  documents for any other -- other objections?
8      A.   Well, that -- that was per litigation due
9  diligence -- just due diligence research.  And
10 before Dragon just obtained the full contingency
11 agreement with Freitas firm, Dragon did contact
12 other law firms -- actually, quite some of them.
13          But all the nonprivileged communications
14 were also produced early in the case.  And I do not
15 have those documents anymore.
16     Q.   Okay.  So there were communications with
17 other law firms besides Freitas?
18     A.   Correct.
19     Q.   Early on in the lawsuit, you are saying,
20 correct?
21     A.   Before the lawsuit.
22     Q.   And was that while you were searching for
23 counsel?
24     A.   Correct.
25     Q.   I see.

Page 34

1        We'll get more into that a little bit
2   later, but let's go over your document collection
3   efforts for a second.  Let's see?
4        Can you tell us where you searched for your
5   documents.
6   A.   Well, previously, it was all the documents
7   -- the documents that I referred to were in our
8   email communications in the dragonipllc.com domain.
9   And that domain was shut down a few years ago.
10  Q.   When you say "a few years ago," could you
11  be more specific.
12  A.   I don't remember exact date but -- because,
13  essentially, Google just canceled the domain.
14  Q.   Would you estimate that to be less than
15  five years ago?
16  A.   I think so.
17  Q.   So it was after this lawsuit began, right?
18  A.   It was before -- it was, yes, after this
19  began and after the appeal was over, the substantive
20  appeal of the case was over, because Dragon did not
21  have sufficient funds to maintain anything.  So it
22  was kind of just --
23       (Reporter clarification.)
24       (Reporter admonition.)
25  A.   So Dragon could not -- Dragon essentially

Page 35

1   went broke, so the domain was taken away by Google.
2   Q.   All right.  It was taken away because you
3   weren't paying Google.  Is that right?
4   A.   Right.
5   Q.   So did Dragon institute what's called a
6   litigation hold after this lawsuit began?
7   A.   Yes.
8   Q.   Okay.  And that domain that you just
9   described, did that have documents that were
10  relevant to this litigation?
11  A.   It had email, but I believe all those were
12  already produced in earlier cases.  The -- just
13  everything that could or should be produced, already
14  produced.  Actually, I believe -- because the case
15  went through a few years of substantive litigation.
16       At that time, Dragon produced whole bunch
17  of documents, including all the due diligence study,
18  everything, to your firm -- I mean to your client.
19  You're counsel.  So it should be in the case
20  already.
21  Q.   Okay.  So other than the email address that
22  was used in connection with the dragonllc.com, were
23  there any other email addresses that you had used
24  whenever you were working with -- or as Dragon?
25  A.   That was the Panda IP LLC.  Because after

Page 36

1   Dragon domain was taken away, the only domain I had
2   for communication was pandaipllc.com.
3   Q.   Okay.  And did you store the emails that
4   were used in connection with your Dragon domain
5   anywhere else?
6   A.   No.  I think when the Freitas firm -- they
7   produced backup documents that they produced earlier
8   to you.  So I think I still have that --
9   Q.   Okay.
10  A.   -- as a record.
11  Q.   So I guess what I'm asking is did you save
12  the emails that were used in connection with your
13  Dragon domain to any other location?  Any, like,
14  centralized folder or database, anything like that?
15  A.   I think there was a folder for all the
16  emails, but I'm not sure because it was not very
17  searchable, because after -- essentially, Google,
18  just before they -- they asked the owner to move
19  that into a -- kind of just somewhere in the cloud
20  location but just as searchable as a real email
21  server.
22  Q.   Right.  Do you still have access to it?
23  A.   I think I do.
24  Q.   Okay.  And did you search through those
25  emails when you were responding to the most recent

Page 37

1   request for production?
2   A.   Yes.
3   Q.   More specifically, you searched through the
4   emails that were used in connection with the Dragon
5   domain for responsive documents for the recent RFPs?
6   A.   Right.
7   Q.   Did you also search through your Panda
8   email address?
9   A.   Yes.
10  Q.   Okay.  Were there any other email addresses
11  that you used in connection with Dragon?
12  A.   No.
13  Q.   Do you have a personal email separate from
14  those two that you mentioned?
15  A.   I do have personal emails.
16  Q.   Okay.  Did you ever communicate with
17  Freitas through those personal emails?
18  A.   That, I cannot remember.  But I intend not
19  to do that.  But I cannot guarantee I never did
20  that.
21  Q.   Which email addresses do you have?
22  A.   It's a personal Gmail account.
23  Q.   What's it called?
24  A.   It's called the.kai.zhu@gmail.com.
25  Q.   What was the last?  It was T-H-E --

Page 70

1    Q.   Okay.
2    A.   It is just for my own convenience, right?
3    Q.   Did you also keep a history of Dragon's
4  financial transactions in that same place?
5    A.   I think so, but there was not much
6  transaction other than the contingency fee agreement
7  and the initial purchase.
8    Q.   Okay.  So the contingency fee agreement,
9  that document was saved along with your bylaws --
10   A.   Yes.
11   Q.   -- and your certificate of formation?
12   A.   Yes.
13   Q.   Dragon's tax returns or tax filings, were
14  those also saved together with those documents or
15  were those separate?
16   A.   Well, because -- this is LLC, so it did not
17  get separate filing.  It incorporates -- it has -- I
18  don't recall the IRS specific form, but there's a
19  separate listing as an entry into my personal
20  filing.
21   Q.   That's as a sole member LLC, right?  A
22  disregarded entity?
23   A.   I -- I don't remember because I'm not tax
24  expert.  I filed through TurboTax.  I think there is
25  -- it's a category for that, but I cannot tell for

Page 71

1  sure.
2    Q.   I see.
3         Before Jing Sun had transferred her
4  ownership interest to you, it was a partnership,
5  right?
6    A.   It was in name only.  So from the very
7  beginning, this was meant to be -- I will be the
8  sole owner and member because she knew nothing about
9  patent law or anything.
10        So the only reason Jing Sun's name was
11  there was because, at that time, I still had a firm
12  job, for the reason I already explained to you.
13   Q.   Right.
14   A.   And as soon as I quit my firm job, you
15  know, I just officially removed her name.
16   Q.   So I guess my question is more whether or
17  not that formality was also represented to the IRS.
18  So did the IRS initially understand Dragon to be a
19  partnership or a single member LLC?
20   A.   I'm not sure that make any difference
21  because all I need to deal with IRS at that time is
22  just get the EIN number.
23   Q.   Okay.  So were you not required, then, to
24  file a Form 1065?  I think they call that also a
25  Schedule K-1.

Page 72

1    A.   No.
2    Q.   You were never required to file that?
3    A.   No.
4    Q.   Even before Jing Sun transferred her
5  ownership interest to you?
6    A.   No.
7    Q.   So while you were a partnership, you did
8  not file a 1065?
9    A.   I don't think so.
10   Q.   Okay.  So any of Dragon's tax matters were
11  commingled -- or, I guess, filed simultaneously and
12  in conjunction with your personal finances -- or
13  your personal taxes, right?
14   A.   Right.
15   Q.   Okay.  And your personal tax records, did
16  you keep those also with the copies of certificate
17  of formation, the bylaws, and operating agreement,
18  or were your tax records kept completely separate?
19   A.   Completely separate.  That's personal.  Why
20  -- they're not mixed together.
21   Q.   Okay.  And did you deduct any expenses that
22  were made on Dragon's behalf whenever you filed your
23  taxes?
24   A.   I don't -- I don't remember, but I doubt
25  it.  I don't think so because there was no expense

Page 73

1  to start with.  So --
2    Q.   The -- other than the patent?
3    A.   Right.
4    Q.   Right.  Okay.
5    A.   But patent was not deducted either.
6    Q.   Oh, it wasn't?
7    A.   Wasn't.
8    Q.   Okay.  So back to the bylaws and operating
9  agreement, Exhibit 6, did you -- did you draft this
10  yourself?
11   A.   I wouldn't say "draft."  Essentially, I
12  copied somewhere from the internet, adapted.
13   Q.   Okay.  So you had worked from a template?
14   A.   Kind of, yes.
15   Q.   Did anybody assist you with selecting the
16  template or --
17   A.   No.
18   Q.   I'm sorry?
19   A.   No.
20   Q.   Okay.  Did you make any amendments to the
21  template other than --
22   A.   I adapted it a little bit, yes.  I modified
23  it.
24   Q.   Okay.  Do you remember which parts you
25  modified in specific other than, of course, just

Page 74

1  inserting, you know, Dragon's name?
2      A.   I don't remember.  That was a long time
3  ago.
4      Q.   All right.  Did you ever amend these bylaws
5  and operating agreement?
6      A.   No.
7      Q.   Let's see.  Aside from the Bank of America
8  account that Dragon had, did it have any other
9  credit accounts or anything similar?
10     A.   Yes.  When I opened the bank account, I
11 believe they issued something like a credit card --
12 something.  But I cannot remember for sure.  I may
13 even still have some plastic cards there --
14 somewhere located.
15     Q.   But that was through Bank of America
16 exclusively?
17     A.   I believe so.
18     Q.   You didn't have, like, an American Express
19 or anything separate for Dragon?
20     A.   No, no.
21     Q.   Okay.  Can you describe the assets or the
22 capital that Dragon started with whenever it was
23 formed?
24     A.   Sure.  So at that time, I negotiated the
25 purchase price for the patent -- the patent in suit.

Page 75

1  So I thought that -- because obviously I could not
2  afford to spend my own money to enforce the patent.
3  That would be very expensive.
4      So from the very beginning, the business
5  model was clearly this had to be a full contingency,
6  even including the costs -- must be advanced by the
7  litigation counsel.
8      So I pulled some money -- more than the --
9  I believe it was a few thousand.  I don't remember
10 exactly amount -- a few thousand more than what I
11 had to use to purchase the patent.
12     And I thought that that could essentially
13 just -- and at that time, the expectation was
14 that -- because I think that deal was an extremely
15 valuable patent, and the belief was that it should
16 not take too much time to get the initial cash flow
17 coming.
18     So that part wasn't capitalized.  I
19 invested my own money initially into Dragon and used
20 the bulk of the money to acquire the patent.  And
21 there was something left as the bare minimum
22 operating expense, like a bank account or all that.
23     Q.   Okay.  So to clarify, the patent itself
24 cost -- what was it?  $30,000?
25     A.   Something -- that sounds right.

Page 76

1      Q.   And did you say that counsel had fronted
2  the cost of the litigation?
3      A.   They had to.  Otherwise, if no counsel
4  would agree to do that, that would not be easy for
5  Dragon.
6      Q.   Okay.  So let's actually refer to that
7  document real quick, the patent purchase agreement.
8      Let me -- I don't think I have handed that
9  to you just yet.  But --
10     A.   Right.
11     (Exhibit 8 was marked for identification.)
12     Q.   Okay.  Mr. Zhu, this is Exhibit 8.  It's
13 the patent purchase agreement that you produced
14 earlier in this case.  It's Bates stamped Dragon DLF
15 17 through 19.
16     Can you tell me if that's accurate.
17     A.   Yeah.  Could you clarify -- when you say
18 "produced earlier in this case," you mean recently?
19 I believe this was produced a long time ago in the
20 early district court case, right?
21     Q.   Yeah.  I just -- I meant to say that was
22 produced earlier in this case.
23     A.   Yeah.  You mean a few years ago, right?
24     Q.   Yes.  I remember this was also produced in
25 connection with our recent --

Page 77

1      A.   Right.
2      Q.   -- request just a few months ago?
3      A.   Right.
4      (Brief pause.)
5      Q.   Okay.  So you recognize the document, and
6  it's accurate to what you understand it to be?
7      A.   I do.
8      Q.   Okay.  Let's go ahead and turn -- give me
9  one moment.  Let's turn just to the first page,
10 Stamp 17, at the very bottom paragraph.
11     Do you see that you had paid -- or Dragon
12 had paid $16,000 to Camhi?
13     A.   Camhi.
14     Q.   Camhi?  Thank you.  And $14,000 to --
15     A.   Another Kamhi.
16     Q.   Another Kamhi?  Spelled differently?
17     A.   Yes.
18     Q.   Okay.  So that would be $30,000 total,
19 right?
20     A.   Correct.
21     Q.   Whenever you said that counsel had fronted
22 the costs of the litigation, was this included?
23     A.   No.
24     Q.   So the money that was spent on the patent,
25 that was fronted by Dragon specifically?

Page 78

1    A.   Correct.
2    Q.   Had it received any money from counsel to
3  assist with that purchase?
4    A.   Could not.  I mean, it's the chicken and
5  egg, right?  You have to acquire the patent first,
6  then pitch to the firm for them to believe that this
7  is a good asset.
8    Q.   I see.
9         Had you identified this patent for the
10 attorneys before you had purchased the patent at any
11 point?
12   A.   Of course not.
13   Q.   Okay.  Did you get any reimbursements from
14 your counsel for this patent after -- after you had
15 purchased the patent?
16   A.   What do you mean by "reimbursement"?  This
17 was the asset they used to litigate.  How can you
18 reimburse that?
19   Q.   So that's a no?
20   A.   No.
21   Q.   Okay.  So whenever you say that counsel had
22 fronted the costs of the litigation, can you detail
23 that a little bit more.  What costs?
24   A.   Privileged.  Privileged.
25   Q.   You are saying the costs of the litigation

Page 79

1  --
2    A.   The details are all privileged
3  communication between attorney and the client.
4    Q.   I see.
5         So instead of asking what parts they had
6  paid for, let me just ask this:  What costs were
7  incurred during the course of the litigation,
8  regardless of who paid for it?
9    A.   Again, the communication between me and my
10 counsel was privileged.  They front everything.
11   Q.   Okay.  Now, I'm not asking for any
12 communications that were delivered from counsel to
13 you or vice versa.  I'm just asking what costs there
14 were in the litigation.
15   A.   I have no idea because everything was paid
16 by the law firm, even the filing fees and so on.
17   Q.   Okay.  So did they run it by you at all?
18   A.   No.
19   Q.   Okay.  So turning now back to the patent
20 purchase agreement, am I understanding right that
21 you had money in Dragon's account and that that
22 money was used to purchase this patent?
23   A.   Could you clarify.  What do you mean by I
24 "had money"?
25   Q.   Dragon had money in its Bank of America

Page 80

1  account?
2    A.   I invest money in my personal capacity into
3  Dragon's business account.
4    Q.   Right.  And that was the money that was
5  used to purchase this patent?
6    A.   Correct.
7    Q.   So it --
8         (Reporter clarification.)
9    Q.   So it hadn't traveled through any separate
10 account or personal account.  It was only the Bank
11 of America account that Dragon owned for the
12 purchase of this patent?
13   A.   Absolutely.
14   Q.   Okay.  And, again, this was still during
15 the window when you had Jing Sun acting on Dragon's
16 behalf, rather than yourself, right?
17   A.   Correct.
18   Q.   Okay.  And that's why her signature is
19 here?
20   A.   Correct.
21   Q.   Okay.  Do you remember paying the
22 maintenance fees for the '444 patent?
23   A.   It was over at that time.  The -- it was
24 beyond the last maintenance window, so Dragon did
25 not need to pay any maintenance fee.

Page 81

1    Q.   Do you remember when the last maintenance
2  window was?
3    A.   I don't remember exactly.  But clearly, if
4  you know a little bit about patent law, the --
5  typically the third term is around the 11th -- half
6  a year in the life of the patent.  At that point, I
7  believe that the patent already paid for the last --
8  just maintenance fee.  So there's nothing to
9  maintain.
10   Q.   Okay.  So there were -- am I understanding
11 right that there were no other costs that were
12 required to -- well, for this patent?
13   A.   Correct.
14   Q.   Okay.  So the only other costs that were
15 involved were strictly as a part of the litigation?
16   A.   I believe that was -- I went through a
17 supplemental exam and some PTO work, and there was
18 some costs.  And I believe that every cost -- but no
19 too much because -- jut kind of just -- maybe couple
20 hundred, that kind of PTO fee.
21        Whenever there was a fee, they used the
22 Dragon account because I was careful to maintain the
23 corporate formality.  As a lawyer, I understand the
24 significance of that.  So everything was taken care
25 of carefully.

Page 86

1    Q.   Okay.  So we already have them?
2    A.   Right.  I thought that you were asking how
3  we came up with the infringement contention.  Was
4  that your question?
5    Q.   Oh, my question was more whether or not you
6  had drafted them --
7    A.   Yeah.  That was part of the communication.
8    Q.   The fact of whether you drafted them or
9  whether your lawyer drafted them?
10   A.   No.  The -- there was some kind of detailed
11 discussion.  If you were asking for that --
12   Q.   Oh, okay.
13   A.   If you -- okay.  Could you clarify your
14 question.
15   Q.   Yes.  I'm asking who drafted the
16 infringement contentions.  I'm not asking for the
17 communications between you and your lawyers.
18   A.   Okay.  Well, essentially, it was me
19 initially.  But they did some modification, I
20 believe.  I mean, you always have to do some
21 modification, right?  It cannot be 100 percent
22 carbon copy of whatever I draft.  So initially, I
23 drafted it.
24   Q.   When did you draft them?
25   A.   Even before I hired them.

Page 87

1    Q.   Was that part of the claim charts that you
2  were describing earlier?
3    A.   Right.
4    Q.   Was that part of your pitch to the law
5  firms when you were trying to find -- find counsel?
6    A.   Of course.
7    Q.   I see.  Okay.
8         So what about the claim construction
9  briefing?  Whenever we had approached the claim
10 construction stage of this case, did you draft those
11 documents?
12   A.   They draft it.
13   Q.   The lawyers did?
14   A.   Mm-hmm.
15   Q.   Did you make any amendments or revisions?
16   A.   We discussed it.
17   Q.   But did you amend or change anything in
18 those documents?
19   A.   We -- I provide my opinion and input.  I do
20 not actually do any amendment.  I could not.  They
21 were the lawyer.
22   Q.   I see what you are saying.
23        Okay.  And would you say the same about
24 these subsequent filings in this case?  For
25 instance, the briefing surrounding the 285 motions.

Page 88

1    A.   Yes.  They essentially just felt -- they
2  usually send me everything for review, yes.
3    Q.   Okay.  And did you make any substantive
4  changes to those?
5    A.   No, no.
6    Q.   What about the IPR proceedings?
7    A.   Both the same.  They -- they handle because
8  they asked for my opinion about some claim
9  contracting issues, technical discussions in the
10 IPR, and all that.  But I did not draft it.
11        I mean, I provided my input again, but I
12 did not actually change them.
13   Q.   Did you -- were you the one who identified
14 the experts for the IPR?
15   A.   No, I did not.  They did.
16   Q.   Okay.  Do you remember who the experts were
17 for the IPR?
18   A.   I don't remember.
19   Q.   Do you remember who the experts were for
20 the 285 briefing -- or the 285 hearing?
21   A.   No.
22   Q.   Do you remember whether or not you had
23 opposed hiring an expert for the claim construction
24 hearing?
25   A.   Oppose?

Page 89

1    Q.   Yes.  Do you remember whether you had an
2  expert for the claim construction hearing?
3    A.   I do not have expert.  They -- they -- I
4  think what happens is they made the recommendation
5  and the -- Dragon just agreed.
6    Q.   Okay.  So do you remember whether or not
7  they had recommended hiring an expert for the claim
8  construction hearing?
9    A.   I cannot remember.
10   Q.   Okay.  Let me hand you another document
11 that DISH's counsel had sent you back in 2014.  Give
12 me one moment.
13        (Exhibit 10 was marked for identification.)
14   Q.   This is Exhibit 10.  It's a letter that
15 counsel for DISH had sent the Freitas firm on
16 October 24th, 2014.  Would you mind taking a look at
17 this and telling me if you recognize it.
18        (Document handed.)
19   A.   Kind of, but this was so long ago.  I don't
20 remember exactly.  Looks familiar, but I cannot tell
21 for sure.
22   Q.   Okay.  So you can't tell us one way or
23 another whether or not you have seen this letter
24 before?
25   A.   Right.

Page 90

1    Q.  Do you believe that you have seen this
2  letter before?
3    A.  Again, I cannot remember.
4    Q.  Okay.  Do you remember whether or not you
5  had any input regarding the response to this letter?
6    A.  Well, first of all, I don't remember the
7  details.  Second of all, at that time, my role in
8  the litigation was pretty much over because my
9  practice mostly involved prelitigation study, like
10  claim charts, invalidity contentions, all those.
11        So when it comes to the substance of actual
12  litigation, I turn to my counsel for his opinion.
13    Q.  I see.
14        Let me ask this too.  I believe we covered
15  some of this early on.  But just to recap, did your
16  counsel identify any of the defendants that Dragon
17  ended up suing or did you identify all of the
18  defendants initially?
19    A.  I identified all of the defendants.
20    Q.  Okay.  Specifically including DISH?
21    A.  Right.
22    Q.  And I remember you saying that you had
23  analyzed DISH's products for infringement, right?
24    A.  Right.
25    Q.  Was there any further analysis that was

Page 91

1  conducted by you or counsel on those products after
2  the filing of the lawsuit?
3    A.  After filing the lawsuit?  No.
4    Q.  You don't know if Freitas looked at any of
5  the -- any of the accused products?
6    A.  I don't think they did.
7    Q.  Okay.  And you did not after filing the
8  lawsuit?
9    A.  No.  I -- the way it works is that I did a
10  very thorough providing of all of the potential
11  infringement products that I could possibly find
12  from internet and compiled everything and produced
13  the infringement contention chart for that.  And
14  they took over.
15    Q.  Okay.  So what about this?  Do you remember
16  there being a Markman hearing in this case?
17    A.  There must be.
18    Q.  Did you attend it?
19    A.  No.
20    Q.  Did you attend any of the hearings that
21  were conducted in this case?
22    A.  No.
23    Q.  What about the IPR?  Did you attend any of
24  the arguments that were represented there?
25    A.  Only after they withdrew, I went to an

Page 92

1  appeal of the IPR, I believe.  That was the only
2  time I went to Washington, D.C.  That's what I
3  remember.  The actual IPR in the PTO, no.
4    Q.  Okay.  And what was your -- what was your
5  role up there when you went to the appeal in DC?
6    A.  Because that time, I had to because they
7  withdrew.  I did not have any counsel.  So I just
8  personally went to -- before the board to just try
9  to save the patent from their perspective.
10    Q.  So were you actually the one that was
11  arguing before the board?
12    A.  Yes.
13    Q.  Okay.  That aside, did you attend any of
14  the hearings for the 285 issue?
15    A.  No.
16    Q.  Any other hearings at all?
17    A.  No.
18    Q.  Okay.  Do you remember how much the experts
19  in this case charged?
20    A.  I don't know.  I'm not familiar with the
21  legal issues.  That's outside my practice.  So
22  regarding those issues, I just trust my counsel's
23  opinion.
24    Q.  Including the cost specifically, right?
25    A.  Right.

Page 93

1    Q.  Okay.  How often would you meet with your
2  counsel?
3    A.  Not often.
4    Q.  Could you specify?
5    A.  Maybe a few times.
6    Q.  A "few" as in more than five or less?
7    A.  I went to their office twice or three
8  times.  That was about it.
9    Q.  And when was that?
10    A.  That was in the earlier stage of the -- I
11  mean, the first -- within the first couple of years.
12    Q.  Does that include the time when you were
13  still presenting the idea of the lawsuit to them?
14    A.  Right, right.
15    Q.  Was that one meeting that you had before
16  they had agreed to --
17    A.  Oh, yes.  We definitely met before they
18  finally agreed to just become the full contingency
19  counsel, yes.
20    Q.  And once they agreed, your estimate is that
21  you met with them two or three other times after
22  that?
23    A.  Yes.
24    Q.  Do you remember what for?
25    A.  Well, some substantive -- just discussion

Page 94

1    on the claim charts, those issues.
2         (Reporter clarification.)
3         Q.   Okay.  Whenever you were first meeting with
4    your counsel, did you -- did you expect them to
5    advise you at all regarding the strength of your
6    case?
7         A.   Advising me?  It was the other way around.
8    I firmly believed this was an extremely valuable
9    patent, and I tried to pitch the idea to them.  I
10   mean, it's not they tried to convince me this is a
11   good patent.  It was the other way around.
12        Q.   I see.
13             Did they take on any due diligence
14   themselves?  I remember you saying that you had done
15   the due diligence, the prefiling investigation.
16             Do you know if they had done any --
17        A.   Of course, they did their part.  Otherwise,
18   they wouldn't agree.
19        Q.   Okay.  As far as reviewing the prosecution
20   history of the patent, is that part of what you did
21   as part of your due diligence?
22        A.   Yes.
23        Q.   Do you know if they did separately?
24        A.   I don't know.  They must have looked into
25   it, but I don't know how they did it.

Page 95

1         Q.   Okay.  Do you remember what -- like, what
2    your counsel's reaction was whenever you had, you
3    know, presented the idea of, you know, this being a
4    valuable patent?
5         A.   They -- they were excited.  They believed
6    it was a good patent.
7         Q.   What did they say?
8         A.   This -- again, it's privileged information,
9    so I object.
10        Q.   Okay.  So you are refusing to answer the
11   question of how they reacted to you presenting the
12   idea?
13        A.   Right.
14        Q.   Okay.  Let me backtrack a little bit.
15             Okay.  We're going to pivot.  Let's go back
16   to Exhibit 2.
17             (Brief pause.)
18        Q.   Those would be your responses to the
19   interrogatories.  Okay.  Let's turn to your answer
20   for Interrogatory No. 2.
21             So do you see where it says that "Because
22   of the United States Supreme Court's 2014 Alice
23   Corporation v. CLS Bank International opinion" --
24   you said that your business environment became very
25   difficult and the NPE patent enforcement business

Page 96

1    model became almost unsustainable?
2         A.   Yeah.
3         Q.   Okay.  Can you tell us:  What impact did
4    Alice have on the -- on Dragon specifically?
5         A.   It's huge.  So basically -- before Alice,
6    there were a lot of patents lawsuits, especially
7    involving software patent and internet patent.
8    However, this '444 patent was not one of those kind
9    of patents.  But the ripple effect was huge.
10        Q.   The -- I'm sorry to interrupt.  The what?
11        A.   The ripple effect.
12        Q.   Okay.
13        A.   It spilled over, in fact.  Because of
14   Alice, all the -- just most of the NPE cases could
15   not proceed.  And that had a huge impact on my case.
16        Q.   How so?
17        A.   Just like when you sell products, if all
18   the -- just kind of -- just other products go away,
19   the field product will become very just valuable.
20   And this was the exact reverse.  Because there was a
21   huge -- just a kind of -- a number of other NPE
22   cases in the market.  So that put a lot of pressure
23   on the defendant's side.
24             And when those cases kind of disappeared,
25   now the defendants will have many more resources to

Page 97

1    fight a case like mine.
2         Q.   Okay.  So it was a question of resource
3    allocation?
4         A.   Kind of.
5         Q.   Okay.  Can you tell us whether Alice had
6    any impact on the '444 patent specifically.
7         A.   It was huge because, before Alice,
8    defendants were much less resistant in terms of
9    defending patents.  And after Alice, because their
10   pressures just were taken away, the defendants were
11   much more willing to fight to death on the other
12   cases, even for good patents.
13        Q.   Okay.  Do you remember if Alice played a
14   role in any of the filings in this case?
15        A.   Filing?  I'm not sure in this case because
16   Alice was about a one-on-one issue.  And clearly
17   there was no one-on-one issue in this patent.  So I
18   don't think -- no direct impact in terms of legal
19   issues.  But as said, there was a huge economic or
20   business perspective spillover effect.
21        Q.   So am I understanding right that it's kind
22   of a question of invigoration on the part of the
23   defendants?
24        A.   It just -- look this way.  Before Alice,
25   the market was very pro plaintiff in terms of patent

1    Q.   Okay.  How many patent applications did you
2  have drafted?
3    A.   One.
4    Q.   One.  Do you remember the title of the
5  invention?
6    A.   No, I don't because essentially, later on,
7  we abandoned that.
8    Q.   Why?
9    A.   Because it was not just -- just I decided
10  it was not a good business idea.
11    Q.   Do you remember the application number?
12    A.   I don't remember.
13    Q.   Do you have access to that information?
14    A.   It should.
15    Q.   Okay.  So if you were asked to provide
16  those records, you'd be able to do so?
17    A.   Yes.
18    Q.   Okay.  Do you remember how long you spent
19  prosecuting that application?
20    A.   I don't remember, because the counsel was
21  the same counsel to help me file the supplemental
22  examination of the '444 patent -- the same guy.
23        So I built a good relationship with him.
24  So initially after I quit my law firm job, I thought
25  that maybe I should get a patent.  But I quickly

1  stopped.  So --
2    Q.   Who was it that was helping you with the
3  prosecution of this other patent?
4    A.   I don't remember the guy's name, but you
5  should have that information because all those
6  related information was produced earlier in the
7  case.
8    Q.   Do you remember which organization or law
9  firm --
10    A.   It was a solo practitioner somewhere near
11  San Diego --
12    Q.   Okay.
13    A.   -- or Los Angeles.  I don't remember.
14    Q.   How did you pay for the prosecution of that
15  patent?
16    A.   You know, at that -- oh, yes.  Now I
17  remember.
18        At that time, I put a kind of -- just
19  budget a certain amount of money into Dragon to pay
20  for that.
21    Q.   Is that what the thousand dollars was
22  intended for?
23    A.   No.  That was separate.
24    Q.   That was a separate amount of money?
25    A.   Yes.

1    Q.   That was dedicated for the prosecution?
2    A.   Yes.  I -- I think what happened was
3  that -- initially, I think that this maybe added
4  good value to patent of Dragon.  So I invested a
5  little bit more money into Dragon.
6        But that was specifically for that
7  prosecution counsel's cost.  And after I used up
8  that money and I found that neither the idea nor
9  economic burden was worth it -- so I stopped.
10    Q.   Do you remember how much money, roughly, it
11  was total that you spent?
12    A.   Couple thousand, about, because he only
13  drafted the initial things.  We did not go very far.
14    Q.   Was it just a provisional application or --
15    A.   No, it was not provisional.  It was more
16  than provisional.  But we did not go very far.
17    Q.   I see.  Let's see.
18        The results of your due diligence, your
19  presuit investigation, did you save those materials?
20    A.   Yes.
21    Q.   So I'm talking specifically about the claim
22  charts.
23    A.   I believe I do, but they were produced in
24  the case anyway.
25    Q.   Those were produced earlier in this case?

1    A.   I mean, they were not just produced.  They
2  were actually served on the plaintiffs.
3    Q.   So --
4    A.   If --
5    Q.   The infringement contentions that were
6  served on the plaintiffs were identical to the claim
7  charts that you drafted?
8    A.   Probably not identical but very similar.
9    Q.   Okay.  And did you serve the ones that you
10  drafted, not the ones that were sent to us, as the
11  infringement contentions?
12    A.   Okay.
13    Q.   But did you produce the claim charts that
14  you had created before the lawsuit?
15    A.   Object, because every time I produce on
16  that potential counsel, it was marked privileged
17  attorney-client communication.  That was part of the
18  communication.
19    Q.   Okay.  And this -- these charts existed
20  before you had met Freitas?
21    A.   Correct.
22    Q.   And your -- help me understand your
23  objection.  You are objecting to which question?
24    A.   The only reason those documents existed in
25  the first place was because I need to send them to

Page 110

1  the potential -- even before hiring, I sent them to
2  whole bunch of firms.  Everyone get them.
3      Q.   And is that the basis for your objection?
4  That's why you are not producing those documents?
5      A.   Correct.
6      Q.   Okay.  What about PowerPoint slides?  Did
7  you create any slide decks, anything?
8      A.   No.
9      Q.   Anything other than those claim charts?
10     A.   No.
11     Q.   Okay.  So those were the only presuit
12 documents or notes that you had created?
13     A.   No.  I have some very detailed analyses,
14 incorporate everything.  More like a firm memo.  But
15 that document was only -- the only reason I had that
16 document was to send them to potential counsel.
17     Q.   So is it similar to a firm memorandum?
18     A.   Yes.
19     Q.   That was describing your --
20     A.   My research on the patent, including
21 everything.
22     Q.   Okay.  Aside from that memo and aside from
23 the claim charts -- and whenever I say "claim
24 charts," I'm talking about infringement charts.
25          Aside from those two documents, had you

Page 111

1  created or drafted anything in connection with your
2  presuit investigation?
3      A.   No, but just want to clarify the record.
4  It's not two documents.  It's a whole bunch of claim
5  charts because each product need a separate -- or
6  more than one claim chart.
7      Q.   Okay.  So let's say "categories of
8  documents."  How about that?
9      A.   Yes.
10     Q.   Anything aside from the -- the infringement
11 charts and the memorandum that you wrote?
12     A.   No.
13     Q.   Okay.  And neither of those documents were
14 produced, correct?
15     A.   Correct.
16     Q.   Because of your objection on privilege?
17     A.   Correct.
18     Q.   Okay.  In response to Interrogatory No.
19 2 -- and you can refer to that if you need.  It's
20 Exhibit 2.
21          You said that "To this day, Dragon still
22 believes the strength and value of its asserted
23 patent."
24          Can you explain that a little bit.  What
25 strength and value do you see in the '444 patent

Page 112

1  currently?
2      A.   Okay.  So first of all, this case, even
3  while it lost, I still personally believe it was
4  just held incorrectly by the judge.
5          But putting that issue aside, the reason
6  this patent, in my opinion, is extremely valuable
7  was because it was one of the founding patents in
8  the whole DVR business.  And this was exemplified by
9  the TiVo lawsuit.  I'm not sure how you are
10 familiar.
11     Q.   The TiVo lawsuit?
12     A.   Yes.  TiVo got billions of dollars,
13 essentially, on the same patent.  I compare all
14 those.  This '444 -- lots of patent, actually --
15 came up multiple times in the TiVo lawsuit.  I
16 studied all those.  I even read the -- the trial
17 transcript of the TiVo case.
18          That was in -- even in martial title, but
19 it was in the patent in Texas.  I read -- what's
20 that lawyer -- yes.  The McKool Smith guy.  I'm sure
21 you've probably heard of that.  That was a legend,
22 but maybe that was quite a -- many years ago.
23          The TiVo case was essentially -- I mean
24 exactly the same idea, except this patent predated
25 the TiVo patent.  So I firmly believe this patent

Page 113

1  was extremely valuable.
2      Q.   Okay.  So as far as the -- the fact that
3  the patent was invalidated, you still believe that
4  this patent has value because the decisions of its
5  invalidation were incorrect?
6      A.   I believe that.
7      Q.   Okay.  Let's talk about your search for
8  counsel.  You mentioned that you had reached out to
9  a number of firms.  Do you remember which firms
10 specifically?
11     A.   Too many that I can remember.  But
12 including some of the very best plaintiff firms.
13     Q.   Do you remember, like, a subset?  Any
14 representative?
15     A.   Yeah.  I just remember a few big names,
16 like McKool Smith, Susman Godfrey, all those firms.
17     Q.   Okay.
18     A.   You are from Houston.  You should know
19 Susman Godfrey.
20     Q.   I sure do.  They're next door.  What about
21 Freitas?  How did you identify Freitas?
22     A.   Well, he's one of those patent litigators
23 who went from big law firms to smaller shops to work
24 on the plaintiff's side.  So naturally, he was on my
25 list.

Page 114

1    Q.   Do you remember how you identified him
2    specifically?  Was there an advertisement on the
3    internet or --
4    A.   No.  It just -- I was in this business.  So
5    I just kind of compiled a list of potential firms
6    that I can potentially call up each of them.
7    Q.   I see.
8         And why did you choose Freitas, as opposed
9    to any of the other firms?
10   A.   Because he agreed to represent me.  It was
11   not easy.  It's just like you pitch your idea in
12   Silicon Valley to -- maybe out of a hundred bunch of
13   capitalists, maybe one or two will invest.
14   Q.   Okay.  So did any of the other firms give
15   you any positive response?
16   A.   Oh, yes.
17   Q.   Which firms?
18   A.   Susman Godfrey.  I remember.
19   Q.   What did they say?
20   A.   Object.  This is privileged -- clear
21   privileged attorney-client communication.
22   Q.   Okay.  Did -- am I understanding right that
23   your objection right now is that discussions about
24   whether or not a lawyer agreed to represent you --
25   A.   No.  You were asking, "What did they say?"

Page 115

1    Q.   Oh, let me rephrase.
2         Did they agree to represent you?
3    A.   No.
4    Q.   Did they express interest --
5    A.   Yes.
6    Q.   -- in representing you?
7    A.   Yes.
8    Q.   Okay.  Did they offer a contingency
9    agreement with you?
10   A.   Of course eventually, at the end, no,
11   because they did not agree to represent.  If they
12   made the offer, I would hire them.
13   Q.   What was it that deterred them?
14   A.   Well, they were -- because it's not a
15   black-or-white thing, right?  Before zero and one,
16   you have many values in between.  It could be .6,
17   .7, .8.  Very close to one but still not one.  Do
18   you see what I'm saying?
19   Q.   Generally.  I guess if we could get a
20   little more specific --
21   A.   Well, they spend a lot of time to -- taking
22   very hard look at the patents.  And it's just that
23   at the end, they have so many other people just
24   backing for their service.  Of course, they have a
25   lot of just choices.  So they decide to pass.

Page 116

1         But didn't mean that they did not initially
2    -- they did not spend resource on it.  It's just
3    like -- very much like a venture capital business.
4    You know what I'm talking about?  Most of them throw
5    a business proposal into just waste bucket in
6    30 seconds -- of course, on your back.  But if they
7    spent days to look into that, that's a different
8    story.
9    Q.   Right.  Yeah.  I mean, whenever you are
10   fishing, it's not like every cast is going to get a
11   bite.
12   A.   Right.
13   Q.   Were there any other bites, so to speak,
14   besides Susman?
15   A.   I cannot remember.  A lot of very strong
16   interests.  But for various reasons, most of them
17   decide to pass.  And there was one that was offering
18   something, but I did not like.  So I passed on them.
19        But other than that, I -- Freitas was the
20   first that was willing to take on the full
21   contingency basis.  And he is a very experienced
22   patent litigator from a very reputable firm, so I
23   didn't want to further wait.  And I cannot pass on
24   them.  That's why I agreed to enter into the
25   agreement.

Page 117

1    Q.   Okay.  So did I hear correctly that there
2    was no other firm that was willing to do a strict
3    contingency representation?
4    A.   It depends on the terms.  It just -- summed
5    up, the terms were not attractive to me.
6    Q.   Like a percentage, you mean?
7    A.   The strategy.  So I cannot discuss details,
8    but I would say I could have retained another firm,
9    but I decide to pass on them.
10   Q.   I see.
11        Had they extended an actual formal offer
12   for representation?
13   A.   No.
14   Q.   Okay.  Do you know if you had made it past
15   any conflicts checks with any of the firms?
16   A.   That's the first thing they would run even
17   before they take a look, right?
18   Q.   Okay.  So let me ask about the actual
19   agreement, then.  For Freitas, you told us that you
20   had secured a 100 percent, full, entire contingency
21   agreement with Freitas?
22   A.   Correct.
23   Q.   Was that represented in an engagement
24   letter or a separate contract?
25   A.   Separate contract.

Page 118

1    Q.   Okay.  Did you also sign an engagement
2 letter?
3    A.   I -- objection.  I cannot disclose the
4 details of our communication.  Everything is part of
5 our communication, and that's privileged.
6    Q.   So you are objecting that the engagement
7 letter, the initiation --
8    A.   I'm not saying one way or the other whether
9 that was an engagement letter because that involves
10 our communication.
11    Q.   So the fact of whether there was an
12 engagement letter or not, you are claiming that that
13 is privileged?
14    A.   It's part of the agreement.
15    Q.   Okay.
16    A.   I never say that was an engagement letter
17 in the first place.  You said that that was an
18 engagement letter.
19    Q.   Okay.  So I'm asking just for the fact of
20 whether or not there was an engagement letter.
21    A.   There was some agreement.
22    Q.   Okay.  And was that agreement called an
23 engagement letter or just a, you know, contingency
24 contract?  Or what was it called?
25    A.   There was only one agreement.

Page 119

1    Q.   Okay.  Was there any other document that
2 you had signed to initiate the relationship with
3 Freitas?
4    A.   That that's agreement.
5    Q.   Okay.  And do you still have that document
6 in your possession?
7    A.   Of course.
8    Q.   Okay.  And did you produce that document in
9 this case?
10    A.   No.
11    Q.   How did you receive that document?  Was it
12 just an email?
13    A.   Yes.
14    Q.   Which email address was it sent to?
15    A.   I saved a hard copy because that was the
16 most important thing for me.  I saved just
17 electronic copy on my computer.
18    Q.   Right.  Which email address did Freitas
19 send that contract to?
20    A.   Dragon IP, LLC.
21    Q.   Now, how was it -- here it is.  What
22 -- what was the nature of the contingency agreement?
23 So, like, what percentage did you -- did you agree
24 to work with him on?
25    A.   Objection.  Privileged.

Page 120

1    Q.   So I'm asking specifically about the fee
2 arrangement, not legal advice that was provided.
3 And fee arrangements -- fee agreements are not
4 privileged in the Third Circuit.
5        So I'm not asking for the advice that
6 Freitas had provided you.  Just the fee arrangement
7 that existed between you, the underlying fact.  Does
8 that make sense?
9    A.   I'm not familiar with the Third Circuit
10 law, but my understanding is that that document not
11 just contains whole bunch of other kind of -- it
12 embodies our negotiation and the discussion,
13 everything.
14    Q.   I see.
15    Q.   Okay.  So I'm not asking about the
16 negotiation or the discussion or anything like that.
17 Just the ultimate result.
18        So what percentage was Freitas entitled to
19 if you were to win in a lawsuit?
20    A.   First of all, I don't remember exactly
21 because I don't know how I can isolate that from the
22 overarching context of what we are discussing here.
23 It was part of our communication.  All I can say is
24 that whether this will be privileged or not, I'm not
25 sure.

Page 121

1        If you claim on the circuit -- what you
2 claim need to be evaluated, whether it's indeed the
3 governing law on this specific, tiny issue -- on the
4 percentage, that thing -- but all I can say is that
5 he took a big chunk.
6    Q.   Okay.  So give me one minute to gather my
7 thoughts.
8        (Brief pause.)
9    Q.   How about this:  Whenever you say "big
10 chunk," can you tell us whether that was more or
11 less than 50 percent?
12    A.   I vaguely remember there's some rules on
13 this topic, but I believe it was close to whatever
14 rules allowed him to take.
15    Q.   Was that the rules in the -- I guess the
16 model rules, the ABA?
17    A.   I don't remember.  That's a long time ago.
18 It's just that -- let me refer to it this way:  I
19 did not pay and I did not need to pay a single
20 dollar on our agreement.  So he was -- because of
21 that, he was very aggressive, which I understood.
22 I'm not paying anything.
23        So at that time, I believe that this patent
24 was really -- and that was, you know, in early -- I
25 mean, way before the Alice patent -- Alice case came

Page 122

1  down.  So I did not think that I would try to kind
2  of back-and-forth negotiate on the specific
3  percentage to me.
4        Say, between Percentage A and B, the
5  difference there was much less relevant to me.  So I
6  agreed to what he proposed.
7     Q.  Okay.  So that you wouldn't have to
8  actually pay for the costs of the litigation?
9     A.  Nothing.
10    Q.  That was your main --
11    A.  Nothing.  That was my first priority.
12    Q.  I understand.  And you said that the nature
13 of the contingency agreement, the fact that it was
14 contingency, meant that Freitas was a lot more
15 aggressive in the litigation?
16    A.  I mean, I use "aggressive."  That's a very
17 subjective opinion.  Also, I expect every counsel
18 who would agree to such a representation would
19 behave the exact same way.
20    Q.  Right.  Let's say "zealous."
21    A.  Yeah, sure.
22    Q.  So the percentage was governed by the
23 rules -- or the relevant rules of ethics, you said.
24 Was that a boundary that you had brought up or one
25 that Freitas had brought up?

Page 123

1     A.  Of course, there was back-and-forth
2  negotiation on those details.  Also, I cannot
3  disclose any of that.  But you can imagine there
4  must be some negotiation.
5     Q.  Right.  Okay.  So he wouldn't get paid
6  unless you won?
7     A.  Correct.
8     Q.  And the amount that he would get would be
9  more or less than half of the winnings?
10    A.  That -- again, this is the specific content
11 of our agreement, which was part of our
12 communication.  I cannot disclose on the privilege.
13    Q.  So I guess to be clear on that, I
14 understand your position that you think that the
15 percentage is privileged.  Regardless of whether or
16 not that's correct, I -- I mean, you have been
17 practicing law for a while.  You understand that
18 between you and Freitas, you were the client?
19    A.  Right.
20    Q.  And so you understand that the client's the
21 one that has the claim of privilege.  And so it's
22 entirely up to you whether or not you choose to
23 waive that privilege.
24    A.  But why?
25    Q.  Well, I guess -- we had discussed whether

Page 124

1  or not the Third Circuit has determined whether fee
2  arrangements are or are not privileged.
3     A.  Well, if you compel that -- maybe if you
4  get a court order to compel that, I may have to
5  produce.  But at this time, I just cannot run the
6  risk.
7     Q.  So that -- that is the why.  You had asked
8  why you might want to disclose it.
9        If you are saying that we need to go
10 through more filings, a motion to compel, a court
11 order to extend this thing, you know, all the way
12 past that point, I mean, we'll consult with our
13 client whether or not that's something that they
14 want to do.
15    A.  Sure.
16    Q.  But the other option, if you elect to waive
17 it here, I guess that's in your hands.  That's your
18 call.
19    A.  I refuse to do that.
20    Q.  Okay.
21    A.  Unless you give me something in return.
22 Why would I give up something for free?
23    Q.  Oh, no.  I'm not here necessarily to
24 negotiate.  It's just kind of --
25    A.  I understand.  That's why I'm telling you.

Page 125

1     Q.  Okay.  So let me ask this:  Did you ever
2  end up paying anything to Freitas at any point?
3     A.  No.
4     Q.  No retainer agreement or retainer fee, I
5  guess?
6     A.  No.
7     Q.  Okay.  And, again, as far as the expert
8  goes, are the experts that were used in the IPR --
9  Freitas was the one who paid those, you said, right?
10    A.  Correct.
11    Q.  Okay.  And same with the experts that were
12 used for the 285 hearing?
13    A.  Correct.
14    Q.  Okay.  Give me one moment to collect my
15 thoughts.
16    A.  Sure.
17    Q.  Actually, you know what?  We're right at
18 about 11:40.  Why don't we take our break right now.
19        (Lunch break taken.)
20    Q.  Mr. Zhu, during the lunch break, did you
21 communicate with anybody?
22    A.  No.
23    Q.  Had you sent any text messages or phone
24 calls or emails?
25    A.  No.

Page 126

1     Q.   All right.  And is your phone currently
2 off?
3     A.   Correct.
4     Q.   Let's go ahead and turn to Exhibit 10
5 briefly.
6          This is the letter that was sent on October
7 24th, 2014, early on in this case.  Do you generally
8 understand the contents of this letter?
9     A.   Yes.  It's about some legal argument.
10    Q.   Could you explain a little bit.
11    A.   It says what it says.  What do you mean by
12 "explain"?
13    Q.   So do you understand this letter to be
14 notifying you that if Dragon was to pursue the
15 litigation, that DISH would pursue attorney's fees
16 under 35 U.S.C. 285?
17    A.   It looks like it states that.
18    Q.   On page six, the last paragraph, maybe?
19    A.   Right.
20    Q.   Had you considered dropping the lawsuit
21 after receiving this letter?
22    A.   I did not understand the law of 285 that
23 much because it was kind of out of my practice area.
24 So at that time, I did not think that was -- more,
25 like, just kind of routine -- kind of just -- thing.

Page 127

1     Q.   Did you read through the letter whenever
2 you received it?
3     A.   I think I did.
4     Q.   Do you know if Freitas had asked you if you
5 wanted to settle the lawsuit or drop the lawsuit
6 after receiving this letter?
7     A.   Not at that time.
8     Q.   Did he at any time?
9     A.   Well, this involves our, again, privileged
10 communication.
11    Q.   I see.
12         Did you, at any point after receiving this
13 letter -- if not immediately after receiving this
14 letter -- did you consider dropping the lawsuit on
15 your own accord?
16    A.   No.
17    Q.   Let's talk for a second about the claim
18 construction.  Do you remember reviewing Judge
19 Andrews's order about claim construction?  His
20 Markman order.
21    A.   I vaguely remember that.
22    Q.   Do you remember Freitas withdrawing shortly
23 after?
24    A.   Not after the Markman, right?  I don't
25 remember the -- the timeline.  So that was quite

Page 128

1 several years ago.
2     Q.   Right.  Do you know if the Markman order
3 was a motivating factor for Freitas terminating his
4 representation of Dragon?
5     A.   I believe so.
6     Q.   Do you know if there's any other reason why
7 Freitas wanted to withdraw from the suit?
8     A.   Not that I can think of.
9     Q.   Okay.  So your best guess is the -- excuse
10 me.
11         Your best guess is the Markman order, the
12 adverse claim construction ruling?
13    A.   Right.
14    Q.   Okay.  Were there any other disagreements
15 between you and Freitas around the time where he
16 withdrew?
17    A.   Disagreement?  On what?
18    Q.   Yes.  What did Freitas tell you about why
19 they were withdrawing?
20    A.   They just said that was a hard loss.
21    Q.   The Markman order?
22    A.   Mm-hmm.
23    Q.   And how did you react to that?  Were you
24 surprised?
25    A.   I saw that, by definition, Markman was a

Page 129

1 legal issue.  And there's a separate court case on
2 that.  The Court decided.  But legal issue, you have
3 to litigate through it.  And that's why we appealed.
4     Q.   The claim construction ruling, you
5 appealed?
6     A.   Yes, I believe -- I believe we had
7 appealed.
8     Q.   Okay.  Well, whenever Freitas said that he
9 was withdrawing, did that bother you?
10    A.   Of course it bothered me.
11    Q.   Why?
12    A.   Because I believed that we had a good case,
13 and they kind of just dropped the ball -- did not
14 handle it well.
15    Q.   What part did they not handle well?
16    A.   I think they were kind of just not up to my
17 expectation in terms of the way they litigated the
18 case.
19    Q.   How so?
20    A.   They did not have a single person having
21 the technical expertise on the case.  So they did
22 not brief the issue well.
23    Q.   Brief which issue specifically?  The claim
24 construction issue?
25    A.   Yes.

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DRAGON INTELLECTUAL PROPERTY, LLC,   )
                                     )
            Plaintiff,               )
                                     )
      v.                             )   C.A. No. 13-2066 (RGA)
                                     )
DISH NETWORK L.L.C.,                 )
                                     )
            Defendant.               )

## DISH'S SECOND SET OF LIMITED REQUESTS FOR PRODUCTION

Pursuant to Rules 26, 34, and 69 of the Federal Rules of Civil Procedure, Defendant DISH Network L.L.C. ("DISH" or "Defendant") requests that Plaintiff Dragon Intellectual Property, LLC ("Plaintiff" or "Dragon") respond to the following Requests for Production under oath within 30 days of service or, to the extent possible, at an earlier date to be agreed upon.

To the extent any of these Requests for Production may be supplemented, changed, or otherwise affected by information acquired by Dragon subsequent to the service of its responses, Defendant directs Dragon to promptly serve supplemental responses Reflecting such changes pursuant to Rule 26(e) of the Federal Rules of Civil Procedure.

## DEFINITIONS

The words and phrases used herein shall have the meanings ascribed to them under the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Delaware.  In addition, the following terms shall have the meanings set forth below whenever used herein:

1.      "Defendant" shall mean DISH Network L.L.C. and any and all predecessors, successors, divisions, subsidiaries, or joint ventures thereof, together with any and all parent or affiliated companies or corporations, and all past or present officers, directors,

employees, agents, attorneys, representatives, and all other Persons acting or purporting to act or that have acted or purported to have acted on behalf of any of the foregoing.

2.  "Dragon" shall Refer to Dragon Intellectual Property, LLC and its past or present parent corporations, subsidiaries, divisions, predecessors, proprietorships, joint ventures, Affiliates, Constituents, officers, managers, members, directors, employees, agents, representatives, and attorneys.

3.  "Dragon Principals" shall Refer to any Entity or Person with a monetary or ownership interest in Dragon or the outcome of the above-captioned litigation, Including, without limitation, Kai Zhu and Jing Sun.

4.  "Freitas" shall Refer to Freitas & Weinberg LLP and its past or present partners, associates, special counsel, Affiliates, Constituents, officers, directors, employees, agents, representatives, and attorneys, Including, without limitation, Robert E. Freitas, Jason S. Angell, Quynh Chi Nguyen, and Jessica N. Leal.

5.  "Constituent(s)" shall mean any owner(s), principal(s), agent(s), manager(s), board member(s), partner(s), leader(s), member(s), representative(s), and/or employee(s).

6.  "Affiliate(s)" shall mean any contractor(s), benefactor(s), debtor(s), customer(s), client(s), and/or creditor(s).

7.  "You" and Your" shall Refer to Dragon and/or the Dragon Principals.

8.  "DISH" shall Refer to DISH Network L.L.C.

9.  "Asserted Patent" or "Patent-in-Suit" shall mean U.S. Patent No. 5,930,444.

10.  "Related Patent(s) and/or Application(s)" as used herein in connection with a given patent shall mean: (i) any U.S. or foreign patent or patent application, regardless of whether

abandoned or not, that is related to the given patent or its application(s) by way of subject matter or claimed priority Date; (ii) all parent, provisional, divisional, continuation, continuation-in-part, reissue, re-examination, extension, and foreign counterpart patents and applications; (iii) any patent or patent application filed by one or more of the same applicant(s) (or his or her assignees) that constitutes or Refers to any of the application(s) that led to issuance of the given patent; and (iv) any U.S. or foreign patent application that claims priority under 35 U.S.C. §§ 119, 120, or 365.

11.     "Accused Product" shall Refer to any product, product feature, system, system feature, method, method feature, activity, service, and/or action of Defendant that Dragon contends infringes, directly or indirectly, or contributes to the infringement of the Asserted Patent, Including all products identified in Dragon's Infringement Contentions.

12.     "Prior Art" shall mean all publications, patents, physical devices, prototypes, products, uses, sales, offers for other activity concerning the subject matter of the Asserted Patent, or related United States or foreign patents, and existing on, or occurring at, a Date such as to be relevant under any subdivision of 35 U.S.C. §§ 102 or 103.

13.     "Asset(s)" shall mean any Thing, tangible or intangible, that can be used to produce positive economic value.

14.     "Liability" or "Liabilities" shall mean any financial or legal exposure.

15.     "Consideration" shall mean any Thing bargained for or exchanged.

16.     References to any natural Person shall Include, in addition to the natural Person, any agent, employee, representative, attorney, superior, or principal thereof.

17.     References to any Entity shall Include, in addition to the Entity, any officer, director, employee, partner, corporate parent, subsidiary, Affiliate, Constituent, agent, representative, attorney, or principal thereof.

18.     "And" and "or" should be understood either disjunctively or conjunctively as necessary to bring within the scope of any Topic all information that might otherwise be construed to be outside of its scope.

19.     "Any" and "all" should each be understood to Include "each and every."

20.     "Communication(s)" or "Communicate" shall mean and Include any contact or correspondence between two or more Persons, Including but not limited to written contact by letter, memorandum, e-mail, fax, note or otherwise, and conversations in face-to-face meetings, telephone conversations, or otherwise.

21.     "Date" shall mean the exact date, if known, or the closest approximation to the exact date as can be specified, Including, without limitation, the year, month, week in a month, or part of a month.

22.     "Describe," when used in relation to an act, event, instance, occasion, transaction, conversation, or Communication, shall Include: (a) stating the Date and place thereof; (b) Identifying the individual participants; (c) summarizing separately what each individual participant said or did; and (d) identifying each Document used or prepared in connection therewith or making any reference thereto.

23.     "Document(s)" shall have the same meaning and scope as the term "documents or electronically stored information" in Rule 34 of the Federal Rules of Civil Procedure, and shall Include any handwritten, printed, recorded, or graphic matter, data or data compilations, or information stored in electronic forms (Including emails) that is or has been in Your actual or constructive possession, custody, or control, regardless of the medium on which it is produced, reproduced, or stored, Including, without limitation, anything that can be classified as a "writing," "original," or "duplicate."   Any document bearing marks, Including, without

limitation, initials, stamped indicia, comments or notations not part of the original text or photographic reproduction thereof, is a separate document.

24.     "Entity" means corporation, company, firm, partnership, joint venture, association, governmental body, or agency, or Persons other than a natural Person.

25.     "Identify," when used with respect to any natural Person, means that the following information shall be provided: the Person's full name, last known home address and telephone number, last known business address and telephone number, last known title or occupation, and last known employer.

26.     "Identify," when used with respect to any Entity (Including, without limitation, corporation, company, firm, partnership, joint venture, association, governmental body or agency, or Persons other than a natural Person), means that the following information shall be provided: the full legal name of the Entity, the place of incorporation or organization, the principal place of business, and the nature of the business conducted by that legal Entity.

27.     "Include" and "Including" shall be construed in their broadest sense and shall not be limited to the illustrative example provided.

28.     "Person" shall Include, without limitation, natural persons, corporations, partnerships, business trusts, associations, and business or other entities, and any officer, director, employee, partner, corporate parent, subsidiary, Affiliate, Constituent, agent, representative, attorney, or principal thereof.  The acts of a person shall Include the acts of directors, officers, owners, members, employees, agents, attorneys, or other representatives acting on a person's behalf.

29.     "Regarding," "Referring to," or "Reflecting" are used in their broadest sense and shall mean directly or indirectly mentioning or describing, pertaining to, concerning,

constituting, evidencing, being connected with, or reflecting upon a stated subject matter, Including but not limited to the particular category identified.

30.     "Relate to," "Related to" and "Relating to" are used in their broadest sense and Include all matter relating to, Referring to, describing, discussing, depicting, identifying, evidencing, concerning, or constituting the referenced subject.

31.     "Thing" has the broadest possible meaning permitted by Rules 26 and 34 of the Federal Rules of Civil Procedure and relevant case law.

32.     "Third-Party" shall mean all Persons who are not parties to the Litigation, as well as their officers, directors, employees, agents, and attorneys.

33.     All words used herein, except those terms and phrases defined herein and those that You understand to have a specialized or technical meaning, shall be assigned all plain and ordinary meanings given the context of their use, and all specialized and technical meanings as necessary to make the discovery request inclusive rather than exclusive.

## **INSTRUCTIONS**

1.     These Requests shall apply to all Documents in Your possession, custody, or control at the present time or coming into Your possession, custody, or control prior to the Date of the production.

2.     If no Documents are responsive to a particular Request, You are to state that no responsive Documents exist.

3.     In the event You object to any Request on the ground that it is overbroad and/or unduly burdensome for any reason, respond to that Request as narrowed to the least extent necessary, in Your judgment, to render it not overbroad/unduly burdensome and state specifically

the extent to which You have narrowed that Request for purposes of Your response and the factual basis for Your conclusion.

       4.     If You decline to produce any Document or part thereof based on a claim of privilege or any other claim, Describe the nature and basis of Your claim and the information withheld in a manner sufficient to:

- disclose the facts upon which You rely in asserting Your claim;

- permit the grounds and reasons for withholding the information to be identified unambiguously; and

- permit the information withheld to be identified unambiguously.

       5.     All Documents requested are to be produced in the same file or other organizational environment in which they are maintained.  For example, a Document that is part of a file, docket, or other grouping should be physically produced together with all other Documents from said file, docket, or grouping, in the same order or manner of arrangement as the original.  Alternatively, as to each Document and Thing produced in response hereto, You shall identify the Request for Production and, where applicable, the Interrogatory number in response to which the Document or Thing is being produced.  Where a Document or Thing exists in hard copy and electronic format, You shall produce both the hard and the electronic copy.

       6.     These Requests seek all responsive Documents in their original language and, if such original language is not English, these Requests also seek English-language translations that may exist for any such Documents.

       7.     Each Document is to be produced along with all drafts, without abbreviation or redaction.

8.      These discovery Requests are continuous in nature, and You are under a duty to supplement or amend any prior responses to these Requests.

9.      These instructions incorporate all related provisions in the Court's orders and local rules, and nothing herein shall be read to conflict with any requirement or deadline set forth therein.

## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION 1.

Any Documents Reflecting Dragon's Assets and/or Liabilities since its formation, Including but not limited to any bank statements, credit card statements, balance sheets, ledgers, invoices, receipts, contracts, agreements, leases, titles, bills, mortgages, loans, liens, statements or estimates of value, accounts payable, accounts receivable, and/or any additional Documents Reflecting any Consideration that has been, was intended to be, or is to be transferred to or from Dragon.

### REQUEST FOR PRODUCTION 2.

Any Documents Relating to Dragon's formation and/or organization, Including but not limited to Dragon's articles of organization, bylaws, policies, membership agreements, management agreements, employment agreements, shareholder agreements, meeting minutes, share certificates, contracts, tax returns, corporate records, and corporate financial accounts (*e.g.*, checking accounts).

### REQUEST FOR PRODUCTION 3.

Any Documents sufficient to Identify any and all of Dragon's Constituents and Affiliates, Including but not limited to Documents sufficient to identify the whereabouts, mailing

8

addresses, email addresses, phone numbers, and/or any other contact information of each Constituent or Affiliate.

**REQUEST FOR PRODUCTION 4.**

   Any Documents supporting Your contention (if any) that Dragon maintained sufficient regard for corporate formalities.

**REQUEST FOR PRODUCTION 5.**

   Any engagement agreement, contract, and/or retainer between Dragon and Freitas, Including any contingency fee agreements or agreements Regarding the payment of costs or expenses.

**REQUEST FOR PRODUCTION 6.**

   Any Documents Reflecting any Consideration received by or intended for Freitas from Dragon or the Dragon Principals.

**REQUEST FOR PRODUCTION 7.**

   Any litigation finance or funding agreements between Dragon or the Dragon Principals and any third-party, including documents sufficient to:

- Identify all Third-Party Funders, Including any identification of the names, business and mailing addresses, phone numbers, whereabouts, or email addresses of any Third-Party Funder;

- show whether any Third-Party Funder's approval was necessary for litigation or settlement decisions in this Action, and if the answer is in the affirmative, the nature of the terms and conditions Relating to that approval; and

- show the nature of the financial interest of the Third-Party Funder(s).

## REQUEST FOR PRODUCTION 8.

Documents sufficient to show Your ability to satisfy the $1,456,273.49 judgment to DISH.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

_____
Rodger D. Smith II (#3778)
Lucinda C. Cucuzzella (#3491)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@morrisnichols.com
ccucuzzella@morrisnichols.com

*Attorneys for Defendant DISH Network L.L.C.*

OF COUNSEL:

G. Hopkins Guy III
BAKER BOTTS L.L.P.
1001 Page Mill Road
Building One, Suite 200
Palo Alto, CA  94304-1007
(650) 739-7500

Ali Dhanani
Bradley Bowling
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX  77002-4995
(713) 229-1234

Jamie R. Lynn
Lauren J. Dreyer
BAKER BOTTS L.L.P.
700 K Street NW
Washington, DC 20001
(202) 639-7700

May 10, 2022

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 10, 2022, copies of the foregoing were caused to be

served upon the following in the manner indicated:

Timothy Devlin, Esquire                                   *VIA ELECTRONIC MAIL*
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE  19806
*Attorneys for Plaintiff*

J. James Li, Ph.D.                                            *VIA ELECTRONIC MAIL*
LILAW INC.
5050 El Camino Real, Suite 200
Los Altos, CA  94022
*Attorneys for Plaintiff*

*/s/ Rodger D. Smith II*
_____
Rodger D. Smith II (#3778)

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DRAGON INTELLECTUAL PROPERTY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 13-2066 (RGA) |
| | ) | |
| DISH NETWORK L.L.C., | ) | |
| | ) | |
| Defendant. | ) | |

## **DISH'S FIRST SET OF LIMITED REQUESTS FOR ADMISSION**

Pursuant to Rules 26, 36, and 69 of the Federal Rules of Civil Procedure, Defendant DISH Network L.L.C. ("DISH" or "Defendant") requests that Plaintiff Dragon Intellectual Property, LLC ("Plaintiff" or "Dragon") admit, for the purposes of this action, the truth of the matters set forth below in writing, and serve such answers upon counsel for DISH, no later than thirty (30) days after service of these requests for admission ("Requests" and each a "Request").

## **DEFINITIONS AND INSTRUCTIONS**

DISH incorporates by reference the Definitions from DISH's First Request for Production.

The following instructions shall apply to the requests below:

1.       Each Request for Admission is to be answered fully, unless all portions of a Request for Admission are in good faith objected to, in which event the reasons for all Your objections shall be stated in detail. If an objection pertains to only a portion of a Request for Admission, or to a word, phrase or clause contained within such request, You shall state Your objection to that portion only and respond to the remainder of the request for admission, using Your best efforts to do so. Any part of a Request for Admission left unanswered will be deemed admitted in accordance with Rule 36 of the Federal Rules of Civil Procedure.

2.      If any part of any Request for Admission is objected to, set forth the basis for Your objection and respond to all parts of the Request for Admission to which You do not object, pursuant to Federal Rule of Civil Procedure 36(a).

3.      If You cannot respond to all or part of any Request for Admission after exercising due diligence to secure the full information to do so, so state and answer to the extent possible, specifying Your inability to respond to the remainder. In any partial response, state whatever information or knowledge You have concerning the unanswered portion, and detail what efforts have been taken to secure the unknown information.

4.      If You find the meaning of any terms in these requests unclear, please assume a reasonable meaning, state what the assumed meaning is, and respond to the request according to the assumed meaning.

5.      None of the definitions and instructions, or the requests set forth below, shall be construed as an admission relating to the existence of any evidence, to the relevance or admissibility of any evidence, or to the truth or accuracy of any statement or characterization in any definition, instruction, or request.

6.      These Requests for Admissions are deemed to be continuing. With respect to any of the following requests as to which You, after responding, discover or acquire additional responsive information, Plaintiff requests that You supplement Your response in accordance with Federal Rule of Civil Procedure 26(e), promptly after You discover or acquire such additional information.

7.      Each Request for Admission is to be answered fully, unless all portions of a Request for Admission are in good faith objected to, in which event the reasons for all Your objections shall be stated in detail. If an objection pertains to only a portion of a Request for

Admission, or to a word, phrase or clause contained within such request, You shall state Your objection to that portion only and respond to the remainder of the request for admission, using Your best efforts to do so. Any part of a Request for Admission left unanswered will be deemed admitted in accordance with Rule 36 of the Federal Rules of Civil Procedure.

## REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 1:**

Admit that Dragon has one member or owner: Mr. Kai Zhu.

**REQUEST FOR ADMISSION NO. 2:**

Admit that Kai Zhu has been the only member or owner of Dragon since its formation.

**REQUEST FOR ADMISSION NO. 3:**

Admit that Dragon has had no employees since its formation.

**REQUEST FOR ADMISSION NO. 4:**

Admit that Dragon has never enacted any bylaws.

**REQUEST FOR ADMISSION NO. 5:**

Admit that Dragon has never maintained company records.

**REQUEST FOR ADMISSION NO. 6:**

Admit that Dragon has never been capitalized.

**REQUEST FOR ADMISSION NO. 7:**

Admit that Dragon has never held any of its assets in a trust.

**REQUEST FOR ADMISSION NO. 8:**

Admit that, for all time since the filing of this lawsuit, Dragon's liabilities have exceeded its assets.

**REQUEST FOR ADMISSION NO. 9:**

  Admit that Dragon has no personal property.

**REQUEST FOR ADMISSION NO. 10:**

  Admit that Dragon has no real property.

**REQUEST FOR ADMISSION NO. 11:**

  Admit that Dragon has no intangible assets, other than the Asserted Patent.

**REQUEST FOR ADMISSION NO. 12:**

  Admit that Dragon has not received any funding from any third-party litigation finance or funding arrangement.

**REQUEST FOR ADMISSION NO. 13:**

  Admit that Dragon has insufficient funds or assets to satisfy the $1,456,273.49 judgment to DISH.

**REQUEST FOR ADMISSION NO. 14:**

  Admit that Dragon had a contingency fee arrangement with Freitas.

**REQUEST FOR ADMISSION NO. 15:**

  Admit that Dragon ceased being in good standing in the State of Delaware as of June 1, 2021.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

_____

Rodger D. Smith II (#3778)
Lucinda C. Cucuzzella (#3491)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@morrisnichols.com
ccucuzzella@morrisnichols.com

*Attorneys for Defendant DISH Network L.L.C.*

OF COUNSEL:

G. Hopkins Guy III
BAKER BOTTS L.L.P.
1001 Page Mill Road
Building One, Suite 200
Palo Alto, CA  94304-1007
(650) 739-7500

Ali Dhanani
Bradley Bowling
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX  77002-4995
(713) 229-1234

Jamie R. Lynn
Lauren J. Dreyer
BAKER BOTTS L.L.P.
700 K Street NW
Washington, DC 20001
(202) 639-7700

May 10, 2022

## <u>CERTIFICATE OF SERVICE</u>

        I hereby certify that on May 10, 2022, copies of the foregoing were caused to be served upon the following in the manner indicated:

Timothy Devlin, Esquire                            *VIA ELECTRONIC MAIL*
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE  19806
*Attorneys for Plaintiff*

J. James Li, Ph.D.                                  *VIA ELECTRONIC MAIL*
LILAW INC.
5050 El Camino Real, Suite 200
Los Altos, CA  94022
*Attorneys for Plaintiff*

                                        */s/ Rodger D. Smith II*

                                        Rodger D. Smith II (#3778)

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DRAGON INTELLECTUAL PROPERTY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 13-2066 (RGA) |
| | ) | |
| DISH NETWORK L.L.C., | ) | |
| | ) | |
| Defendant. | ) | |

## DISH'S SECOND SET OF LIMITED REQUESTS FOR INTERROGATORIES

Pursuant to Rules 26, 33, and 69 of the Federal Rules of Civil Procedure, Defendant DISH Network L.L.C. ("DISH" or "Defendant") hereby serves this first set of Interrogatories on Plaintiff Dragon Intellectual Property, LLC ("Plaintiff" or "Dragon"), and requests that Plaintiff serve its responses upon counsel for DISH, no later than thirty (30) days after service of these Interrogatories.

## DEFINITIONS AND INSTRUCTIONS

DISH incorporates by reference the Definitions from DISH's Second Set of Limited Requests for Production, served on May 10, 2022.

The following instructions shall apply to the Interrogatories below:

1.     These Interrogatories are continuing in nature and require supplemental or additional responses in accordance with Rule 26(e) of the Federal Rules of Civil Procedure.

2.     If you are unable to answer any of the following Interrogatories fully and completely, after exercising due diligence to secure the information necessary to make full and complete answers, so state. In addition, answer each Interrogatory to the fullest extent possible, specifying your knowledge, your inability to answer the remainder, and state whatever information of knowledge you may have concerning the unanswered portions of the Interrogatory.

3.      If you object or otherwise decline to set forth in your response any of the information requested by any Interrogatory, set forth the exact grounds upon which you rely with specificity so as to permit Defendant and the Court to determine the legal sufficiency of your objection or position, and provide the most responsive information you are willing to provide without a court order.

4.      As required by Rule 26(b)(5), if you claim that any information inquired about or document sought by any Interrogatory is privileged or protected from disclosure, then Dragon shall identify such information and set out separately a detailed description of the factual circumstance supporting Dragon's claim of privilege or protection with respect to each such document, communication, or thing, in a manner that enables Defendant to assess the applicability of the privilege or protection. Specifically, Dragon shall furnish a privilege log identifying each such document, communication, or thing for which the claim of privilege or protection is made that includes the following information:

a.   the identity of the document, communication, or thing, including the exact name and title of the document, and the number of pages, attachments, or appendices to the document, and any serial or identification numbers appearing on the document;

b.   a general description of the document, communication, or thing;

c.   the name of the writer, sender, or initiator of the document, communication, or thing;

d.   the name of all recipients of the document (including the addressees and any indicated or blind copies) or persons present at the communication;

e.   the date of the document, communication, or thing;

2

f.   the reason(s) for each objection or claim of privilege; and

g.   the identity of each person having knowledge of the actual basis, if any, on which the privilege or other ground for objection is based.

5.   The singular form of a noun or pronoun shall be considered to include within its meaning the plural form of the noun or pronoun so used, and vice versa; the use of the masculine form of a pronoun also includes within its meaning the feminine form of the pronoun so used, and vice versa; and the use of any tense of any verb also includes within its meaning all other tenses of the verb so used.

## INTERROGATORIES

**INTERROGATORY NO. 1:**

Explain Dragon's ability, or lack thereof, to satisfy the $1,456,273.49 judgment to DISH.

**INTERROGATORY NO. 2:**

Explain Dragon's efforts to initially capitalize the company and all efforts taken until present to keep the company adequately capitalized.

**INTERROGATORY NO. 3:**

Explain Dragon's efforts to maintain sufficient regard for corporate formalities and identify any documents supporting your contentions.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

_____

Rodger D. Smith II (#3778)
Lucinda C. Cucuzzella (#3491)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@morrisnichols.com
ccucuzzella@morrisnichols.com

*Attorneys for Defendant DISH Network L.L.C.*

OF COUNSEL:

G. Hopkins Guy III
BAKER BOTTS L.L.P.
1001 Page Mill Road
Building One, Suite 200
Palo Alto, CA  94304-1007
(650) 739-7500

Ali Dhanani
Bradley Bowling
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX  77002-4995
(713) 229-1234

Jamie R. Lynn
Lauren J. Dreyer
BAKER BOTTS L.L.P.
700 K Street NW
Washington, DC  20001
(202) 639-7700

May 10, 2022

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 10, 2022, copies of the foregoing were caused to be

served upon the following in the manner indicated:

| | |
|---|---|
| Timothy Devlin, Esquire | *VIA ELECTRONIC MAIL* |
| DEVLIN LAW FIRM LLC | |
| 1526 Gilpin Avenue | |
| Wilmington, DE  19806 | |
| *Attorneys for Plaintiff* | |

| | |
|---|---|
| J. James Li, Ph.D. | *VIA ELECTRONIC MAIL* |
| LILAW INC. | |
| 5050 El Camino Real, Suite 200 | |
| Los Altos, CA  94022 | |
| *Attorneys for Plaintiff* | |

*/s/ Rodger D. Smith II*

Rodger D. Smith II (#3778)

EXHIBIT G

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DRAGON INTELLECTUAL PROPERTY, LLC, | |
| Plaintiff, | |
| v. | C. A. No. 13-2066-RGA |
| DISH NETWORK, LLC, | |
| Defendant. | |

**PLAINTIFF DRAGON INTELLECTUAL PROPERTY, LLC'S RESPONSE TO DISH'S
SECOND SET OF LIMITED REQUESTS FOR PRODUCTION**

Pursuant to Fed. R. Civ. P. 26 and 33, Plaintiff Dragon Intellectual Property, LLC

("Plaintiff") hereby respond to Defendant Dish Network, LLC's ("Defendant") Second Set of

Limited Requests for Production (Nos. 1-3) (each, a "Request," collectively, the "Requests") as

follows:

**GENERAL STATEMENT**

1.     Plaintiff incorporate by reference each and every general objection set forth below

into each specific response.  The specific response may repeat a general objection for emphasis or

some other reason.  The failure to include any general objection in any specific response shall not

be interpreted as a waiver of any general objection to that response.

2.     By responding to Defendant's Requests for Production, Plaintiff does not waive

any objection that may be applicable to: (a) the use, for any purpose, by Defendant, of any

information or documents given in response to Defendant's Requests for Production; or (b) the

admissibility, relevancy, or materiality of any of the information or documents to any issue in this

case.

3.      No incidental or implied admissions are intended by the responses herein.  The fact that Plaintiff have answered or objected to any Request for Production should not be taken as an admission that Plaintiff accept or admit the existence of any "fact" set forth or assumed by such request.  Nothing in Plaintiff's objections or responses should be taken as any admission or statement regarding the appropriate scope of any claim or construction of any claim term or phrase.

4.      Plaintiff's responses to Defendant's Requests for Production are made to the best of Plaintiff's present knowledge, information, and belief.  Plaintiff reserve the right to supplement and amend these responses should future investigation indicate that such supplementation or amendment is necessary.  Plaintiff reserve the right to make any use of, or to introduce at any hearing and at trial, information or documents that are responsive to Defendant's Requests for Production, but discovered subsequent to Plaintiff's service of these responses, including, but not limited to, any information or documents obtained in discovery herein.

5.      By stating that it will provide information in response to any particular Requests for Production, Plaintiff make no representation that any such information exists.

## GENERAL OBJECTIONS

Plaintiff makes the following General Objections to every paragraph of Defendant's Second Set of Common Requests for Documents and Things to Plaintiff.

1.  Plaintiff objects to each request to the extent that it purports, through the definitions, instructions, or otherwise, to impose burdens or duties that exceed the scope of reasonable and permissible discovery under the Federal Rules of Civil Procedure or the Local Rules of Delaware.

2.  Plaintiff objects to each Request for Production that calls for privileged information, including, without limitation, information protected by the attorney-client privilege, attorney work product immunity doctrine or any other applicable privilege or immunity.  The production of any

-2-

privileged information or document by Plaintiff is unintentional, and Plaintiff do not intend to waive any applicable objection or privilege as a result of such unintentional production. Except for items Plaintiff may from time to time decide to include, Plaintiff will not log protected items in connection with or in relation to the subject of this litigation dated subsequent to its commencement.

3.   Plaintiff objects to each request to the extent that it is overbroad, unduly burdensome, oppressive, or constitutes an abuse of process, particularly when the request is unduly burdensome in view of the cost necessary to investigate weighed against Defendant's need for the information or document.

4.   Plaintiff objects to each Request for Production to the extent that it is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action, as set forth in Federal Rule of Civil Procedure 26.

5.   Plaintiff objects to each request to the extent that it might be construed as calling for a legal conclusion. Any responses or the production of documents by Plaintiff shall not be construed as providing a legal conclusion regarding the meaning or application of any terms or phrases used in the First Set of Requests for Production or Second Set of Requests for Production.

6.   Plaintiff objects to each request to the extent that it seeks information or documents already in Defendant's possession, custody, or control, or that are in the public domain and are as readily available to Defendant as they are to Plaintiff.

7.   Plaintiff objects to each request to the extent that it seeks information or documents that Defendant can obtain from other parties just as readily as from Plaintiff.

8.   Plaintiff objects to each request to the extent that it seeks information or documents beyond Plaintiff's possession, custody, or control, or that calls for Plaintiff to prepare documents or things that do not currently exist.

9.   Plaintiff objects to each request to the extent that it seeks information or documents that are cumulative or duplicative of information or documents already provided by Plaintiff.

10. Plaintiff objects to each Request for Production that calls for information prepared in anticipation of litigation or for trial absent a showing a substantial need by Defendant.

11. Plaintiff objects to each request as overbroad and unduly burdensome, harassing, or duplicative, including each request that it is unlimited in temporal scope or otherwise not limited to a time frame relevant to this litigation.

12. Plaintiff objects to each request to the extent that it seeks information or documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

13. Plaintiff objects to each request to the extent that it seeks information or documents that Plaintiff is not allowed to disclose pursuant to either a court order or pursuant to confidentiality obligations or agreements with third parties.

14. Plaintiff objects to each request to the extent that it is vague and ambiguous.

15. Plaintiff objects to each request to the extent that it is duplicative of any other request.

16. Plaintiff objects to each request to the extent that it lacks foundation or assumes facts that are incorrect or unknown to Plaintiff.

17. Plaintiff objects to each request to the extent that it seeks information or documents within the scope of Federal Rule of Civil Procedure 26(b)(4) and therefore constitutes an improper and premature attempt to conduct expert discovery.

18. Plaintiff objects to each request and to the accompanying definitions and instructions to the extent that they ask for information or documents "concerning," "regarding," or "relating to" the subject matter of the request on that grounds that such instructions, definitions, and requests are overly broad and impermissibly seek the mental impressions and thoughts of counsel in violation of the work-product doctrine.

19. Plaintiff objects to each request to the extent that it attributes any special or unusual meaning and/or scope to any technical terms or phrases.

20. Plaintiff objects to each Request for Production, and to the accompanying definitions and instructions, to the extent that they seek information or documents that Defendant can obtain from other parties just as readily as from Plaintiff.  In particular, Plaintiff object to Defendant's defining the terms "Plaintiff," "You," and "Your" to include third parties.

21. Plaintiff objects to each Request for Production with the accompanying definition "Related Patent" or "Related Patents" as overly broad, unduly burdensome, vague and ambiguous.

22. Plaintiff object to each Request for Production to the extent that it seeks information or documents that Plaintiff are not allowed to disclose pursuant to either a court order or pursuant to confidentiality obligations or agreements with third parties.

23. Plaintiff objects to each request and to the accompanying definitions and instructions to the extent that they alter the plain meaning and/or scope of any terms or phrases in any specific request and thereby render such request vague, ambiguous, overly broad or uncertain.

24. Plaintiff object to each Request for Production to the extent that it lacks foundation or assumes facts that are incorrect or unknown to Plaintiff.

25. Plaintiff incorporates these General Objections into each response herein as if fully set forth.

## DOCUMENTS AND THINGS REQUESTED

**REQUEST FOR PRODUCTION NO. 1:**

Any Documents Reflecting Dragon's Assets and/or Liabilities since its formation, Including but not limited to any bank statements, credit card statements, balance sheets, ledgers, invoices, receipts, contracts, agreements, leases, titles, bills, mortgages, loans, liens, statements or estimates of value, accounts payable, accounts receivable, and/or any additional Documents Reflecting any Consideration that has been, was intended to be, or is to be transferred to or from Dragon.

**RESPONSE TO REQUEST NO. 1:**

Plaintiff incorporates the General Objections set forth above as if fully set forth herein.

Plaintiff further objects to this Request to the extent it seeks information or documents that

Plaintiffs is not allowed to disclose pursuant to confidentiality obligations or agreements with

third parties.  Plaintiff further objects to this Request as overly broad, unduly burdensome, and

not proportional to the needs of the case, particularly in view of the cost necessary to investigate

weighed against Defendant's need for the information or document.

Subject to and without waiver of any of the foregoing, Plaintiff will produce relevant and

non-privileged documents responsive to this Request, if any such documents exist, to the extent

such documents can be located and retrieved without undue burden.  Plaintiff reserves the right

to supplement or amend the above responses in due course based on additional findings and

discovery.

**REQUEST FOR PRODUCTION NO. 2:**

Any Documents Relating to Dragon's formation and/or organization, Including but not limited to Dragon's articles of organization, bylaws, policies, membership agreements, management agreements, employment agreements, shareholder agreements, meeting minutes, share certificates, contracts, tax returns, corporate records, and corporate financial accounts (*e.g.*, checking accounts).

**RESPONSE TO REQUEST NO. 2:**

Plaintiff incorporates the General Objections set forth above as if fully set forth herein. Plaintiff further objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case, particularly in view of the cost necessary to investigate weighed against Defendant's need for the information or document.  Plaintiff further objects to this Request to the extent that it is duplicative or cumulative of other Requests.  Plaintiff further objects to this Request to the extent it seeks information or documents that Plaintiffs is not allowed to disclose pursuant to confidentiality obligations or agreements with third parties.

Subject to and without waiver of any of the foregoing, Plaintiff will produce relevant and non-privileged documents responsive to this Request, if any such documents exist, to the extent such documents can be located and retrieved without undue burden.  Plaintiff reserves the right to supplement or amend the above responses in due course based on additional findings and discovery.

**REQUEST FOR PRODUCTION NO. 3:**

Any Documents sufficient to Identify any and all of Dragon's Constituents and Affiliates, Including but not limited to Documents sufficient to identify the whereabouts, mailing addresses, email addresses, phone numbers, and/or any other contact information of each Constituent or Affiliate.

**RESPONSE TO REQUEST NO. 3:**

Plaintiff incorporates the General Objections set forth above as if fully set forth herein. Plaintiff further objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case, particularly in view of the cost necessary to investigate weighed against Defendant's need for the information or document.  Plaintiff further objects to this Request to the extent it seeks documents or information beyond Plaintiff's possession, custody, or control or that calls for Plaintiff to prepare documents that do not currently exist.

Plaintiff further objects to this Request to the extent it seeks information or documents that Plaintiffs is not allowed to disclose pursuant to confidentiality obligations or agreements with third parties.

Subject to and without waiver of any of the foregoing, Plaintiff will produce relevant and non-privileged documents responsive to this Request, if any such documents exist, to the extent such documents can be located and retrieved without undue burden.  Plaintiff reserves the right to supplement or amend the above responses in due course based on additional findings and discovery.

**REQUEST FOR PRODUCTION NO. 4:**

Any Documents supporting Your contention (if any) that Dragon maintained sufficient regard for corporate formalities.

**RESPONSE TO REQUEST NO. 4:**

Plaintiff incorporates the General Objections set forth above as if fully set forth herein. Plaintiff further objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case, particularly in view of the cost necessary to investigate weighed against Defendant's need for the information or document.  Plaintiff further objects to this Request to the extent that it purports, through the instructions, definitions or otherwise, to impose burdens or duties that exceed the scope of reasonable and permissible discovery under the Federal Rules of Civil Procedure, in particular as it seeks information and documents from persons who are not named parties in this litigation.  Plaintiff will respond consistent with the statutory requirements.  Plaintiff further objects to this Request to the extent it seeks information that is not relevant to any claim or defense raised in this lawsuit.

Subject to and without waiver of any of the foregoing, Plaintiff will produce relevant and non-privileged documents responsive to this Request, if any such documents exist, to the extent

such documents can be located and retrieved without undue burden.  Plaintiff reserves the right to supplement or amend the above responses in due course based on additional findings and discovery.

**REQUEST FOR PRODUCTION NO. 5:**

Any engagement agreement, contract, and/or retainer between Dragon and Freitas, Including any contingency fee agreements or agreements Regarding the payment of costs or expenses.

**RESPONSE TO REQUEST NO. 5:**

Plaintiff incorporates the General Objections set forth above as if fully set forth herein. Plaintiff further objects to this Request to the extent that it seeks information or documents protected by attorney-client privilege, the work-product doctrine, the common interest doctrine, or any other applicable law, privilege, or protection.  Plaintiff further objects to this Request to the extent that it is duplicative or cumulative of other Requests.  Plaintiff further objects to this Request to the extent it seeks information or documents that Plaintiffs is not allowed to disclose pursuant to confidentiality obligations or agreements with third parties.

Subject to and without waiver of any of the foregoing, Plaintiff will produce relevant and non-privileged documents responsive to this Request, if any such documents exist, to the extent such documents can be located and retrieved without undue burden.  Plaintiff reserves the right to supplement or amend the above responses in due course based on additional findings and discovery.

**REQUEST FOR PRODUCTION NO. 6:**

Any Documents Reflecting any Consideration received by or intended for Freitas from Dragon or the Dragon Principals.

**RESPONSE TO REQUEST NO. 6:**

Plaintiff incorporates the General Objections set forth above as if fully set forth herein. Plaintiff further objects to this Request to the extent that it seeks information or documents protected by attorney-client privilege, the work-product doctrine, the common interest doctrine, or any other applicable law, privilege, or protection.  Plaintiff further objects to this Request to the extent that it purports, through the instructions, definitions or otherwise, to impose burdens or duties that exceed the scope of reasonable and permissible discovery under the Federal Rules of Civil Procedure, in particular as it seeks information and documents from persons who are not named parties in this litigation.  Plaintiff will respond consistent with the statutory requirements. Plaintiff further objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case, particularly in view of the cost necessary to investigate weighed against Defendant's need for the information or document.  Plaintiff further objects to this Request to the extent it seeks information or documents that Plaintiffs is not allowed to disclose pursuant to confidentiality obligations or agreements with third parties.  Plaintiff further objects to this Request to the extent that it is duplicative or cumulative of other Requests.

Subject to and without waiver of any of the foregoing, Plaintiff will produce relevant and non-privileged documents responsive to this Request, if any such documents exist, to the extent such documents can be located and retrieved without undue burden.  Plaintiff reserves the right to supplement or amend the above responses in due course based on additional findings and discovery.

**REQUEST FOR PRODUCTION NO. 7:**

Any litigation finance or funding agreements between Dragon or the Dragon Principals and any third-party, including documents sufficient to:
- Identify all Third-Party Funders, Including any identification of the names, business and mailing addresses, phone numbers, whereabouts, or email addresses of any Third-Party Funder;

- show whether any Third-Party Funder's approval was necessary for litigation or settlement decisions in this Action, and if the answer is in the affirmative, the nature of the terms and conditions Relating to that approval; and
- show the nature of the financial interest of the Third-Party Funder(s).

## RESPONSE TO REQUEST NO. 7:

Plaintiff incorporates the General Objections set forth above as if fully set forth herein.

Plaintiff further objects to this Request to the extent that it seeks information or documents

protected by attorney-client privilege, the work-product doctrine, the common interest doctrine,

or any other applicable law, privilege, or protection.  Plaintiff further objects to this Request to

the extent that it purports, through the instructions, definitions or otherwise, to impose burdens or

duties that exceed the scope of reasonable and permissible discovery under the Federal Rules of

Civil Procedure, in particular as it seeks information and documents from persons who are not

named parties in this litigation.  Plaintiff will respond consistent with the statutory requirements.

Plaintiff further objects to this Request as overly broad, unduly burdensome, and not

proportional to the needs of the case, particularly in view of the cost necessary to investigate

weighed against Defendant's need for the information or document.  Plaintiff further objects to

this Request to the extent it seeks documents or information beyond Plaintiff's possession,

custody, or control or that calls for Plaintiff to prepare documents that do not currently exist.

Plaintiff further objects to this Request to the extent it seeks information or documents that

Plaintiffs is not allowed to disclose pursuant to confidentiality obligations or agreements with

third parties.   Plaintiff further objects to this Request to the extent it seeks information that is not

relevant to any claim or defense raised in this lawsuit.

Subject to and without waiver of any of the foregoing, Plaintiff will produce relevant and

non-privileged documents responsive to this Request, if any such documents exist, to the extent

such documents can be located and retrieved without undue burden.  Plaintiff reserves the right

-11-

to supplement or amend the above responses in due course based on additional findings and discovery.

**REQUEST FOR PRODUCTION NO. 8:**

Documents sufficient to show Your ability to satisfy the $1,456,273.49 judgment to DISH.

**RESPONSE TO REQUEST NO. 8:**

Plaintiff incorporates the General Objections set forth above as if fully set forth herein. Plaintiff further objects to this Request to the extent that it purports, through the instructions, definitions or otherwise, to impose burdens or duties that exceed the scope of reasonable and permissible discovery under the Federal Rules of Civil Procedure, in particular as it seeks information and documents from persons who are not named parties in this litigation. Plaintiff will respond consistent with the statutory requirements. Plaintiff further objects to this Request to the extent that it is duplicative or cumulative of other Requests.

Subject to and without waiver of any of the foregoing, Plaintiff will produce relevant and non-privileged documents responsive to this Request, if any such documents exist, to the extent such documents can be located and retrieved without undue burden. Plaintiff reserves the right to supplement or amend the above responses in due course based on additional findings and discovery.

Dated: August 3, 2022

DEVLIN LAW FIRM LLC

*/s/ Timothy Devlin*
Timothy Devlin (No. 4241)
1526 Gilpin Avenue
Wilmington, DE 19806
Phone: (302) 449-9010
tdevlin@devlinlawfirm.com

*Attorneys for Plaintiff*
*Dragon Intellectual Property, LLC*

## CERTIFICATE OF SERVICE

It is certified that a copy of the foregoing has been served on Defendant via electronic

mail transmission addressed to the person(s) below:

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Rodger D. Smith II
rsmith@morrisnichols.com
Lucinda C. Cucuzzella
ccucuzzella@morrisnichols.com

BAKER BOTTS L.L.P.
G. Hopkins Guy III
hop.guy@bakerbotts.com
Bradley Bowling
brad.bowling@bakerbotts.com
Ali Dhanani
ali.dhanani@bakerbotts.com
Jamie R. Lynn
jamie.lynn@bakerbotts.com

LILAW INC.
J. James Li
lij@lilaw.us

FREITAS & WEINBERG LLP
Robert E. Freitas
rfreitas@fawlaw.com

Dated: August 3, 2022

/s/ Timothy Devlin
Timothy Devlin (No. 4241)

# EXHIBIT H

**BAKER BOTTS** LLP

700 K STREET, N.W.     AUSTIN     NEW YORK
WASHINGTON, D.C.    BRUSSELS   PALO ALTO
20001              DALLAS     RIYADH
                        DUBAI      SAN FRANCISCO
TEL +1 202.639.7700   HOUSTON  **WASHINGTON**
FAX +1 202.639.7890  LONDON
BakerBotts.com

August 4, 2022

Lauren J. Dreyer
TEL: 2026397823
FAX: 2026391153
lauren.dreyer@bakerbotts.com

Timothy Devlin (No. 4241)
1526 Gilpin Avenue
Wilmington, DE 19806
tdevlin@devlinlawfirm.com

      Re:    *Dragon Intellectual Property LLC v. DISH Network L.L.C.*
               Case No: 1:13-cv-02066-RGA

Dear Mr. Devlin,

      We write to identify certain deficiencies in Dragon's responses to DISH Network L.L.C.'s First Set of Requests for Admission, Second Set of Interrogatories, and Second Set of Requests for Production, served on August 3, 2022.

      Request for Admission No. 14 sought the admission or denial of whether Dragon was represented by counsel on a contingency-fee basis. Dragon refused to admit or deny these facts, citing privilege. That information is a simple fact—it is not privileged information. This is self-evident by, for example, Dragon's admission in its response to Interrogatory No. 1, in which it explained that it had "secure full contingency-fee based legal representation." Even were this simple fact privileged (which it is not), Dragon has waived privilege as to this fact by its interrogatory responses. Request for Production Nos. 5-6 sought, among other things, the contingency-fee agreement between Dragon and its counsel, Freitas. Dragon has admitted that it had a contingency-fee agreement in place. That agreement itself is also not privileged. *See, e.g.*, *Montgomery County v. Microvote Corp.*, 175 F.3d 296, 304 (3rd Cir. 1999) (holding "attorney-client privilege does not shield fee arrangements" and "the fee agreement letter does not come within the ambit of the work-product privilege").

      Similarly, Request for Admission No. 12 sought the admission or denial of whether Dragon has received third-party litigation funding, and Request for Production No. 7 sought any litigation funding agreement. Dragon refused to admit or deny this fact, citing privilege, and has produced no such documents. But this information is also not privileged. *See, e.g.*, *Acceleration Bay LLC v. Activision Blizzard, Inc.*, No. CV 16-453-RGA, 2018 WL 798731, at *1 (D. Del. Feb. 9, 2018) (finding documents provided by plaintiff to third-party litigation funder and its counsel not privileged); *see also VLSI Tech. LLC v. Intel Corp.*, No. 18-cv-00966, D.I. 975 (D. Del. Aug. 1, 2022) (disclosing existence and names of litigation funders to public).

      Please explain why Dragon refuses to admit or deny this factual and non-privileged information and refuses to produce the requested documents.

**BAKER BOTTS** LLP

Timothy Devlin (No. 4241)                    - 2 -                    August 4, 2022

      In addition, Dragon's responses to Requests for Production Nos. 1-8 are deficient under the Federal Rules, which require Dragon to "state whether any responsive materials are being withheld on the basis of [an] objection." Fed. R. Civ. P. 34(b)(2)(C). Dragon has not done so. Although Dragon objected to each Request, it has not confirmed whether any responsive materials exist that are being withheld on the basis of its objections. Please confirm that information for each Request immediately. Please also confirm whether you are continuing to search for responsive documents or whether your search is complete. Please also confirm that you will be producing a privilege log for any documents that you are withholding on the basis of privilege, and that you will produce that privilege log by August 11, 2022 or otherwise reasonably in advance of the deposition of Dragon.

     .

                                      Sincerely,

                                        */s/Lauren J. Dreyer*

                                      Lauren J. Dreyer